**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | | |
|---|---|---|
| **CHESAPEAKE BAY FOUNDATION, INC.**<br>6 Herndon Avenue<br>Annapolis, MD 21403<br>Anne Arundel County<br><br>and<br><br>**SHORERIVERS**<br>114 South Washington Street, Suite 301<br>Easton, MD 21601<br>Talbot County<br><br>        Plaintiffs,<br>v.<br><br>**ANDREW WHEELER,** Administrator,<br>Environmental Protection Agency,<br><br>and<br><br>**ENVIRONMENTAL PROTECTION AGENCY**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460<br><br>and<br><br>**RICKEY DALE "R.D." JAMES**,<br>Assistant Secretary of the Army (Civil Works)<br>108 Army Pentagon<br>Washington, DC 20310<br><br>and<br><br>**ARMY CORPS OF ENGINEERS**<br>441 G Street NW<br>Washington, DC 20314<br><br>        Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. _____ |

## COMPLAINT FOR DECLARATORY JUDGEMENT

1.     This action arises from the defendant agencies' illegal regulatory efforts to rollback protections for our nation's waters, in conflict with the purpose and mandates of the Clean Water Act. Definition of "Waters of the United States"—recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019) ("Final Repeal Rule").

2.     Plaintiffs have also challenged the defendant agencies final rule—Navigable Waters Protection Rule—in this court. The Navigable Waters Protection Rule: Definition of "Waters of the United States", 85 Fed. Reg. 22,250 (Apr. 21, 2020) ("Final Replacement Rule"). The Agencies undertook a two-step process to repeal and replace the 2015 Clean Water Rule. First, the Agencies issued the Final Repeal Rule, which repealed the 2015 Rule defining "waters of the United States" and reinstated the 1986 regulations while the Agencies developed a new definition of "waters of the United States." Final Repeal Rule, 84 Fed. Reg. at 56,626–27. Second, the Agencies issued a regulation to replace the 2015 Clean Water Rule with the Navigable Waters Protection Rule, which would severely reduce the scope of the waters protected by the Clean Water Act. Final Replacement Rule, 85 Fed. Reg. 22,251–52.

3.     While these two actions represent step one and two of a bifurcated process to repeal and replace the 2015 Clean Water Rule, the regulatory records are distinct and the standards for repealing an existing regulation and promulgating a new regulation differ. For clarity, Plaintiffs have filed two separate complaints and intend to develop separate records for review but are amenable to coordinating future filing deadlines and motions practice between the two matters to conserve judicial resources.

4.     The purpose of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The statute aims to accomplish this by prohibiting the discharge of pollutants, including dredge and fill material, into

navigable waters without a permit to do so. 33 U.S.C. §§ 1311(a); 1342, 1344, 1362(12). The Act

defines "navigable waters" as "the waters of the United States, including the territorial seas." *Id.*

at § 1362(7). But the statute does not define "waters of the United States," which has led to decades

long efforts from the executive and judicial branches to clarify the definition, culminating in the

2015 Clean Water Rule. Clean Water Rule: Definition of "Waters of the United States", 80 Fed.

Reg. 37,054 (June 29, 2015) ("Clean Water Rule").

5.      The Clean Water Rule delineated waters to be protected by the Clean Water Act, in

order to "increase [Clean Water Act] program predictability and consistency by clarifying the

scope of 'waters of the United States' protected under the Act." Clean Water Rule, 80 Fed. Reg.

at 37,054. The Clean Water Rule established that the statute covers wetlands and tributaries "that

require protection in order to restore and maintain the chemical, physical, or biological integrity

of traditional navigable waters" in such a way that limited the case-by-case analyses the agencies

exercised prior to the Clean Water Rule. *Id.* at 37,055.

6.      The Chesapeake Bay is a waterbody that will not be restored if its wetlands and

tributaries are not protected under the Clean Water Act.  The Final Repeal Rule, by reverting

jurisdiction to the regulations existing in 1986, will ensure that the Bay is not restored.

7.      The Chesapeake Bay is the nation's largest estuary and has been declared a national

treasure.      Chesapeake      Bay      Watershed      Agreement      1      (2014),

https://www.chesapeakebay.net/documents/FINAL_Ches_Bay_Watershed_Agreement.withsigna

tures-HIres.pdf (last visited Apr. 20, 2020) ("Chesapeake Bay Watershed Agreement"). The Bay

receives half of its water from an intricate network of hundreds of thousands of creeks, headwater

streams, and rivers, and 1.5 million acres of wetlands, many of which are non-navigable tributaries,

non-tidal wetlands, and ephemeral and intermittent streams. Chesapeake Bay Program, *Facts and*

*Figures*, https://www.chesapeakebay.net/discover/facts (last visited Apr. 20, 2020); Chesapeake Bay Program, *Watershed's Non-tidal Wetlands Provide a Multitude of Benefits to the Bay*, https://www.chesapeakebay.net/news/article/watersheds_non_tidal_wetlands_provide_a_multitude_of_benefits_to_the_bay (last visited Apr. 24, 2020). Restoration of the Chesapeake Bay—as well as waters across the country—depends on a definition of "waters of the United States" that affords protection in broad terms, and the removal of headwater streams and upland wetlands from Clean Water Act coverage harms that restoration.

8.     The Chesapeake Bay has long been polluted by excess nutrients entering the Bay's tributary rivers, streams, and wetlands. Excess nitrogen, phosphorus, and sediment lead to an overabundance of algae, known as algal blooms. Algal blooms in combination with sediment block sunlight from reaching underwater grasses that serve as food and habitat for many Bay species. Once algal blooms begin to decay, the decomposition process robs the Bay of oxygen, leading to hypoxic (low oxygen) and anoxic (no oxygen) conditions in the Bay. In these low oxygen conditions, many species of commercially valuable fish and crustaceans cannot survive.

9.     To restore the Chesapeake Bay, the EPA issued the Chesapeake Bay Total Maximum Daily Load ("Bay TMDL") on December 29, 2010.  The Bay TMDL was created under the Clean Water Act by the EPA and the Bay jurisdictions of Maryland, Virginia, Pennsylvania, Delaware, New York, West Virginia, and the District of Columbia to reduce the amount of pollutants entering the Bay and its tributaries. Clean Water Act Section 303(d): Notice for the Establishment of the Total Maximum Daily Load for the Chesapeake Bay, 76 Fed. Reg. 549 (Jan. 5, 2011). The Bay TMDL set watershed wide limits on the amount of nitrogen, phosphorus, and sediment that could enter the Bay and its tributaries while still meeting the water quality standards set for the Chesapeake Bay. *See* EPA, Chesapeake Bay Total Maximum Daily Load for Nitrogen,

Phosphorus, and Sediment    (Dec. 29, 2010),    https://www.epa.gov/chesapeake-bay-tmdl/chesapeake-bay-tmdl-document [herein after "Bay TMDL"]; Bay TMDL Executive Summary,    ES-1,    https://www.epa.gov/sites/production/files/2014-12/documents/bay_tmdl_executive_summary_final_12.29.10_final_1.pdf. It is CBF's mission to save the Chesapeake Bay, by defending the Bay TMDL and ensuring compliance with its terms through state Watershed Implementation Plans (together the Blueprint).

