# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CHESAPEAKE BAY FOUNDATION, INC., *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>ANDREW WHEELER, in his official capacity as Administrator of the U.S. Environmental Protection Agency, *et al.*,<br><br>    *Defendants*. | Nos. 1:20-cv-01063-RDB,<br>1:20-cv-01064-RDB |

## BRIEF OF THE INSTITUTE FOR POLICY INTEGRITY AT NEW YORK UNIVERSITY SCHOOL OF LAW AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Max Sarinsky
Bethany A. Davis Noll (*pro hac vice* pending)
139 MacDougal Street, Third Floor
New York, New York 10012
(212) 992-8932
*Counsel for Amicus Curiae*
*Institute for Policy Integrity*

December 1, 2020

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii
INTEREST OF AMICUS CURIAE ......................................................................................1
SUMMARY OF ARGUMENT ..............................................................................................2
ARGUMENT ..........................................................................................................................3
    I.      The Agencies Cannot Evade Responsibility for Assessing the Harms of Each Rule ..........3
    II.     The Agencies Irrationally Treat Unmonetized Harm from Both Rules as Effectively Worthless .....................................................................................................................5
    III.    The Agencies Grossly Undervalue the Harms That They Do Quantify, Failing to Recognize the Critical Importance of Wetlands in Both Analyses .....................................8
           A.     The Agencies Ignore the Substantial Interstate Benefits Wetlands Provide ............9
           B.     The Agencies Grossly Underestimate Wetlands' In-State Benefits .......................11
           C.     The Agencies' Assumption that States Will Preserve Waters Losing Federal Protection Is Speculative and Overlooks Key Considerations .............................12
    IV.   In Stark Contrast to Their Treatment of Forgone Benefits, the Agencies Overestimate the Compliance-Cost Savings of Both Rules ..............................................14
CONCLUSION ....................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**  **Page(s)**

*Air All. Hous. v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018) ................................................................5

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229 (9th Cir. 2001) ..................13

*Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011) ............................................................12

*California v. Bernhardt,* 2020 WL 4001480 (N.D. Cal. July 15, 2020) .......................................15

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin*, 538 F.3d 1172 (9th Cir. 2008) ................................................................................................................................11, 15

*EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014) ................................................13

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .........................................................15

*Mayor of Baltimore v. Azar*, 973 F.3d 258 (4th Cir. 2020) ...........................................................4

*Michigan v. EPA*, 576 U.S. 743 (2015) .........................................................................................3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...................3, 5

*Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032 (D.C. Cir. 2012) ........................................4

*Rapanos v. United States*, 547 U.S. 715 (2006) ...................................................................2, 4, 13

*Sierra Club v. Dep't of the Interior*, 899 F.3d 260 (4th Cir. 2018) .............................................10

**Statutes and Regulations**

33 U.S.C. § 1251(a) .....................................................................................................................2, 3

Clean Water Rule: Definition of "Waters of the United States,"
  80 Fed. Reg. 37,054 (June 29, 2015) .........................................................................................3

Definition of "Waters of the United States"—Recodification of Pre-Existing Rules,
  84 Fed. Reg. 56,626 (Oct. 22, 2019) ................................................................................. *passim*

Navigable Waters Protection Rule: Definition of "Waters of the United States,"
  85 Fed. Reg. 22,250 (Apr. 21, 2020) ................................................................................ *passim*


## TABLE OF AUTHORITIES (cont.)

**Other Authorities**                                                                 **Page(s)**

Attorneys General of New York et al., Comment Letter to Revised Definition of "Waters of the United States" (Apr. 15, 2019), *available at* https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-5467 ................................................................................................... 13

Brief for Appellants, *Colorado v. EPA*, No. 20-1238 (10th Cir. July 9, 2020) .............................. 2

Catherine L. Kling, Ph.D., *Expert Review of the Economic Analysis for the Proposed Revised Definition of "Waters of the United States"* (2019), *available at* https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-5467 (Attachment B) .. 10

EPA & U.S. Dep't of the Army, Economic Analysis of the EPA-Army Clean Water Rule (2015), *available at* https://www.epa.gov/sites/production/files/2015-06/documents/508-final_clean_water_rule_economic_analysis_5-20-15.pdf ............................................. 4, 6, 8, 14