10.     To create the Chesapeake Bay TMDL, the entire Chesapeake Bay watershed was divided into 92 individual segments with assigned waste load allocations and load allocations. Bay TMDL, ES-3; Chapter 9: Chesapeake Bay TMDLs (providing the nutrient limits for each of the 92    segment    TMDLS),    https://www.epa.gov/sites/production/files/2014-12/documents/bay_tmdl_executive_summary_final_12.29.10_final_1.pdf; Appendices Q and R (More detailed LAs and WLAs are provided in Appendix Q for annual TMDLs and in Appendix R    for    daily    TMDLs),    https://www.epa.gov/chesapeake-bay-tmdl/chesapeake-bay-tmdl-appendices. Waste load allocations are numeric pollutant limits assigned to a specific body of water for pollution coming from point sources, i.e. discrete conveyances of pollutants from permitted entities like waste water treatment plants, municipal separate storm sewer system ("MS4") permits, National Pollution Discharge Elimination System ("NPDES") permits, and dredge and fill permits. 40 C.F.R. § 130.2(h). Load allocations are numeric pollutant limits assigned to nonpoint sources of pollutants, namely agricultural and stormwater runoff. 40 C.F.R. § 130.2(g). Meeting the waste load allocations and load allocations for each of the 92 segments is essential to the recovery of the Chesapeake Bay and achieving the Bay TMDL. Removing headwater streams and adjacent wetlands from coverage under the Clean Water Act also removes those waters from coverage under

the TMDL, which lessens the ability of the Bay jurisdictions to meet the requirements of the Bay TMDL.

11.     The permitting provisions of the Clean Water Act are key to achieving the goals of the Bay TMDL, and the repeal of the 2015 Clean Water Rule reduces the number of water bodies protected by the permitting sections of the Act. For example, the 2015 Clean Water Rule expressly protected tributaries to rivers as jurisdictional waters, and extended protections to Delmarva Bays (seasonal freshwater wetlands) and pocosins (a wetland bog with sandy, peat soil) that have a significant nexus to navigable waters. Clean Water Rule, 80 Fed. Reg. at 37,071. Thousands of Delmarva Bays and pocosins dot the Delaware, Maryland, and Virginia peninsula. By repealing the 2015 Clean Water Rule, a pollution discharger would no longer need a permit to release pollutants into or dredge and fill these waters. As a result, the area of the watershed covered by discharge permits will be greatly reduced, leading to more harmful pollution entering the Bay and its tributaries, which impacts the success of the Blueprint.

12.     The 2014 Chesapeake Bay Watershed Agreement, a multi-state agreement signed by the watershed jurisdictions and federal agencies, recommitted the Bay jurisdictions and EPA to meeting the goals of the Bay TMDL. *See* Chesapeake Bay Watershed Agreement, at 16.  The Chesapeake Bay Watershed Agreement identifies wetlands as habitat to be protected: the Vital Habitats goal directs the creation or reestablishment of 85,000 acres of tidal and non-tidal wetlands and enhancing the function of an additional 150,000 acres of degraded wetlands by 2025. *Id.* at 5. The Healthy Watersheds goal also recognizes that many small watershed—likely comprised of headwater streams and healthy wetlands—are currently healthy but "at risk of degradation as the demand for local lands and resources increases." *Id.* at 9. The Chesapeake Bay Agreement directs that "100 percent of state-identified currently healthy waters and watersheds remain healthy." *Id.*

The repeal of the Clean Water Rule will hinder the achievability of the Chesapeake Bay Agreement.

13.     The Agencies arbitrarily repealed the Clean Water Rule, contrary to the plain language of the Clean Water Act, the legislative history, and the case law interpreting the Act.

14.     The Agencies repeal of the Clean Water Rule violates the Administrative Procedure Act, as the Agencies have not supported their decision with a reasoned explanation.

15.     Further, the Agencies rejected the extensive record developed to support the Clean Water Rule, including the Connectivity Report, without justification or support based in the repeal record. EPA, *Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence* (2013) (hereinafter "Connectivity Report"),

16.     Therefore, Chesapeake Bay Foundation, Inc. and ShoreRivers jointly request this court to vacate the Final Repeal Rule, as its issuance was arbitrary, capricious, an abuse of discretion and not in accordance with the law. 5 U.S.C. § 706(2)(A).

## JURISDICTION AND VENUE

17.     This action is brought pursuant to the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§701-706, which waive the defendant's sovereign immunity. This Court has jurisdiction over the plaintiff's claims under 28 U.S.C. § 1331 (federal question) and may issue a declaratory judgement and further relief pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§2201 and 2202.

18.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) and local rules because plaintiffs Chesapeake Bay Foundation and ShoreRivers reside within this District.

**PLAINTIFFS**

19.     The plaintiff organizations in this case, as well as their members, are committed to protecting "the chemical, physical, and biological integrity of the Nation's waters[,]" specifically the Chesapeake Bay and the tributaries and wetlands in the watershed. 33 U.S.C. § 1251(a).

20.     Plaintiff Chesapeake Bay Foundation, Inc. (CBF) is a 501(c)(3) non-profit organization committed to saving the Bay and keeping it saved, through the implementation of the Chesapeake Bay TMDL. CBF represents more than 300,000 members and e-subscribers across the country, and has offices in Annapolis and Easton, Maryland; Richmond and Virginia Beach, Virginia; Harrisburg, Pennsylvania; and the District of Columbia. For over 50 years, CBF has been working to restore the Chesapeake Bay and its tributary rivers and streams. CBF scientists and legal staff monitor the administration of the Clean Water Act as it relates to the health of the Chesapeake Bay.

21.     CBF and local stakeholders sued EPA to require the agency to develop the Chesapeake Bay TMDL. *Fowler v. EPA*, No. 1:09-C-00005-CKK, 2009 U.S. Dist. LEXIS 132084 (D.D.C. 2009).  This matter resulted in a settlement agreement with the United States requiring EPA to, among other things, issue the Chesapeake Bay Total Maximum Daily Load by December 31, 2010.

22.     CBF participated extensively in the development of the Chesapeake Bay TMDL and the Bay jurisdictions' Watershed Implementation Plans—collectively the Chesapeake Bay Clean Water Blueprint. The TMDL required the Bay jurisdictions to develop watershed implementation plans that explained how the jurisdictions would meet the waste load and load allocations established in the TMDL. *See supra* ¶¶ 9-10. CBF continues to participate in efforts to implement and refine the Blueprint throughout the Bay watershed. The Blueprint presents the best

example of cooperative federalism working towards the goal of restoring the Bay. However, the Blueprint goals will only be met if the Clean Water Act is properly interpreted and enforced, not weakened. Because jurisdiction under the Act is governed by federal regulations, the repeal of the Clean Water Rule harms the interests of CBF and its members.