EPA & U.S. Dep't of the Army, Economic Analysis for the Final Rule: Definition of "Waters of the United States"— Recodification of Pre-Existing Rules (2019), *available at* https://www.epa.gov/sites/production/files/2019-09/documents/wotus_rin-2040-af74_final_ea_508compliant_20190905.pdf ....................................................... *passim*

EPA & Dep't of the Army, Economic Analysis of the Navigable Waters Protection Rule: Definition of "Waters of the United States" (2020), *available at* https://www.epa.gov/sites/production/files/2020-01/documents/econ_analysis_-_nwpr.pdf
 ............................................................................................................................ *passim*

EPA & Dep't of the Army, The Navigable Waters Protection Rule – Public Comment Summary Document, Topic 11: Economic Analysis and Resource and Programmatic Assessment (2020), *available at* https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-11574
 ............................................................................................................................ 11, 15

EPA, *Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence* (2015), *available at* https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=296414 ......................................... 9, 11

EPA, *Guidelines for Preparing Economic Analyses* (2010), *available at* https://www.epa.gov/environmental-economics/guidelines-preparing-economic-analyses ..... 13

## TABLE OF AUTHORITIES (cont.)

**Other Authorities (cont.)**                                                                                         **Page(s)**

Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993) ........................................................3

Jeffrey Mullen, Ph.D., *Final Review of the 2018 EPA Economic Analysis for the Proposed
Revised Definition of Waters of the United States* (2019), *available at*
https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-9717 (Ex. D) ..........9, 12

John C. Whitehead, Ph.D., *Comments on "Economic Analysis for the Proposed Revised
Definition of 'Waters of the United States'"* (2019), *available at*
https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-9717 (Ex. C)
....................................................................................................................................................10

Klaus Moeltner, et al., *Waters of the United States: Upgrading Wetland Valuation Via Benefit
Transfer*, 164 Ecological Econ. 106,336 (2019)..................................................................11, 12

Office of Mgmt. & Budget, Circular A-4, Regulatory Analysis (2003)...........................................
....................................................................................................................................................5, 9

States' Memorandum in Support of Motion for Preliminary Injunction, *North Dakota v. EPA*, 127
F. Supp. 3d 1047 (D.N.D. 2015)..............................................................................................14

U.S. Fish & Wildlife Serv., *Wetlands of Maryland* (1995), *available at*
https://www.fws.gov/wetlands/Documents%5CWetlands-Of-Maryland.pdf ..........................12

The Institute for Policy Integrity at N.Y.U. School of Law ("Policy Integrity") submits this brief as amicus curiae in support of Plaintiffs' challenge to the Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) ("Replacement Rule"), and Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019) ("Repeal Rule"), promulgated by the Environmental Protection Agency and Department of the Army, Corps of Engineers ("the agencies").[1]

**INTEREST OF AMICUS CURIAE**

Policy Integrity is a nonpartisan think tank dedicated to improving the quality of government decisionmaking through advocacy and scholarship in administrative law, economics, and environmental policy. Policy Integrity's staff of economists and lawyers has produced extensive scholarship on the use of economic analysis in regulatory decisionmaking. Harnessing its academic and regulatory expertise, Policy Integrity has participated in multiple agency and court proceedings regarding the two rules at issue here. For instance, as described more fully in Policy Integrity's motion to file this brief, Policy Integrity submitted comments and an expert report on the proposals underlying these rules. And Policy Integrity has submitted amicus briefs in support of plaintiffs challenging the Replacement Rule in other courts.

This amicus brief focuses on the fundamental flaws, including economic errors and unfounded assumptions, in the agencies' economic analyses of each challenged rule. EPA & Dep't of the Army, Economic Analysis of the Navigable Waters Protection Rule: Definition of "Waters of the United States" (2020) ("2020 EA"); Economic Analysis for the Final Rule: Definition of "Waters of the United States"— Recodification of Pre-Existing Rules (2019) ("2019 EA"). Policy

---

[1] This brief does not purport to represent the views, if any, of New York University School of Law. Policy Integrity states that no party's counsel authored this brief in whole or in part, and no person contributed money intended to fund the preparation or submission of the brief.