23.     CBF as an organization is harmed by the repeal of the Clean Water Rule. CBF has spent millions of dollars restoring waterways; advocating at the local, state, and federal level for clean water protections; educating students and teachers about the value of the Chesapeake Bay and its tributaries; and filing legal actions in state and federal courts in support of water quality protections and the preservation of wetlands. The Clean Water Rule specifically identified certain waters found within the Bay watershed, e.g., headwater and ephemeral streams, Delmarva Bays and pocosins, and wetlands as covered by the Clean Water Act.  Rescission of the Clean Water Rule removes these waterbodies from Clean Water Act jurisdiction and subjects them to possible destruction or degradation.  Rescission of the Clean Water Rule will therefore harm water quality in the Chesapeake Bay.

24.     CBF operates its Education Department throughout the watershed, taking students and teachers on trips to immerse classes in Bay ecology, and learn about the threats facing its recovery. CBF spends over $4 million a year on education programming throughout the Bay watershed. CBF educators lead students and teachers on trips in wetlands areas, headwater streams, and other seasonal waters and wetlands to investigate macroinvertebrates and conduct water quality sampling. Polluted waters significantly affect the efficacy of these education trips. When waters are polluted, educators and students limit contact with the water, thereby hampering the ability of students to investigate a given waterbody. Reducing the scope of the Clean Water Act's

jurisdiction harms CBF's education department. The potential for increased pollution resulting from this rule will hamper CBF's education programming and its use of local waterways.

25.     The activities of CBF's Environmental Protection and Restoration Department are also harmed by the repeal of the Clean Water Rule. CBF conducts extensive restoration projects throughout the Bay watershed, included tree plantings to create streamside buffers and wetlands restoration projects. These restoration programs cost over a million dollars a year. Many of these stream plantings occur in areas where streams run through farms. These restoration efforts will be negatively impacted if waterbodies lose protection under the Clean Water Act. Restoration projects will become less effective if the surrounding water bodies are polluted. Decisions over where to install best management practices (or "BMPs") and other restoration projects may change if waters bodies are no longer protected by the Clean Water Act.

26.     CBF works across the watershed restoring wetlands and ephemeral or intermittent streams to reduce pollution entering the Bay's tributaries. For example, CBF restored wetlands on the Old Naval Academy dairy farm in Odenton, Maryland, which improved the ability of the wetlands to filter sediment and nutrient pollution and reduce erosive runoff velocities. CBF members and volunteers participated with CBF staff in planting vegetation associated with this project.

27.     In Virginia, CBF is working with a farm in Augusta County to remove livestock from a spring branch that originates on the property and all the surface water flowing through the property.  CBF is providing financial assistance for the project through the South River/ Christians Creek 319 TMDL program. This program will provide a well, watering system for the livestock, and will install a fencing to remove livestock access from all surface water. In total, this project will restore 6.8 acres of riparian forested buffer.

28.     CBF has been working since 2018 on a farm in Winchester, Virginia to help implement a Conservation Plan. With financial help from CBF, the farm is now installing a system of fences and water supply features that will allow them to raise animals without allowing their livestock to access the farm's streams and wetlands. When completed, their new system of BMPs will help protect 13 acres of wetlands and headwater stream riparian buffers.

29.     The repeal of the Clean Water Rule harms CBF's restoration work by weakening protections for wetlands and ephemeral streams, thereby threatening the efficacy of restoration projects across the Bay watershed.

30.     CBF members will be harmed if the repeal of the Clean Water Rule is upheld. CBF's members from across the country live near and recreate in waters of the United States and their tributaries or nearby wetlands. CBF members enjoy swimming, kayaking, boating, sailing, fishing, crabbing, bird watching, and other aesthetic and recreational pursuits in the waters of the Bays and its rivers and streams. Some of these members own property with waters that will no longer be protected by the Clean Water Act. These members are fearful that the decision to remove protections for local waterways, including tributary streams and wetlands, will lead to increased pollution in these waterways. The Final Repeal Rule therefore harms their use and interest in the Bay's waters.

31.     The Bay is an economic engine in the region, supporting robust fishing and aquaculture industries, as well as recreation and tourism industries. A compromised Bay threatens the health of those industries, and the members who rely on those industries for their income.

32.     Plaintiff ShoreRivers is a 501(c)(3) non-profit organization whose mission is to protect and restore Eastern Shore waterways through science-based advocacy, restoration, and education. ShoreRivers is headquartered in Easton, Maryland. ShoreRivers represents more than

3,500 members and supporters across the Eastern Shore. ShoreRivers has a dedicated staff of educators, scientists, restoration specialists, and advocates that focus on policies and projects that improve the health of rivers on the Delmarva peninsula. ShoreRivers staff includes four Riverkeepers who regularly patrol and monitor waterways in the Eastern Shore: the Chester Riverkeeper, the Choptank Riverkeeper, the Miles/Wye Riverkeeper, and the Sassafras Riverkeeper.

33.    ShoreRivers conducts extensive restoration work across the Delmarva peninsula in order to reduce the pollution entering local waterbodies. As of 2019, ShoreRivers installed 131 pollution reduction projects across the Eastern Shore. These restoration projects are aimed at reducing the amount of sediment and nutrients entering waterways on the Delmarva peninsula, and are threatened by the weakening of the Clean Water Act's protections. The repeal of the Clean Water Rule will harm ShoreRivers and its efforts to restore local waterways on the Delmarva Peninsula.

34.    ShoreRivers' members are harmed by the repeal of the Clean Water Rule. These members enjoy swimming, kayaking, boating, sailing, fishing, crabbing, bird watching, and other aesthetic and recreational pursuits in rivers, streams and wetlands on the Delmarva Peninsula that will be impacted by the repeal rule. Members also own property with streams and wetlands at risk of losing protection under the Clean Water Act and are concerned that pollution upstream may harm water quality on their property. Members also rely on clean water for their livelihood, through aquaculture operations on the Eastern Shore. These endeavors are threatened by the removal of streams and wetlands from Clean Water Act protections and the resulting negative effects on downstream water quality.

35.     ShoreRivers' members participate in water quality monitoring on all four of the major rivers on the Eastern Shore—the Chester, Choptank, Miles/Wye, and Sassafras rivers and their creeks and tributary streams—as part of an extensive army of volunteer citizen scientists. ShoreRivers' members care about local water quality and are harmed by the decision to remove protections for local waterways, including tributary streams and wetlands.

## DEFENDANTS

36.     Defendant Andrew Wheeler, signer of the repeal of the Clean Water Rule, is sued in his official capacity as the Administrator of the United States Environmental Protection Agency.