1

Integrity's expertise in economic analysis and experience with these rules give it a unique and useful perspective on the agencies' claims regarding these analyses.

## SUMMARY OF ARGUMENT

Despite their obligation to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a)—and their authority to exercise jurisdiction over waters with "a significant nexus to waters . . . navigable in fact," *Rapanos v. United States*, 547 U.S. 715, 759 (2006) (Kennedy, J., concurring) (internal quotation marks omitted)—the agencies do not meaningfully assess the impacts of these rules on downstream water quality, repeatedly failing to recognize the extensive harm the rules will cause.

Though the agencies have cited their economic analyses as one way that they have fulfilled the requirement to provide a reasoned explanation, see *infra* at 5,[2] time after time in those analyses they rely on irrational and ill-informed assumptions, violate regulatory guidance and precedent, and make claims about water connectivity that are inconsistent with science—all with the effect of making the rules' extensive harms seem minor in relation to their alleged cost savings. For example, the agencies tout the rules as net beneficial for society despite failing to assess the extent of whole categories of water-quality harms that each rule will impose. And while the agencies value some impacts of wetlands degradation under Section 404's dredge/fill program, their analyses are riddled with errors that understate critical regulatory harms. All told, the agencies neglect the vast majority of the wetlands-related costs from the two rules—collectively more than $2 billion annually, according to expert analysis.

---

[2] *See also* Brief for Appellants 15, *Colorado v. EPA*, No. 20-1238 (10th Cir. July 9, 2020) (claiming that the Replacement Rule is "supported" by the economic analysis and that the analysis helps "thoroughly explain[]" the agencies' decisions).

By disregarding many impacts on the "chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), the agencies "fail[] to consider an important aspect" of the Clean Water Act's jurisdictional analysis, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), rendering the rules arbitrary and capricious.

## ARGUMENT

In limiting clean-water protection to its narrowest scope in decades through these two rulemakings, the agencies repeatedly obscure the true impact of their rules. While the agencies' economic analyses claim to assess the impacts of the rules, those analyses are lacking and thus demonstrate that the agencies fail to provide a reasoned explanation for either rule.

### I. The Agencies Cannot Evade Responsibility for Assessing the Harms of Each Rule

As a preliminary matter, the agencies apparently hope to avoid responsibility for their error-filled economic analyses by claiming that they did not rely on them. 85 Fed. Reg. at 22,335; 84 Fed. Reg. at 56,662. But those attempts fall flat.

The agencies prepared an economic analysis for each rule pursuant to a longstanding executive order that requires agencies to assess regulatory costs and benefits and adopt a regulation only when the "benefits . . . justify its costs." Exec. Order No. 12,866, § 1(b)(6), 58 Fed. Reg. 51,735 (Oct. 4, 1993). Costs in a regulatory analysis encompass "any disadvantage" from a rule, including harms "to human health or the environment." *Michigan v. EPA*, 576 U.S. 743, 748 (2015). Thus, in an analysis for a rollback such as the rules at issue here, costs often take the form of environmental harms or forgone environmental benefits.

Pursuant to this executive order, agencies for decades have assessed, quantified, and monetized regulatory impacts. When promulgating the Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015) ("Clean Water Rule"), the agencies

3

monetized many of the rule's environmental benefits and determined that those benefits exceeded total compliance costs by tens or hundreds of millions of dollars per year. EPA & U.S. Dep't of the Army, Economic Analysis of the EPA-Army Clean Water Rule xi (2015) ("2015 EA"). Yet in these two rules, the agencies now conclude that compliance-cost savings exceed the monetized benefits of the forgone environmental protections—this time unreasonably understating forgone benefits and inflating compliance-cost savings. *See infra* Sections II–IV.

When substantial flaws undermine an agency's economic analysis, like here, courts find the rule arbitrary and capricious. *See, e.g.*, *Mayor of Baltimore v. Azar*, 973 F.3d 258, 281–82 (4th Cir. 2020). Yet the agencies claim that these rules are "not based on the . . . economic analysis," and cite caselaw to suggest that only if "an agency decides to rely on a cost-benefit analysis" would this doctrine apply. 85 Fed. Reg. at 22,335 (citing *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039–40 (D.C. Cir. 2012)); *accord* 84 Fed. Reg. at 56,662. But these claims cannot relieve the agencies of responsibility for their erroneous analyses.