37.     Defendant United States Environmental Protection Agency ("EPA") is the federal agency charged with implementing the majority of the Clean Water Act. The mission of the EPA is to protect human health and the environment. The EPA should work to ensure that "Americans have clean air, land and water; … efforts to reduce environmental risks are based on the best available scientific information; [and f]ederal laws protecting human health and the environment are administered and enforced fairly, effectively and as Congress intended[.]" EPA, Our Mission and What We Do, https://www.epa.gov/aboutepa/our-mission-and-what-we-do (last visited Dec. 12, 2019). The EPA is a signatory to the Chesapeake Bay Watershed Agreement, issued the Chesapeake Bay TMDL, and is responsible for its oversight and implementation. 33 U.S.C. § 1267(g).

38.     Defendant Rickey Dale "R.D." James, who signed the repeal of the Clean Water Rule for the United States Army Corps of Engineers, is sued in his official capacity as Assistant Secretary of the Army (Civil Works).

39.     Defendant United States Army Corps of Engineers ("Corps") is the federal agency responsible for the implementation of Section 404 of the Clean Water Act—the permit program

for the discharge of dredged and fill material in the waters of the United States. 33 U.S.C. § 1344(a). The Corps is housed within the United States Army, as part of the United States Department of Defense. The Corps is subject to the Chesapeake Bay TMDL pursuant to Executive Order 13508 and is a signatory of the Chesapeake Bay Watershed Agreement.

## BACKGROUND

40.     For decades prior to the Clean Water Act, despite Congressional efforts, our waters were a dumping ground for waste. In 1972, Congress passed the Clean Water Act, a comprehensive water protection statute "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

41.     Key to the implementation of the Clean Water Act is the prohibition of discharging pollutants into navigable waters or dredging and filling wetlands without a permit to do so. 33 U.S.C. §§ 1342, 1344.

42.     The Act defines "navigable waters" as the "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). But the Act does not define "waters of the United States." The long-standing definition of "navigable waters" before the 1972 Clean Water Act included only waters that are navigable in fact, meaning the waters are "used, or … susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *The Daniel Ball*, 77 U.S. 557, 563 (1870).

43.     The legislative history of the Clean Water Act illustrates that Congress intended the definition of navigable waters to be broader than the existing definition established by *The Daniel Ball* based solely on navigability. *See United States v. Riverside Bayview Homes*, 474 U.S. 121, 132–33 (1985).  According to the Supreme Court,

Protection of aquatic ecosystems, Congress recognized, demanded broad federal authority to control pollution, for '[water] moves in hydrologic cycles and it is essential that the discharge of pollutants be controlled at the source.' S. Rep. No. 92-414, p. 77 (1972). In keeping with these views, Congress chose to define the waters covered by the Act broadly. … the Act's definition of 'navigable waters' as 'the waters of the United States' makes it clear that the term 'navigable' as used in the Act is of limited import. … Congress evidently intended to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes and to exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed 'navigable' under the classical understanding of the term. See S. Conf. Rep. No. 92-1236, p. 144 (1972); 118 Cong. Rec. 33756-33757 (1972) (statement of Rep. Dingell).

*Id.*

### *Rapanos* **and Regulatory Uncertainty**

44.     Despite the broad definition intended by Congress, the definition of "waters of the United States" repeatedly came before the courts as the Agencies attempted to implement the Clean Water Act permitting programs.

45.     The Supreme Court most recently considered the definition of the term "waters of the United States" in *Rapanos v. United States,* 547 U.S. 715 (2006). There, the Court was asked to determine whether non-navigable wetlands lying near drains or ditches that eventually emptied into traditional navigable waters constituted "waters of the United States." *Id.* at 729. The justices failed to come to an agreement, which resulted in the Court issuing a plurality opinion.

46.     In the plurality opinion, Justice Scalia proffered an interpretation of the Clean Water Act that would only protect "relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as streams, oceans, rivers, and lakes." *Id.* at 739 (internal quotations and alterations omitted). Justice Scalia's interpretation of "waters of the United States" would not include "channels through which waters flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Id.* Justice Scalia went on to explain "wetlands with a continuous surface connection to bodies that

are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands" would be considered jurisdictional under the Act. *Id.* at 739, 742. However, this narrow reading of the Act was rejected by five members of the Court, so it is not controlling.

47.     In a concurring opinion, Justice Kennedy concluded that wetlands are "waters of the United States" if the wetlands, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780. Justice Kennedy clarified that if the "wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" *Id.* Justice Kennedy's decision came to be known as the "significant nexus" test.

48.     In the dissenting opinion, Justice Stevens would have conferred jurisdiction over the wetlands under the existing interpretation or using Justice Kennedy's significant nexus test but dissented on the grounds that the existing interpretation in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985) controlled. *Id.* at 792, 808. Justice Kennedy's significant nexus test has therefore been viewed as the governing opinion to determine jurisdiction under the Clean Water Act.

49.     Importantly, Justice Roberts remarked in a concurring opinion that "no opinion command[ed] a majority of the Court on how precisely to read Congress' limits on the reach of the Clean Water Act." *Id.* at 758. This necessitated clarification from the Agencies, attempted first through guidance, and then, the 2015 Clean Water Rule.

50.     In the wake of the *Rapanos* decision, the Agencies issued a guidance memorandum to instruct the regional offices of the agencies on the implementation of the *Rapanos* decision when asserting jurisdiction over waters of the United States. *See* EPA and Corps, Clean Water Act

Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States* & *Carabell v. United States*, https://www.epa.gov/sites/production/files/2016-04/documents/rapanosguidance6507.pdf (last visited Apr. 20, 2020). The memorandum stated that the agencies would assert jurisdiction over traditional navigable waters, wetlands adjacent to traditional navigable waters, relatively permanent non-navigable tributaries of traditional navigable waters, and wetlands that abut non-navigable tributaries. *Id.* at 1. The agencies would undertake a significant nexus analysis to determine jurisdiction of non-navigable tributaries that are not relatively permanent, wetlands adjacent to non-navigable tributaries that are not relatively permanent, and wetlands adjacent to but that do not directly abut a relatively permanent non-navigable tributary. *Id.*

51.     While the Agencies provided guidance on the implementation of the Clean Water Act post-*Rapanos*, the interpretation of "waters of the United States" was still uncertain. The guidance document was expressly not a regulation, furthering the need for the Agencies to promulgate binding regulations defining "waters of the United States."

**The Clean Water Rule**

52.     In response to the *Rapanos* decision and the resulting guidance, the Agencies developed the Clean Water Rule. On April 21, 2014, the Agencies published a proposed rule to define "waters of the United States." Proposed Rule, Definition of "Waters of the United States" Under the Clean Water Act, 79 Fed. Reg. 22,188 (Apr. 21, 2014). The Agencies proposed to define certain waters as jurisdictional, which included tributaries and adjacent wetlands to traditionally navigable waters. *Id* at 22,188–89. Additionally, the Agencies proposed a smaller "other waters" category, which would undergo a case-specific analysis to determine if there was a significant nexus to traditionally navigable waters. *Id.* at 22,189.