First, the economic analysis is relevant in each rule because the agencies exercise discretion to determine the scope of their jurisdiction and have claimed that this decision is reasonable. *See* 85 Fed. Reg. at 22,252 (claiming that Replacement Rule strikes a "reasonable and appropriate balance" on jurisdictional scope); 84 Fed. Reg. at 56,664 (stating that Repeal Rule "is the most appropriate" choice for agencies to "exercise their discretion and policy judgment"). Indeed, in the Repeal Rule, the agencies apply a standard which is "concerned with downstream water quality," and encompasses waters with "significant effects on . . . the aquatic ecosystem," *Rapanos*, 547 U.S. at 769, 773 (Kennedy, J., concurring) (internal quotation marks omitted), thus highlighting the need to assess the impact of the rule on downstream waters. And to be reasonable, an agency must "articulate a satisfactory explanation for its action," and courts set aside the action if an

4

agency failed to consider "an important aspect of the problem." *State Farm*, 463 U.S. at 43. This includes the harm of a deregulatory rule. *See, e.g.*, *Air All. Hous. v. EPA*, 906 F.3d 1049, 1067–68 (D.C. Cir. 2018).

Second, in both rules, the agencies do in part rely on the economic analysis to support the rulemaking. In the Replacement Rule, the agencies tout their belief that the rule will result in "net cost savings for all entities affected," 85 Fed. Reg. at 22,335, and that "net benefits would increase" under the rule, *id.* at 22,334. In the Repeal Rule, likewise, the agencies claim that their economic analysis provides "helpful information," 84 Fed. Reg. at 56,663, on the repeal, and that their regulatory decision was chosen because it was the "most . . . efficient" alternative, *id.* at 56,661.

For these reasons, the agencies cannot escape the flaws in their economic analyses. And as detailed below, those flaws make clear that the rules are arbitrary and capricious.

## II. The Agencies Irrationally Treat Unmonetized Harm from Both Rules as Effectively Worthless

The agencies pay little attention to the unquantified cost (in the form of forgone benefits and environmental harms) of both rules under the Section 311 oil spill prevention program and of the Replacement Rule under the Section 402 pollutant-discharge program, reporting each rule as net beneficial without serious evaluation of the potentially vast harms under these programs.

But as longstanding White House guidance explains, agencies should assess "quantitative information" about a rule's impacts whenever possible—such as the number of "stream miles of [affected] water quality," Office of Mgmt. & Budget, Circular A-4, Regulatory Analysis 27 (2003) ("Circular A-4"). If an agency cannot "express in monetary units all of the important benefits and costs," then it should carefully assess how "important the non-quantified benefits or costs may be in the context of the overall analysis," performing a detailed qualitative analysis when "the non-quantified benefits and costs are likely to be important." *Id.* at 2. In this case, the agencies not only

5

fail to adequately provide quantitative estimates, but also draw conclusions about the rules that may be undermined by a fair assessment of those unquantified impacts.

The agencies' contrasting approach in the Clean Water Rule helps illustrate this point. In 2015, to assess that rule's impacts, the agencies used mathematical sampling to project that the Clean Water Rule would increase federal regulatory protection of all waters by 2.84–4.65%. 2015 EA at 12. By knowing how many waters would be affected, the agencies were able to quantify and monetize many costs and benefits. The agencies projected *all* compliance costs from the rule, and monetized regulatory benefits under the Section 402 and 404 programs. *Id.* at xi. Through this assessment, the agencies concluded that the rule's monetized benefits—namely, environmental benefits under Sections 402 and 404—exceeded total compliance costs. *Id.* at x–xi. Thus, the agencies were able to conclude that this rule was net beneficial on the whole. Though there were benefits of the Clean Water Rule that were unmonetized at that time, monetizing those benefits would have only served to further support the agencies' conclusion.