17

53.     The Agencies supported their proposed rule with extensive science. The Agencies reviewed over a thousand peer-reviewed scientific papers that addressed the connectivity of aquatic resources and effects on downstream waters, in order to understand whether a significant nexus exists. *Id.* at 22,222. The resulting report, *Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence*, underwent extensive peer review and public comment, including review by EPA's Scientific Advisory Board. *Id.* at 22,222.

54.     The Connectivity Report came to a series of conclusions that served as the scientific underpinnings for the Clean Water Rule. First, streams and intermittent waters have a strong influence on the character and function on downstream waters. *Id.* at 22,222; Connectivity Report, at ES-2. In the proposed rule, the EPA found that "all tributary streams, including perennial, intermittent, and ephemeral streams, are *chemically, physically, and biologically connected* to downstream rivers via channels and associated alluvial deposits where water and other materials are concentrated, mixed, transformed, and transported." 79 Fed. Reg. at 22,222 (emphasis added). Second, EPA found that wetlands and open waters in riparian areas and floodplains "are chemically, physically, and biologically connected with rivers" and contribute to transport of organic matter, removal of excess nutrients, provide nursery habitat, and serve as sinks that retain floodwaters, sediment, nutrients, and contaminants that would otherwise harm downstream water quality. *Id.* at 22,223. Third, wetlands not in floodplains (vernal pools, prairie potholes, playa lakes) benefit downstream water quality through floodwater storage, nutrient retention and transformation, and groundwater recharge. *Id.*

55.     Relying on the extensive scientific evidence developed during the rulemaking process, the Agencies finalized the Clean Water Rule on June 29, 2015. The Clean Water Rule established three categories of waters to determine coverage under the Clean Water Act: (1) waters

that are jurisdictional in all instances, (2) waters that are never jurisdictional, and (3) other waters that are only jurisdictional if there is a significant nexus to a jurisdictional water. Clean Water Rule, 80 Fed. Reg. at 37,058–59.

56.     The Clean Water Rule defined jurisdictional waters, consistent with *Rapanos*, to include traditionally navigable waters, interstate waters, and territorial seas, along with impoundments of such waters. *Id.* at 37,057–58. Tributaries were also included as jurisdictional where they contribute to flow of a primary water with a bed, banks, and an ordinary high-water mark. *Id.* at 37,058. Tributaries were included because those waters "play an important role in the transport of water, sediments, organic matter, nutrients, and organisms to downstream waters." *Id.* The Clean Water Rule also included waters adjacent to jurisdictional waters—wetlands, ponds, lakes, oxbows, and similar waters—as jurisdictional. *Id.* The Agencies established a geographic distance marker to establish the boundary of adjacent waters covered under the Clean Water Rule. *Id.*

57.     The Clean Water Rule defined a narrow category of other waters that would be subject to a case-specific analysis to determine jurisdiction. The Agencies identified five "types of waters in specific regions that science demonstrates should be subject to a significant nexus analysis and are considered similarly situated by rule because they function alike and are sufficiently close to function together in affecting downstream waters." *Id.* at 37,059. These waters—Prairie potholes, Carolina and Delmarva bays, pocosins, western vernal pools in California, and Texas coastal prairie wetlands—are analyzed collectively in the watershed that drains to the nearest jurisdictional water. The Clean Water Rule recognized that these features constituted "similarly situated" waters, and their impact on downstream waters must be determined collectively, not individually. *Id.*   The "other waters" category included waters that are not

categorically protected but are located within the 100-year flood plain of a primary water or within 4,000 feet of the high-tide line or ordinary high-water mark of a primary water, impoundment, or tributary. *Id.* These waters were also subject to a significant nexus analysis to determine jurisdiction under the Clean Water Act.

58.     The Agencies also clarified the waters that are expressly excluded from jurisdiction. *Id.* The Clean Water Rule expanded the waters not covered under the Clean Water Act, namely excluding ditches and artificial waters, as well as erosional features. *Id.* The Clean Water Rule maintained all prior exclusions from earlier regulations—converted cropland, waste treatment systems, stormwater control features—and codified exclusions that had been applied as a matter of agency practice. *Id.*

59.     Through the development of the Connectivity Report and the proposed rule, the Agencies engaged in an extensive public comment process. From the publication of the proposed rule, the Agencies recognized that "developing a final rule to provide the intended level of certainty and predictability, and minimizing the number of case-specific determinations, will require significant public involvement and engagement." Proposed Clean Water Rule, 79 Fed. Reg. at 22,188. To that end, the Agencies solicited public comment on the proposed rule for more than 200 days. Clean Water Rule, 80 Fed. Reg. at 37,057. The Clean Water Rule

> reflect[ed] the over 1 million public comments on the proposal, the substantial majority of which supported the proposed rule, as well as input provided through the agencies' extensive public outreach effort, which included over 400 meetings nationwide with states, small businesses, farmers, academics, miners, energy companies, counties, municipalities, environmental organizations, other federal agencies, and many others.

*Id.*

60.     In total, the Clean Water Rule was developed through extensive public comments, grounded in peer-reviewed science that established the relationship between streams, wetlands,

and tributaries and traditionally navigable waters. In repealing the Clean Water Rule, the Agencies failed to consider the well-developed record or engage in any meaningful review of the public comments.

**The Repeal of the Clean Water Rule**

61.     Efforts to repeal the Clean Water Rule began on February 28, 2017, when President Trump issued an Executive Order titled "Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the 'Waters of the United States' Rule. Exec. Order No. 13,778, 82 Fed. Reg. 12,497 (Feb. 28, 2017). The Executive Order directed the EPA and Corps to review the Clean Water Rule for consistency with the Administration's policy to promote economic growth, minimize regulatory uncertainty, and show due regard for the roles of Congress and the States. *Id.* at §§ 1, 2(a). Pursuant to that policy, the Agencies were ordered to "publish for notice and comment a proposed rule rescinding or revising the rule, as appropriate and consistent with law." *Id.* at § 2(a). Further, the Executive Order instructed the Agencies to "consider interpreting the term 'navigable waters,' as defined in 33 U.S.C. 1362(7), in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos v. United States*, 547 U.S. 715 (2006)"—despite the fact that Justice Scalia's opinion was rejected by a majority of the Supreme Court and has not been followed by the Agencies when interpreting "waters of the United States. *Id.* at § 3. This executive fiat began the process to repeal the Clean Water Rule, in violation of the Administrative Procedure Act.