For the two rules being challenged here, however, the agencies present the rules as net beneficial even though their analyses are incomplete and feature large unquantified forgone benefits. For the Repeal Rule, the agencies project total cost savings from the rule but only some monetized estimates of forgone benefits. Unquantified harms from this rule include forgone benefits under Section 311, under Section 402's pesticide general permit implementation program, and under Section 404's stream mitigation program. 2019 EA at xii–xiii. Nonetheless, the agencies report that the rule results in net benefits, providing monetized projections of forgone benefits as if they capture all of the harm from the rule. 84 Fed. Reg. at 56,663–64. In doing so, the agencies effectively treat unquantified harms as worthless. But this analysis is incomplete and does not justify the agencies' conclusion that the Repeal Rule is net-beneficial. Indeed, the forgone benefits

that the agencies monetize nearly reach the low end of the range of avoided costs, 2019 EA at 194, meaning that the rule could easily be net-costly once those unquantified benefits are assessed.

For the Replacement Rule, the agencies quantify even fewer regulatory harms and treat all regulatory impacts outside the Section 404 program with similar disregard. For the Replacement Rule, the agencies provide a nationwide analysis only of the rule's impacts under the Section 404 program, and do not attempt to quantify how many waters will lose protection nationwide under the Section 402 and 311 programs. 2020 EA at xxii. This leads to a very restricted set of analyses. For example, the agencies analyze three limited "case study" watersheds, but fail to monetize Section 402 water-quality impacts like they did in the Clean Water Rule. *id.* at xviii–xix tbl. ES-4. And in a qualitative assessment, the agencies briefly recognize adverse impacts such as the rule's possible "negative impact on water quality," *id.* at 59, and probability of an increased risk of oil spills, *id.* at 83, but do not assess the severity or downstream harms of these impacts and repeatedly suggest that states may limit these impacts by filling the regulatory gap. *See, e.g.*, *id.* at 62; *see also infra* Section III.C (explaining that assumption of gap-filling is unsupported). Circumscribing their analysis in these ways leaves the agencies unable to make meaningful estimates of the Replacement Rule's impacts, despite the obligation to reasonably assess available information about a rule's effects.

In sum, the agencies cannot seriously purport to protect the nation's waters when they do not meaningfully assess how severely each challenged rule will harm water quality. Their failure to quantify or meaningfully assess the scope of so many impacts of each rule renders hollow their claims that the rules are net beneficial, and undermines their justifications for each rule.

### III. The Agencies Grossly Undervalue the Harms That They Do Quantify, Failing to Recognize the Critical Importance of Wetlands in Both Analyses

On top of disregarding key categories of impacts, the agencies also minimize the impacts that they do quantify, gutting the estimates of key benefits of protecting wetlands that the agencies recognized when promulgating the Clean Water Rule.

In 2015, in the Clean Water Rule, the agencies concluded that the expansion of regulatory jurisdiction under the Section 404 dredge/fill program would yield more than $300 million in annual benefit nationwide. 2015 EA at x. In the Repeal Rule, the agencies now reduce the benefits of wetland protection from that rule to no more than $106 million per year. 2019 EA at 194. And in the Replacement Rule, which restricts the agencies' jurisdiction even further, the agencies value average annual forgone benefits at no more than $173 million per year. 2020 EA at xxiii. Accordingly, the agencies now claim that the two rollbacks will collectively cause less harm under the Section 404 program than the corresponding benefit that the agencies projected from the Clean Water Rule alone. This counter-intuitive finding is the result of unjustified methodological choices that leads to a substantial undercounting of forgone benefits.[3]

To make matters worse, even with all the unsound methodological choices that the agencies make, the agencies are still unable to conclude that the two rollbacks are net-beneficial in all scenarios. *See id.* at xxii–xxiii (reporting Replacement Rule's overlapping ranges of costs and benefits); 2019 EA at 194–95 (showing that Repeal Rule's forgone benefits under Section 404 may exceed cost savings). When a regulatory measure may be net-costly, as these analyses show,

---

[3] The agencies also assess the costs and benefits of the Replacement Rule (but not the Repeal Rule) through "case studies" of three watersheds, but these case studies suffer from similar errors as the nationwide analysis, and again minimize the costs of wetlands degradation. Just like with the nationwide analysis, the case studies rely on inappropriate assumptions about state gap-filling, *see, e.g.*, 2020 EA at xx–xxi, and falsely assume that only residents in-state and in certain neighboring counties are harmed by wetlands degradation, *id.* at 121.