62.     Only a few months after the Executive Order, the Agencies determined repeal was appropriate, and issued a proposed rule to repeal the Clean Water Rule. Proposed Rule, Definition of "Waters of the United States"-Recodification of Pre-Existing Rules, 82 Fed. Reg. 34,899 (July 27, 2017). The Proposed Rule stated the repeal of the Clean Water Rule was the first step in a two-step rulemaking process and in the interim, the Agencies proposed to recodify the regulations

existing before the Clean Water Rule. *Id.*  In practical terms, this means that once the Clean Water Rule was repealed, the Agencies would then operate on the same case-by-case basis that created the inconsistencies which lead to the development of the Clean Water Rule. Only in the second step of the rulemaking process, which had not happened when the proposed rule was published, would the Agencies redefine "waters of the United States" consistent with Justice Scalia's opinion in *Rapanos. Id*. at 34,902.

63.     In the proposed repeal rule, the Agencies stated that they "do not intend to engage in substantive reevaluation of the definition of 'waters of the United States' until the second step of the rulemaking." *Id.* at 34,903. As a result, the Agencies solicited comments from the public not on the issue of whether repeal was appropriate, but whether "it is desirable and appropriate to re-codify in regulation the status quo as an interim first step pending a substantive rulemaking to reconsider the definition of 'waters of the United States' and the best way to accomplish it." *Id.* The Agencies framed their decision to repeal the Clean Water Rule as maintaining the status quo by painting their action as simply re-codifying the pre-existing regulations, and therefore limited the scope of comments from the public. *Id.*

64.     Critically, in the Proposed Rule, the Agencies did nothing to acknowledge the well-developed record supporting the Clean Water Rule. The only document produced to support the repeal was an economic report that directly conflicted with the economic analysis developed under the Clean Water Rule, which the Agencies then abandoned later in the rulemaking process. *See* Supplemental Notice of Proposed Rulemaking, Definition of "Waters of the United States"–Recodification of Preexisting Rule, 83 Fed. Reg. 32,227, 32,250 (July 12, 2018). The Agencies provided no studies that refuted the findings of the Connectivity Report, or the 1 million public

comments received in support of the Clean Water Rule. *See* Clean Water Rule, 80 Fed. Reg, at 37,057.

65.     Nearly a year after issuing the Proposed Rule, the Agencies issued a supplemental notice of proposed rulemaking. Supplemental Notice of Proposed Rulemaking, Definition of "Waters of the United States"–Recodification of Preexisting Rule, 83 Fed. Reg. 32,227 (July 12, 2018). The stated intent of the supplemental rulemaking was to "clarify, supplement, and give interested parties an opportunity to comment on certain important considerations and reasons for the agencies' proposal." *Id.*

66.     In total, the Agencies received over 770,000 comments on the Proposed Rule to repeal the Clean Water Rule. Final Repeal Rule, 84 Fed. Reg. at 56,626. The majority of the comments submitted on the repeal of the Clean Water Rule advocated to retain the Clean Water Rule.

67.     Finally, on October 22, 2019, the Agencies issued the Final Rule repealing the Clean Water Rule. Final Rule, Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019). For the first time in the Final Repeal Rule, the Agencies articulated four reasons for repealing the Clean Water Rule.

68.     First, the Agencies determined "that the 2015 Rule did not implement the legal limits on the scope of the agencies' authority under the Clean Water Act … as intended by Congress and reflected in Supreme Court cases, including Justice Kennedy's articulation of the significant nexus test in *Rapanos*." *Id.*

69.     Second, the Agencies concluded that "in promulgating the 2015 Rule the agencies failed to consider and accord due weight the policy" of the Clean Water Act section 101(b) to

"recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution[.]" *Id.*; *see* 33 U.S.C. §1251(b).

70.     Third, the Agencies concluded that the repeal of the 2015 Rule would "avoid interpretations of the [Clean Water Act] that push the envelope of their constitutional and statutory authority absent a clear statement from Congress authorizing the encroachment of federal jurisdiction over traditional state land-use planning authority." *Id.*

71.     Fourth, the Agencies concluded that "the 2015 Rule's distance-based limitations suffered from certain procedural errors and a lack of adequate record support." *Id.*

72.     Additionally, the Agencies supported their decision to repeal the Clean Water Rule with the decision from two federal courts in Texas and Georgia that remanded the 2015 rule back to these agencies. *Id.* at 56,639–40. However, these decisions were issued in the spring and summer of 2019, well over two years since the issuance of the proposed rule and at least a year after the issuance of the supplemental notice of proposed rulemaking. Further, the Agencies submitted their final repeal rule to the Office of Management and Budget in July of 2019, which traditionally marks the end of the agency's decision-making process. *See* OMB, *OIRA Conclusion of EO 12866 Regulatory Review*, https://www.reginfo.gov/public/do/eoDetails?rrid=129319 (last visited Apr. 20, 2020). The decision from the Southern District of Georgia was not issued until August of 2019, making it all the more difficult to understand how the agency could have relied on the decision during the rulemaking process if the Agencies were seriously contemplating the merits of repeal. *See* Final Repeal Rule, 84 Fed. Reg. at 56,640.

73.     Additionally, with the issuance of the Final Repeal Rule, the Agencies published for the first time a new economic analysis intended to supplement the rulemaking record. EPA and Corps, Economic Analysis for the Final Rule: Definition of "Waters of the United States"-

Recodification of Pre-Existing Rules (Sept. 5, 2019), https://www.epa.gov/sites/production/files/2019-09/documents/wotus_rin-2040-af74_final_ea_508compliant_20190905.pdf . The second Economic Analysis is couched as being informational only, as a means to avoid the requirements of the Administrative Procedure Act. Final Repeal Rule, 84 Fed. Reg. at 56,662; see also *Nat'l Assn'n of Home Builders v. EPA*, 682 F.3d 1032, 1039–40 (the quality of an agency's economic analysis can be tested under the Administrative Procedure Act if the "agency decides to rely on a cost-benefit analysis as part of its rulemaking."). But the updated Economic Analysis was clearly developed to support the premade decision to repeal the Clean Water Rule. The Economic Analysis II was not shared with the public during the rulemaking process, leaving the public unable to comment on the merits of the report or the appropriateness of relying on the analysis to repeal the Clean Water Rule.

## CAUSES OF ACTION

### COUNT 1

**The Agencies Violated the Administrative Procedure Act by Issuing a Final Rule Inconsistent with the Clean Water Act**

74.     The allegations of the preceding paragraphs 1 through 73 are incorporated here by reference.

75.     The purpose of the Clean Water Act is clear—to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Congress created a comprehensive approach to restoring water quality, with a significant role for the federal government. The Final Repeal Rule skirts that role by significantly reducing the scope of federal protection for waters and wetlands, in direct contradiction with the purpose of the Act.

76.     It is arbitrary for the Agencies to adopt a regulation without establishing that the rule comports with the purpose of the statute. See *FCC v. Fox Television Stations, Inc*., 556 U.S.

502, 515 (2009) (holding that an "agency must show that … [a] new policy is permissible under the statute" it is implementing); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("an agency rule would be arbitrary and capricious in the agency… entirely failed to consider an important aspect of the problem."). When adopting regulations that interpret statutory terms, the Agencies interpretation must comply with the "purpose and intent of the statute… [and] no amount of deference can justify an interpretation of the statute that is contrary to law." *Nat. Res. Def. Council, Inc. v. Envtl. Prot. Agency*, 656 F.2d 768, 774 (D.C. Cir. 1981).