8

longstanding White House guidance instructs the agency to "conduct further analysis" to determine whether "alternative plausible assumptions [are] more appropriate." Circular A-4 at 42. Yet the agencies disregard this advice and continually short-change their forgone benefit estimates.

Specifically, the agencies commit at least three crucial errors. First, the agencies ignore wetlands' well-recognized interstate benefits. Second, they erroneously devalue the harms that individuals receive from in-state wetlands. And third, they make baseless assumptions that states will seamlessly fill the regulatory gap left by the rules, despite extensive indications otherwise.

These errors are significant. Correcting them reveals that the two rules could collectively deprive society of over $2.4 billion in annual benefits under the Section 404 program. Jeffrey Mullen, Ph.D., *Final Review of the 2018 EPA Economic Analysis for the Proposed Revised Definition of Waters of the United States* 34 tbl. 8.1 (2019) ("Mullen Report").

### A. The Agencies Ignore the Substantial Interstate Benefits Wetlands Provide

One of the most substantial errors is the agencies' decision to cut off the harms of wetlands degradation at the state border. This decision not only leads to a drastic undercounting of the harms from each rule, but also evinces a fundamental misunderstanding of wetlands services.

To monetize the costs of wetlands degradation, the agencies estimate the wetlands acreage lost in each state from each rule and then, using studies that assess people's willingness to pay for wetlands protection, calculate the monetary value of that lost acreage. But the agencies erroneously assume that only individuals residing within the state of the affected wetland are harmed, and that the harm from loss of out-of-state wetlands "is zero." 2020 EA at 207; 2019 EA at 62.

But this assumption violates sound science, as wetlands benefit a wide range of other water bodies without respect to state boundaries. EPA, *Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence* 4-1 to 4-45 (2015)

("Connectivity Report"). To provide an illustration, under the agencies' assumptions, Maryland households that rely on the Chesapeake Bay obtain no benefit from upstream wetlands near the Susquehanna River in Pennsylvania and New York, even though the Susquehanna River feeds directly into the Chesapeake Bay. But there is no basis for that conclusion.

Echoing the science, economic studies submitted to the agencies during the comment period conclude that individuals place considerable value on wetlands outside their home state. *See, e.g.*, Catherine L. Kling, Ph.D., *Expert Review of the Economic Analysis for the Proposed Revised Definition of "Waters of the United States"* 6 (2019). One study, for example, finds that more than 80% of the benefits of wetlands protection are interstate. John C. Whitehead, Ph.D., *Comments on "Economic Analysis for the Proposed Revised Definition of 'Waters of the United States'"* 10 (2019). The agencies' assumption that the benefits of wetlands protection stop at the state border thus represents "a complete failure to reasonably reflect upon the information contained in the record." *Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (internal quotation marks omitted).

The agencies' justification for this approach—that much of the relevant economic literature on wetlands valuation was "conducted at the state level," 2020 EA at 207; 2019 EA at 62—misses the point. The fact that some studies looked at valuation of in-state wetlands hardly means that wetlands provide zero interstate benefits. In fact, numerous relevant studies assess multi-state regions. One study, for instance, "found that residents of Oregon, Washington, and Nevada all reported positive willingness to pay values to protect wetlands in . . . California." Kling Report at 6. Research also shows that households as distant as 640 miles from a water body can benefit from its preservation. *Id*. Indeed, the agencies briefly admit that "wetland benefits cross[] state boundaries," 2020 EA at 226, yet their analysis assumes the opposite.

10

Ultimately, while there may be "a range of values" for wetlands' interstate benefits, the value is "certainly not zero" as the agencies assume. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin*, 538 F.3d 1172, 1200 (9th Cir. 2008).

### B. The Agencies Grossly Underestimate Wetlands' In-State Benefits

Because the agencies irrationally disregard wetlands' interstate benefits, they consider only the harms to in-state residents. But here, too, they severely undervalue the harms of each rule.