77.     The Agencies have not demonstrated how the Final Repeal Rule revoking the Clean Water Rule is consistent the with Clean Water Act and the objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Congress intended the Clean Water Act to broadly protect waters, "intend[ing] that the term 'navigable waters' be given the broadest possible constitutional interpretation." S. Rept. No. 92-1236, at 144 (1972) (Conf. Rep.). In fact, while debating the definition of "waters of the United States," Representative Dingell stated that the definition "clearly encompasses all water bodies, including main streams and their tributaries, for water quality purposes." 118 Cong. Rec. 33,757 (Oct. 4, 1972) (statement of Rep. Dingell). The broad reach of the jurisdiction of the Clean Water Act envisioned by Congress directly connects to the purpose of the statute. "Protection of aquatic ecosystems, Congress recognized, demanded broad federal authority to control pollution, for 'water moves in hydrologic cycles and it is essential that discharge of pollutants be controlled at the source.'" *Riverside Bayview Homes*, 474 U.S. at 132–33 (citing S. Rep. No. 92-414, at 77 (1972)).

78.     The Final Repeal Rule does not comport with the purpose of the statute. Repealing the Clean Water Rule ignores the biological and chemical connections that create healthy waters,

as expressly recognized in the purpose of the Act. This nearsighted approach to water protection removes significant numbers of waters from the Clean Water Act—including waters and wetlands that have a significant nexus to downstream navigable waters—which fundamentally hampers the objective to restore and maintain our Nation's waters.

79.     The Agencies have not demonstrated how removing waters from Clean Water Act protections complies with the purpose of the Act. The Final Repeal Rule reduces the number of waters that would require a permit to discharge pollutants or fill wetlands, which inherently hinders the ability to restore and maintain national water quality. This is a vast departure from the purpose and intent of the Clean Water Act to restore and maintain water quality. The Final Repeal Rule contradicts the purpose of the Clean Water Act, in violation of the Administrative Procedure Act.

## COUNT 2

### The Agencies Violated the Administrative Procedure Act by Issuing a Predetermined Decision to Repeal the Clean Water Rule

80.     The allegations of the preceding paragraphs 1 through 79 are incorporated here by reference.

81.     The most basic tenant of administrative law requires agencies to meaningfully consider their actions, through the notice and comment rulemaking process that incorporates public comment and differing perspectives. Throughout this process, the agencies are meant to provide a "reasoned explanation … to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by the courts and interested public." *Dept. of Commerce v. New York,* 139 S.Ct. 2551, 2575–76 (2019). Agencies cannot predetermine the outcome of a rulemaking then undergo a sham notice and comment process in order to support the agency's conclusions. *See Saget v. Trump*, 375 F.Supp.3d 280, 360–61 (E.D.N.Y.  2019); *Cowpasture River*

*Pres. Ass'n v. Forest Service,* 911 F.3d 150, 179 (4th Cir. 2018). Agency actions violate the Administrative Procedure Act if they are pretextual. *Saget,* 375 F.Supp.3d at 361.

82.     The decision to repeal the Clean Water Rule was made by the Administration long before the Agencies began the formal rulemaking process. The President issued an Executive Order directing the Agencies to review the Clean Water Rule, but in the same order called on the agencies to initiate a rulemaking to rescind the rule. Exec. Order No. 13,778.

83.     On July 27, 2017, the Agencies followed through with the charge from the Executive Order and issued a proposed rule to repeal the Clean Water Rule. Propose Repeal Rule, 82 Fed. Reg. at 34,899. The Agencies jumped directly to the conclusion that the Clean Water Rule should be repealed. In doing so, the Agencies foreclosed any comments on the substance of the Clean Water Rule or the case-by-case analysis that existing before 2015. *Id.* at 34,903.

84.     In the Supplemental Rulemaking, the Agencies again stated that the Clean Water Rule be repealed, with no further supporting analysis. Supplemental Repeal Rule, 83 Fed. Reg. at 32,227. The Agencies only solicited comments to support the conclusions they had already reached.

85.     For over two years, the Agencies have merely gone through the motions of a rulemaking to support the pre-ordained decision to repeal the Clean Water Rule, without analyzing the merits of that decision or considering any alternatives. Any support for repeal produced by the Agencies came after the decision had already been made.

86.     Because the Agencies impermissibly predetermined the outcome of their rulemaking long before the Final Rule was issued, relying only on *post hoc* rationale, the repeal of the Clean Water Rule is arbitrary and unlawful. *Saget,* 375 F.Supp.3d at 361.

## COUNT 3

### The Agencies Violated the Administrative Procedure Act by Failing to Articulate a Reasoned Explanation to Repeal the Clean Water Rule

87.     The allegations of the preceding paragraphs 1 through 86 are incorporated here by reference.

88.     The Administrative Procedure Act requires agencies to articulate a reasonable explanation for its decisions. In deregulatory actions, an agency must provide a reasoned explanation for its action, and not "simply disregard rules that are still on the books." *Fox*, 556 U.S. at 515; *see also Physicians for Soc. Responsibility v. Wheeler,* No. 19-5104, 2020 U.S. App. LEXIS 12727 at *19–20 (D.C. Cir. Apr. 21, 2020). As such, an agency cannot reverse course on a regulation without articulating a reasonable explanation for such a change, as "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16. This requirement is especially important when the new policy "rests upon factual findings that contradict those which underlay its prior policy[.]" *Id.* at 515.

89.     Here, the Agencies have not articulated a reasonable explanation for the decision to repeal the Clean Water Rule. The Agencies developed the Clean Water Rule on a well-developed record supported with extensive scientific evidence and public support. Clean Water Rule, 80 Fed. Reg, at 37,057.  Now the Agencies have made a complete about-face without reckoning with the rulemaking record of the Clean Water Rule that would in any way support repealing the Rule. The Agencies have developed no scientific studies to support the repeal, and the public support for the Clean Water Rule remains strong. The only document the Agencies produced during the rulemaking process was the first Economic Analysis I, which the Agencies then disavowed. *See* Supplemental Repeal Rule, 83 Fed. Reg. at 32,250.

90.     The Agencies have provided no factual support for their decision to repeal the Clean Water Rule that meets the standard articulated in prior caselaw. Instead, the Agencies relied solely on predetermined conclusions, and solicited comment on those conclusions to support their decision. *See* Proposed Repeal Rule, 82. Fed. Reg. at 34,903; Supplemental Repeal Rule, 83 Fed. Reg. at  32,227; *supra* ¶¶ 83, 84.   These actions by the Agencies violated the mandate of the Administrative Procedure Act to provide a reasoned explanation for agency decisions. The Agencies made no effort to meaningfully consider the merits of the Clean Water Rule in the repeal process, instead cabining such discussions for a later rulemaking. The Agencies provided no substantive rationale for rejecting the definition of "waters of the United States" articulated in the Clean Water Rule, falling far short of the requirements of the Administrative Procedure Act.