To monetize in-state harms, the agencies commissioned a study that calculated a per-acre value for wetlands loss per household. *See* Klaus Moeltner, et al., *Waters of the United States: Upgrading Wetland Valuation Via Benefit Transfer*, 164 Ecological Econ. 106,336 (2019) ("Moeltner Study"), *cited in* 2020 EA at 207–10 & 2019 EA at 59–64. The agencies then apply that value to monetize the harm of degraded wetlands in each state to that state's residents. In calculating those state-level values, the agencies commit several errors.

First, the agencies ignore the unique benefits that wetlands provide to local residents, such as attenuating flooding, Connectivity Report at 4-1 to 4-2 (describing benefits), by irrationally assuming that *no* in-state residents live near any degraded wetland. EPA & Army Corps of Engineers, The Navigable Waters Protection Rule – Public Comment Summary Document, Topic 11: Economic Analysis and Resource and Programmatic Assessment 80 (2020) ("Response to Comments"). The agencies' explanation for this exclusion—that "the majority [of] the affected households are likely to be non-local," *id.*—is insufficient. Even if many individuals do not live near a degraded wetland, the agencies' own analysis shows that whether someone lives locally to a wetland is a major variable in their valuation, 2020 EA at 209, 2019 EA at 65, and the additional valuation from those who do live near a wetland could thus still be substantial.

The agencies also reduce the benefits of wetlands for in-state residents through a mathematical trick. The commissioned study found that individuals place a greater value on each acre of wetlands as the total acreage of wetlands increases. *See* Moeltner Study at 9 (reporting "convexity of the [willingness-to-pay] function"). Accordingly, individuals suffer more when wetlands are degraded in areas with greater wetlands acreage versus less acreage. Thus, the "baseline" acreage used in the analysis—that is, the assumed acreage starting point, prior to any degradation—significantly affects the assessment of forgone benefits. Yet in calculating the harms from wetlands losses, the agencies assume an unreasonably low baseline acreage of just 10,000 per state, 2020 EA at 210, even though most states have well beyond 10,000 acres of wetlands. Maryland alone has roughly 600,000 wetlands acres.[4] According to one expert, setting the low baseline acreage obscures more than $1.2 billion in annual harms caused by the Replacement Rule alone. *See* Mullen Report at 32.

By arbitrarily reducing the harms that in-state residents suffer from wetlands loss, the agencies "opportunistically frame[] the costs . . . of the rule." *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148–49 (D.C. Cir. 2011).

    C.    **The Agencies' Assumption that States Will Preserve Waters Losing Federal Protection Is Speculative and Overlooks Key Considerations**

The agencies also inappropriately minimize the harms of each rule under Section 404 through unsupported assumptions about state gap-filling. To support their claim that the benefits of each rule outweigh its costs, the agencies rely on the speculative assumption that states may preserve many of the waters losing federal protection. *See, e.g.,* 2020 EA at xxiii (showing that cost savings outweigh forgone benefits by greater ratio as states are assumed to fill the gap).

---

[4] U.S. Fish & Wildlife Serv., *Wetlands of Maryland* 18 (1995), *available at* https://www.fws.gov/wetlands/Documents%5CWetlands-Of-Maryland.pdf.

12

But agencies are not permitted to rely on "speculation . . . not supported by the record," *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1244 (9th Cir. 2001)—an important principle enshrined in EPA's own guidelines. Specifically, EPA guidelines provide that a cost-benefit analysis may account for rules that are "currently under consideration," but should not speculate about future rulemakings that are neither "imminent" nor can be "anticipated with a high degree of certainty." EPA, *Guidelines for Preparing Economic Analyses* 5-2, 5-13 (2010).

And here the agencies ignore concrete evidence showing that state regulations will likely not fill the regulatory gap. That evidence falls into three categories. First, states have little incentive to prohibit pollution across state lines. *See EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 495 (2014) (explaining that since "pollution emitted in one State . . . caus[es] harm in other States," states will typically underregulate pollution when "[l]eft unregulated"). Indeed, a key purpose of the Clean Water Act is to "protect[] downstream States from out-of-state pollution that they cannot themselves regulate," *Rapanos*, 547 U.S. at 777 (Kennedy, J., concurring), and that upstream states are incentivized to under-regulate. The agencies assume away this reality.