91.     As such, this Court should vacate the repeal of the Clean Water Rule as arbitrary and capricious, in violation of the Administrative Procedure Act. 5 U.S.C. § 706.

## COUNT 4

### The Agencies Violated the Administrative Procedure Act by Failing to Provide Adequate Notice and Comment

92.     The allegations of the previous paragraphs 1 through 91 are incorporated here by reference.

93.     The Agencies did not provide adequate notice and comment in the rulemaking process to repeal the Clean Water Rule.

94.     The Administrative Procedure Act requires the Agencies to provide notice of a proposed rulemaking that shares either the terms or the substance of a proposed rule. 5 U.S.C. § 553(b)(3). Then the agency's "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" and the agency's must give

"consideration of the relevant matter presented" and "shall incorporate in the rules adopted a concise general statement of their basis and purpose." *Id.* at §553(c).

95.     The notice and comment process in federal rulemaking serves a critical role in assuring federal regulations are well-developed and fair to those affected by the rulemaking. The public comment process "improves the quality of agency rulemaking by ensuring that agency regulations will be tested by exposure to diverse public comment." *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983). In addition, the ability to submit information to the agencies during the rulemaking process enhances juridical review. *Id.*

96.     An agency is required to "make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible." *Home Box Office, Inc. v. Federal Communications Commission,* 567 F.2d 9, 36 (D.C. Cir. 1977); *South Carolina ex rel. Tindal v. Block*, 717 F.2d 874, 885 (4th Cir. 1983).  If agencies do not provide adequate evidence of the agencies' reasoning behind the proposed rule, the public's ability to comment on the proposal is significantly hampered. *See Ohio Valley Envtl. Coal. v. Army Corps of Eng'rs,* 674 F.Supp. 2d 783, 802–03 (S.D. WV 2009). Such is the case here with the repeal of the Clean Water Rule.

97.     Because the Agencies had predetermined the outcome of the rulemaking process, the Proposed Repeal Rule did not provide adequate opportunity for notice and public comment. By limiting the scope of comments and soliciting comments only on the appropriateness of reinstating the prior regulations, the Agencies did not provide the public with the opportunity to meaningfully comment on whether the Clean Water Rule should be repealed, having already concluded that repeal was warranted.

98.     Further, the Proposed Repeal Rule did not provide adequate evidence of the Agencies' rationale for repealing the Clean Water Rule, instead only sharing four primary reasons for repealing the Clean Water Rule in the Final Rule. Final Repeal Rule, 84 Fed. Reg. at 56,626. This prevented the public from meaningfully commenting on the reasoning of the Agencies' decision-making, in violation of the Administrative Procedure Act and the strong body of case law defining "meaningful public comment."

99.     Therefore, this Court should vacate the repeal of the Clean Water Rule as it violated the notice-and-comment requirements of the Administrative Procedure Act. 5 U.S.C. § 553(b).

## COUNT 5

### The Agencies Violated the Administrative Procedure Act by Relying on an Economic Analysis Not Shared with the Public

100.     The allegations of the previous paragraphs 1 through 99 are incorporated here by reference.

101.     The Clean Water Act does not require a cost-benefit analysis when promulgating definitional regulations, but an executive order requires federal agencies to assess both the costs and benefits of significant regulatory actions. Exec. Order No. 12,866, Regulatory Planning and Review, 58 Fed. Reg. 190 (Oct. 4, 1993). If federal agencies rely on an economic analysis to justify their decision, that analysis is subject to scrutiny under the Administrative Procedure Act. See, e.g., *Nat'l Assn'n of Home Builders v. EPA*, 682 F.3d 1032, 1039-50 (noting that the quality of an agency's economic analysis can be tested under the Administrative Procedure Act if the "agency decides to rely on a cost-benefit analysis as part of its rulemaking."). If an agency does undergo an economic analysis, "a serious flaw undermining that analysis can render the rule unreasonable." *Id*. Further, the economic analysis must comply with the requirements of the Administrative Procedure Act to disclose such information to the public during the notice and comment process.

102.    The Agencies published Economic Analysis II with the final rule, claiming the document served as only an informational tool. But the Agencies clearly intended for the Economic Analysis II to support their decision to repeal the Clean Water Rule. Economic Analysis II represented a substantial change from Economic Analysis I, which the Agencies disavowed.  As such, Economic Analysis II should have been provided to the public during the notice and comment process to inform the public in their evaluation of the rule prior to the comment period deadline.

103.    By publishing Economic Analysis II with the Final Rule, the Agencies have circumvented the requirements of the Administrative Procedure Act unlawfully. As such, the repeal of the Clean Water Rule should be vacated.

## COUNT 6

**The Agencies Violated the Administrative Procedure Act by Adopting a Rule that Prevents the Agencies from Complying with Statutory Duties under the Clean Water Act**

104.    The allegations of the proceeding paragraphs 1 through 103 are incorporated here by reference.

105.    The Final Rule prevents the Agencies from complying with their statutory duty under Section 117(g) of the Clean Water Act to restore the Chesapeake Bay; to meet their obligations under the Chesapeake Bay TMDL; and to achieve the goals of the 2014 Chesapeake Bay Watershed Agreement. *See* 33 U.S.C. § 1267(g); Bay TMDL, at ES-1; Chesapeake Bay Watershed Agreement, at 5, 9. Removing waters and wetlands from Clean Water Act jurisdiction interferes with the Agencies responsibility to restore water quality in the Chesapeake Bay. See *supra* ¶¶ 7–12.

106.    It is arbitrary and capricious for the Agencies to adopt the Final Rule, which prevents the Agencies from complying with their duties under the Clean Water Act and the

Chesapeake Bay Watershed Agreement. As such, the Final Rule violates the Administrative Procedure Act.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

1.      Declare that defendant Agencies acted arbitrarily and unlawfully in promulgating the challenged rule: Definition of Waters of the United States—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019);

2.      Vacate and set aside the challenged rule;

3.      Reinstate the 2015 Clean Water Rule in the jurisdictions where the Rule went into effect;

4.      Issue an order awarding Plaintiffs their costs of litigation, including reasonable attorney's fees; and

5.      Grant plaintiffs such further relief as the Court deems necessary.

Dated April 24, 2020.

Respectfully submitted,

/s/ Brittany E. Wright
Brittany E. Wright (Bar No. 21029)
Jon A. Mueller (Bar No. 17142)
Chesapeake Bay Foundation, Inc.
6 Herndon Avenue
Annapolis, MD 21403
(443) 482-2077
Fax: (410) 268-6687
bwright@cbf.org
jmueller@cbf.org

*Counsel for Chesapeake Bay Foundation, Inc. and ShoreRivers*