Second, state-by-state regulation can be very costly, and many states may lack the resources to effectively protect their own waters. For instance, Michigan—one of only two states to administer its own Section 404 program—generates permit fees covering less than 20% of the program's cost. Attorneys General of New York et al., Comment Letter to Revised Definition of "Waters of the United States" A-12 (Apr. 15, 2019). As fifteen states advised the agencies, regulating would require states to "commit a substantial amount of state money" or "impose extremely high permit application fees," either of which "would impose a substantial burden." *Id.*

Third, numerous states have staunchly opposed additional clean-water protections in the recent past. Indeed, thirty-two states sued to enjoin the Clean Water Rule in 2015, 85 Fed. Reg. at

13

22,258 n.15, arguing that the rule's modest expansion of federal jurisdiction would "burden the States with substantial unrecoverable costs," *see* States' Memorandum in Support of Motion for Preliminary Injunction 10, *North Dakota v. EPA*, 127 F. Supp. 3d 1047 (D.N.D. 2015). Yet despite this demonstrated antipathy to sensible clean-water controls, the agencies now implausibly assume that fifteen of those same states may fill the regulatory gap left by the Replacement Rule. *Compare* 85 Fed. Reg. at 22,258 n.15 *with* 2020 EA at 39–41.

In short, the agencies' claim that states may preserve the waters losing protection under these rules omits key considerations and thus inappropriately minimizes the harms of these rules.

## IV. In Stark Contrast to Their Treatment of Forgone Benefits, the Agencies Overestimate the Compliance-Cost Savings of Both Rules

While drastically undercounting the forgone benefits of each rule, the agencies take the opposite approach to cost savings, inflating these savings by quintupling their per-acre mitigation-cost estimates from the Clean Water Rule without explanation.

In 2015, when assessing the Clean Water Rule's impacts, the agencies used available data to catalogue mitigation costs, projecting per-acre mitigation costs to comply with the rule at $24–$66 thousand. *See* 2015 EA at xi (reporting total compliance cost), 40–41 (reporting total acreage affected). But at each step of these successive rollbacks, the agencies greatly increase this valuation without explanation. In the Repeal Rule, the agencies project a per-acre mitigation-cost savings of $51–$142 thousand—more than double their estimates from the Clean Water Rule. *See* 2019 EA at 69, 194. These numbers then jump even higher in the Replacement Rule, with per-acre mitigation-cost estimates for the national analysis of $146–$327 thousand. *See* 2020 EA at 174–75. In other words, the Replacement Rule's high-end cost-savings estimate is nearly five times the Clean Water Rule's high-end estimate per acre. With these across-the-board increases in

compliance costs, the agencies falsely report the Replacement Rule overall as net beneficial—even without correcting for their other methodological errors.

Yet the agencies offer little explanation or justification for this change, stating simply that they "updated mitigation costs per acre and linear foot for each state." Response to Comments at 94. This bare-bones account falls well short of the "reasoned explanation" necessary to "disregard[] facts and circumstances that underlay" the Clean Water Rule. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). Because the agencies "failed to identify or explain any changed circumstances, technology, or economic conditions that would justify this dramatic recalculation" of compliance costs, their "new and inflated calculations" lack a reasonable basis. *California v. Bernhardt,* 2020 WL 4001480, at *30 (N.D. Cal. July 15, 2020).

Since agencies "cannot put a thumb on the scale by undervaluing the benefits and overvaluing the costs of more stringent standards," *Ctr. for Biological Diversity*, 538 F.3d at 1198, this lopsided analysis cannot stand.

## CONCLUSION

For the forgoing reasons, this Court should grant Plaintiffs' motion.

Dated: December 1, 2020          Respectfully submitted,

/s/ Max Sarinsky
Max Sarinsky
Bethany A. Davis Noll (*pro hac vice* pending)
INSTITUTE FOR POLICY INTEGRITY
139 MacDougal Street, Third Floor
New York, NY 10012
(212) 992-8932
max.sarinsky@nyu.edu
*Counsel for Amicus Curiae*
*Institute for Policy Integrity*

15