**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

_____

CHESAPEAKE BAY FOUNDATION, INC., *et al.*,)

)

Plaintiffs,        )

)

v.              )        Civil Action Nos. RDB-20-1063,

)        RDB-20-1064

)

ANDREW R. WHEELER, in his official   )

capacity as Administrator of the U.S.   )

Environmental Protection Agency, *et al.*,  )

)

Defendants.     )

_____ )

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................................................................v

GLOSSARY ........................................................................................................xiv

INTRODUCTION...................................................................................................1

BACKGROUND.....................................................................................................3

    A.    Statutory and Regulatory Background.................................................3

        1.    CWA Permitting Programs.......................................................3

        2.    The Chesapeake Bay's Unique Status in the CWA...................................4

    B.    Prior Regulatory Definitions  of "Waters of the United States" and Litigation........................................................................................5

        1.    The 2015 Rule .........................................................................7

        2.    The Repeal Rule .....................................................................9

    C.    The Navigable Waters Protection Rule...............................................11

STANDARD OF REVIEW ....................................................................................12

ARGUMENT .......................................................................................................13

I.    The Court Lacks Jurisdiction to Consider Plaintiffs' Claims. .........................14

    A.    The Court Lacks Jurisdiction to Review the NWPR...........................14

        1.    Plaintiffs Lack Standing to Challenge the NWPR....................14

        2.    Plaintiffs' Challenges to the NWPR Are Not Ripe...................18

    B.    The Court Lacks Jurisdiction to Review the Repeal Rule. ...................19

II.    The NWPR Should Be Upheld........................................................................20

    A.    The NWPR Is Permissible Under the CWA. .....................................20

        1.    The NWPR Reasonably Construes "Waters of the United States," an Ambiguous Statutory Phrase................................21

2.  Neither the Act nor *Rapanos* Precludes the Agencies' Reasonable Interpretation of "Waters of the United States." ..................22

  a.  *Rapanos* Does Not Foreclose the Agencies' Interpretation of "Waters of the United States." ..........................22

  b.  The CWA's Objective Does Not Foreclose the Agencies' Interpretation of "Waters of the United States." ..................................................................................25

B.  The NWPR Is Neither Arbitrary Nor Capricious Under the APA ......................30

  1.  Science Alone Cannot Determine the Agencies' Jurisdiction. ..........................................................................31

  2.  The NWPR's Consideration of Science Is Well-Reasoned and Supported by the Administrative Record. ........................................34

  3.  The Agencies Explained Their Reasons for Excluding Ephemeral Features ..............................................................................36

  4.  The NWPR's Treatment of Adjacent Wetlands Is Reasonable. ..........................................................................38

  5.  The Agencies Adequately Considered the Effects of the NWPR on Water Quality ..............................................................41

  6.  The NWPR Preserves State Flexibility to Manage Water Quality in the Chesapeake Bay ..............................................................43

III.  The Repeal Rule Was Lawful. ..................................................................46

A.  The Repeal Rule Was Reasonable and Well-Supported. ....................................47

  1.  The Agencies Reasonably Concluded that the 2015 Rule Extended Jurisdiction Beyond Recognized Limits of the CWA ..................................................................................47

  2.  The 2015 Rule's Distance Limitations Were Flawed. ...........................52

  3.  The Agencies Reasonably Returned to the Preexisting Regulatory Regime While Developing a New Definition. ......................53

4.      The Repeal Rule Did Not Need to Substantively Reevaluate the 2015 Rule's Record Concerning Science or Water Quality. ................................................................................55

B.      The Repeal Rule Complied with APA Procedural Requirements. ........................58

1.      The Repeal Rule Complied with Notice and Comment Procedures and Was Not Predetermined. ................................58

2.      The Economic Analysis Accompanying the Repeal Rule Was Not a Basis for the Rule. ..................................................61

3.      The Repeal Rule's Conclusions Concerning the Distance Limitations Were Sufficiently Noticed and Supported. ............................61

IV.     To the Extent the Court Finds Fault with Either Rule, It Should Defer Ruling on Remedy. .......................................................................63

CONCLUSION ...........................................................................................64

# TABLE OF AUTHORITIES

## Cases

*Air Alliance Houston v. EPA,*
  906 F.3d 1049 (D.C. Cir. 2018) .......................................................57

*Alliance for Natural Health U.S. v. Sebelius,*
  775 F. Supp. 2d 114 (D.D.C. 2011)...................................................36

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission,*
  988 F.2d 146 (D.C. Cir. 1993) .........................................................63

*Alpharma, Inc. v. Leavitt,*
  460 F.3d 1 (D.C. Cir. 2006) .............................................................62

*American Canoe Ass'n, Inc. v. Murphy Farms, Inc.,*
  326 F.3d 505 (4th Cir. 2003) ...........................................................16

*American Express Co. v. Italian Colors Restaurant,*
  570 U.S. 228 (2013).........................................................................26

*American Farm Bureau Federation v. EPA,*
  984 F. Supp. 2d 289 (M.D. Pa. 2013),
  *aff'd,* 792 F.3d 281 (3d Cir. 2015) ...................................................45

*American Farm Bureau Federation v. EPA,*
  792 F.3d 281 (3d Cir. 2015) ...............................................5, 44, 45

*American Hospital Ass'n v. NLRB,*
  499 U.S. 606 (1991).........................................................................13

*Arbaugh v. Y&H Corp.,*
  546 U.S. 500 (2006).........................................................................12

*Arkansas v. Oklahoma,*
  503 U.S. 91 (1992)...........................................................................51

*Baehr v. The Creig Northrop Team, P.C.,*
  953 F.3d 244 (4th Cir. 2020) ...........................................................14

*California v. Wheeler,*
  467 F. Supp. 3d 864 (N.D. Cal. 2020).....................2, 11, 22, 23, 25, 27

*Central Delta Water Agency v. United States,*
  306 F.3d 938 (9th Cir. 2002) ...........................................................16

*Chevron, U.S.A., Inc. v. NRDC*,
  467 U.S. 837 (1984) ............................................................................... 1, 13, 20

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ...................................................................................... 13

*Clapper v. Amnesty International USA*,
  568 U.S. 398 (2013) ...................................................................................... 16

*Coalition for Mercury-Free Drugs v. Sebelius*,
  671 F.3d 1275 (D.C. Cir. 2012) ..................................................................... 20

*Colorado v. EPA*,
  445 F. Supp. 3d 1295 (D. Colo. 2020) ......................................................... 11, 24

*County of Maui v. Hawaii Wildlife Fund*,
  140 S. Ct. 1462 (2020) ............................................................................... 33, 38

*CTIA-The Wireless Ass'n v. FCC*,
  530 F.3d 984 (D.C. Cir. 2008) ....................................................................... 19

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ...................................................................................... 12

*Davis v. Federal Election Commision*,
  554 U.S. 724 (2008) ...................................................................................... 12

*Deerfield Plantation Phase II-B Property Owners Ass'n, Inc. v. U.S. Army Corps of Engineers*,
  501 F. App'x 268 (4th Cir. 2012) ................................................................... 25

*Entergy Corp. v. Riverkeeper, Inc.*,
  556 U.S. 208 (2009) ...................................................................................... 21

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ..................................................... 30, 31, 46, 54, 57, 58, 60

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
  528 U.S. 167 (2000) ............................................................................... 14, 15, 17

*Georgia v. Pruitt*,
  326 F. Supp. 3d 1356 (S.D. Ga. 2018) ............................................................. 8

*Georgia v. Wheeler*,
  418 F. Supp. 3d 1336 (S.D. Ga. 2019) ............................................................. 9

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ...................................................................................63

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)........................................................................................16

*In re EPA & DOD Final Rule*,
    803 F.3d 804 (6th Cir. Oct. 9, 2015),
    *vacated by* 713 F. App'x 489 (6th Cir. 2018) ....................................................7

*In re EPA & DOD Final Rule*,
    713 F. App'x 489 (6th Cir. 2018).......................................................................8

*Kentuckians for Commonwealth Inc. v. Rivenburgh*,
    317 F.3d 425 (4th Cir. 2003) ....................................................................27, 63

*Lewis v. Casey*,
    518 U.S. 343 (1996)........................................................................................12

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    140 S. Ct. 2367 (2020) .......................................................................58, 59, 61

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).............................................................................12, 14, 16

*Lujan v. Nat'l Wildlife Federation*,
    497 U.S. 889 (1990).............................................................................17, 18, 19

*Mayo Foundation for Medical Education & Research v. United States*,
    562 U.S. 44 (2011)..........................................................................................21

*McLouth Steel Products Corp. v. Thomas*,
    838 F.2d 1317 (D.C. Cir. 1988) ..................................................................58, 62

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)....................................................................................63, 64

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)........................................................................................25

*Nat'l Ass'n of Home Builders v. EPA*,
    667 F.3d 6 (D.C. Cir. 2011)..............................................................................17

*Nat'l Ass'n of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012) .......................................................................61

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Services*,
    545 U.S. 967 (2005) .............................................................................. 2, 21, 23, 25, 28, 51

*Nat'l Park Hospitality Ass'n v. Department of the Interior*,
    538 U.S. 803 (2003) ........................................................................................... 12, 18

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995) ...................................................................................... 17

*North Carolina Growers' Ass'n v. United Farm Workers*,
    702 F.3d 755 (4th Cir. 2012) ................................................................................. 13, 55

*North Carolina v. Rice*,
    404 U.S. 244 (1971) ...................................................................................................... 20

*North Dakota v. EPA*,
    127 F. Supp. 3d 1047 (D.N.D. Aug. 27, 2015) ....................................................... 7

*Ohio v. U.S. Army Corps of Engineers*,
    No. 2:15-cv-2467, 2019 WL 1368850 (S.D. Ohio Mar. 26, 2019) ......................... 8

*Ohio Valley Environmental Coalition v. Aracoma Coal Co.*,
    556 F.3d 177 (4th Cir. 2009) ....................................................................................... 13

*Olivares v. Transportation Security Administration*,
    819 F.3d 454 (D.C. Cir. 2016) ..................................................................................... 62

*Precon Development Corp. v. U.S. Army Corps of Engineers*,
    633 F.3d 278 (4th Cir. 2011) ....................................................................................... 24

*Preiser v. Newkirk*,
    422 U.S. 395 (1975) ...................................................................................................... 20

*Pronsolino v. Nastri*,
    291 F.3d 1123 (9th Cir. 2002) ...................................................................................... 4

*Puget Soundkeeper Alliance v. Wheeler*,
    No. C15-1342-JCC, 2019 WL 6310562 (W.D. Wash. Nov. 25, 2019) ............................ 9, 15

*Rapanos v. United States*,
    547 U.S. 715 (2006) ............................................................... 1, 2, 6, 23, 24, 26, 27, 35, 40

*Reno v. Catholic Social Services, Inc.*,
    509 U.S. 43 (1993) ........................................................................................................ 12

*Reno v. Flores*,
    507 U.S. 292 (1993) ................................................................13, 37, 38, 39

*Shalala v. Guernsey Memorial Hospital*,
    514 U.S. 87 (1995) .................................................................................36

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) ...............................................................................16

*Solid Waste Agency of North Cook County v. U.S. Army Corps of Engineers*,
    531 U.S. 159 (2001) .........................................6, 22, 23, 26, 27, 37, 52, 58

*South Carolina Coastal Conservation League v. Pruitt*,
    318 F. Supp. 3d 959 (D.S.C. Aug. 16, 2018) ........................................ 8

*Southern Walk at Broadlands Homeowner's Ass'n Inc., v. OpenBand at Broadlands LLC*,
    713 F.3d 175 (4th Cir. 2013) ...............................................................12

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ...........................................................................63

*Steel Co. v. Citizens for a Better Environment*,
    523 U.S. 83 (1998) .................................................................................12

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009) .........................................................................14, 15

*Texas v. EPA*,
    No. 3:15-cv-00162, 2018 WL 4518230 (S.D. Tex. Sept. 12, 2018) ...... 8

*Texas v. EPA*,
    389 F. Supp. 3d 497 (S.D. Tex. 2019) ................................................. 9

*Texas v. United States*,
    523 U.S. 296 (1998) ...............................................................................19

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017) ...........................................................................63

*United States v. Bailey*,
    571 F.3d 791 (8th Cir. 2009) ................................................................25

*United States v. Deaton*,
    332 F.3d 698 (4th Cir. 2003) ..........................................................20, 21

*United States v. Donovan,*
   661 F.3d 174 (3d Cir. 2011) ...................................................................................25

*United States v. Eurodif S.A.,*
   555 U.S. 305 (2009) ...............................................................................................23

*United States v. Johnson,*
   467 F.3d 56 (1st Cir. 2006)......................................................................................25

*United States v. Mendoza,*
   464 U.S. 154 (1984) ................................................................................................64

*United States v. Riverside Bayview Homes, Inc.,*
   474 U.S. 121 (1985) ..............................................................................6, 22, 38, 40

*United Steelworkers of America v. Marshall,*
   647 F.2d 1189 (D.C. Cir. 1980) ..............................................................................59

*Vasquez v. Hillery,*
   474 U.S. 254 (1986) ................................................................................................24

*Vermont Yankee Nuclear Power Corp. v. NRDC,*
   435 U.S. 519 (1978) ................................................................................................60

*Warth v. Seldin,*
   422 U.S. 490 (1975) ................................................................................................20

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) ................................................................................................64

### Statutes

5 U.S.C. § 706(2) ...........................................................................................13, 63

33 U.S.C. §§ 1251 et seq............................................................................................1

33 U.S.C. § 1251(a)-(b) ...........................................................................................25

33 U.S.C. § 1251(a) ................................................................................................. 3

33 U.S.C. § 1251(a)(2)..............................................................................................57

33 U.S.C. § 1251(b) .................................................................................3, 10, 22, 27

33 U.S.C. § 1255(a)(1) .............................................................................................28

33 U.S.C. § 1258(a) .................................................................................................28

33 U.S.C. § 1267 ..............................................................................................28, 43

33 U.S.C. § 1267(a)-(c)...................................................................................... 5

33 U.S.C. § 1267(a)(2) ....................................................................................... 5

33 U.S.C. § 1267(a)(3) ....................................................................................... 5

33 U.S.C. § 1267(d)-(e) ..................................................................................... 5

33 U.S.C. § 1267(g)............................................................................................ 5

33 U.S.C. § 1311 ................................................................................................. 4

33 U.S.C. § 1311(a) ........................................................................................... 3

33 U.S.C. § 1311(b)(1)(C) .................................................................................. 4

33 U.S.C. § 1313 ...............................................................................................45

33 U.S.C. § 1313(a) ............................................................................................ 4

33 U.S.C. § 1313(b) ............................................................................................ 4

33 U.S.C. § 1313(c)(1) ........................................................................................ 4

33 U.S.C. § 1313(d) ............................................................................................ 4

33 U.S.C. § 1313(d)(1)(A) .................................................................................. 4

33 U.S.C. § 1313(d)(1)(B) .................................................................................. 4

33 U.S.C. § 1314 ................................................................................................. 4

33 U.S.C. § 1316 ................................................................................................. 4

33 U.S.C. § 1317 ................................................................................................. 4

33 U.S.C. § 1329(i)(1) .......................................................................................28

33 U.S.C. § 1342 ................................................................................................. 4

33 U.S.C. § 1344(a) ............................................................................................ 4

33 U.S.C. § 1344(d) ............................................................................................ 4

33 U.S.C. § 1344(g) .................................................................................................... 4

33 U.S.C. § 1362(7) ................................................................................. 3, 9, 21, 22, 26

33 U.S.C. § 1362(11) .................................................................................................. 4

33 U.S.C. § 1362(12) .................................................................................................. 3

33 U.S.C. § 1377(e) .................................................................................................... 4

## Regulations

33 C.F.R. § 328.3(a) .................................................................................................. 6

40 C.F.R. § 120.2(3)(i)(C) .......................................................................................38

40 C.F.R. § 120.2(3)(iii) ..........................................................................................36

40 C.F.R. § 122.44(d)(1)(vii)(A) ............................................................................... 4

40 C.F.R. § 130.2(j) .................................................................................................... 4

40 C.F.R. § 130.7(b)(1) ............................................................................................. 4

40 C.F.R. § 131.8 ....................................................................................................... 4

40 C.F.R. § 131.10(b) ...............................................................................................42

40 C.F.R. § 232.2(q) .................................................................................................. 6

## Federal Registers

39 Fed. Reg. 12,115 (Apr. 3, 1974) .....................................................................5, 22

42 Fed. Reg. 37,122 (July 19, 1977) .......................................................................... 5

76 Fed. Reg. 549 (Jan. 5, 2011) ................................................................................. 5

80 Fed. Reg. 37,054 (June 29, 2015) .............................................................. 7, 32, 50

82 Fed. Reg. 12,497 (Mar. 03, 2017) ......................................................................... 9

82 Fed. Reg. 34,899 (July 27, 2017) ...................................................................10, 59

83 Fed. Reg. 5200 (Feb. 6, 2018) .............................................................................. 8

83 Fed. Reg. 32,227 (July 12, 2018) ........................................................ 10, 54, 59, 60, 61, 62

84 Fed. Reg. 56,626 (Oct. 22, 2019) .............. 10, 47, 48, 49, 50, 51, 53, 54, 55, 56, 58, 60, 61, 62

85 Fed. Reg. 22,250 (Apr. 21, 2020) .........................................3, 5, 11, 22, 24, 26, 29, 30, 31, 32
33, 34, 35, 36, 37, 38, 39, 41, 42, 43, 46

## GLOSSARY

| | |
|---|---|
| 2015 Rule | Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015) |
| APA | Administrative Procedure Act |
| Bay TMDL | Clean Water Act Section 303(d): Notice for Establishment of the Total Maximum Daily Load (TMDL) for the Chesapeake Bay, 76 Fed. Reg. 549 (Jan. 5, 2011). |
| Corps | U.S. Army Corps of Engineers |
| CWA | Clean Water Act, 33 U.S.C. §§ 1251 et seq. |
| EA | Economic Analysis |
| EPA | U.S. Environmental Protection Agency |
| NPDES | National Pollutant Discharge Elimination System |
| NWPR | Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) |
| Repeal Rule | Definition of "Waters of the United States"- Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019) |
| RPA | Resource and Programmatic Assessment |
| RTC | Response to Comments |
| SAB | EPA's Science Advisory Board |
| TMDL | Total Maximum Daily Load |

**INTRODUCTION**

The Navigable Waters Protection Rule ("NWPR") brings decades of debate regarding the jurisdictional limits of the Clean Water Act, 33 U.S.C. §§ 1251 et seq., ("CWA") to a close. Previously, CWA jurisdiction often turned on an administratively burdensome and case-specific analysis. This analysis looked at whether certain wetlands and other waters had a "significant nexus" to traditionally navigable waters—a case-by-case analysis that was a stopgap "[a]bsent more specific regulations" by the U.S. Army Corps of Engineers ("Corps") and EPA (collectively the "Agencies"). *Rapanos v. United States*, 547 U.S. 715, 782 (2006) (Kennedy, J., concurring in judgment). The application of this standard muddied the waters of CWA jurisdiction. It spawned years of litigation. But the NWPR now more clearly defines discrete categories of covered waters. The regulated public can better anticipate whether a CWA permit may be required to discharge pollutants into a particular water or wetland.

Plaintiffs' challenges to the NWPR lack merit. Yet this Court should not even reach the merits of these claims. Plaintiffs fail to show any concrete application of the NWPR now injuring their interests. Even if the Court hears Plaintiffs' facial challenge, it should uphold the NWPR. The rule is consistent with the CWA and well-supported.

The NWPR promulgates a reasonable interpretation of the CWA's ambiguous phrase "waters of the United States." That Agency construction is entitled to deference by this Court. *See Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). Plaintiffs argue otherwise, citing the Supreme Court opinions in *Rapanos*. But *Rapanos* addresses a fundamentally different question from the question before this Court. *Rapanos* addresses the outer limits of the CWA: how far can the Agencies reach; what waters may the Agencies regulate? The opinions do not dictate what waters the Agencies *must* regulate.

1

Further, while the Agencies carefully crafted the NWPR interpretation to synthesize major aspects of the opinions in *Rapanos*, the Agencies' reasonable construction of the statute is entitled to deference—*regardless of these prior judicial interpretations. See Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 982 (2005). A "court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference *only if* the prior court decision holds that its construction follows from the *unambiguous* terms of the statute and thus leaves no room for agency discretion." *Id.* at 982 (emphasis added). Yet none of the opinions in *Rapanos* found the term "navigable waters" meaning "waters of the United States" unambiguous. Rather, as the Chief Justice stressed, the Agencies are "delegated rulemaking authority . . . [and] are afforded generous leeway by the courts" in interpreting the jurisdictional reach of the CWA. *Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring). The NWPR articulates a clear and reasonable construction of the CWA.

The NWPR is also neither arbitrary nor capricious under the Administrative Procedure Act ("APA"). The Agencies' analysis and discussion span more than 1,500 pages across the rule's preamble, Resource and Programmatic Assessment ("RPA"), Economic Analysis ("EA"), and Response to Comments ("RTC"). Plaintiffs suggest that scientific data alone should somehow determine the scope of CWA jurisdiction. It cannot. Jurisdiction is fundamentally a legal inquiry. And the Agencies did consider the science, as well as other factors relevant to their reasoned decisionmaking. As one court explained in denying a motion for preliminary injunction of the NWPR, "Plaintiffs' arguments that the Agencies disregarded the scientific evidence they previously had gathered is ultimately a policy disagreement as well." *California v. Wheeler*, 467 F. Supp. 3d 864, 875 (N.D. Cal. 2020).

Plaintiffs incorrectly suggest that the mere fact that the NWPR will shift regulation of some waters and wetlands to the states and tribes automatically spells environmental catastrophe. But the Agencies' careful balancing of the CWA's objective and policies, including the CWA's cooperative federalism framework, is well-reasoned and consistent with congressional intent. The Agencies are entitled to summary judgment.

Because the NWPR replaced the Repeal Rule, the Court need not consider Plaintiffs' Repeal Rule challenges. These challenges are unripe unless and until the NWPR ceases to be in effect. But if the Court reaches the merits of the Repeal Rule, the Agencies are entitled to summary judgment on that rule as well. If the Court finds flaws in either rule, separate remedy briefing, tailored to any decision, would be warranted.

## BACKGROUND

### A.   Statutory and Regulatory Background

Congress enacted the CWA with the objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), while declaring its policy to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." *Id.* § 1251(b). The Act prohibits "the discharge of any pollutant by any person," *id.* § 1311(a), to "navigable waters," which "means the waters of the United States," *id.* § 1362(7), unless otherwise authorized under the Act. The Act also prohibits certain discharges to non-jurisdictional waters that are conveyed to jurisdictional waters and that are not otherwise authorized under the Act. *See* 85 Fed. Reg. 22,250, 22,289 (Apr. 21, 2020).

### 1.   CWA Permitting Programs

Two programs are key to implementing the CWA's prohibition on the unauthorized discharge of pollutants into "navigable waters." 33 U.S.C. §§ 1311(a), 1362(12). EPA or authorized states issue CWA National Pollutant Discharge Elimination System ("NPDES")

permits for the discharge of pollutants (other than dredged or fill material) from point sources into "waters of the United States." *Id*. § 1342. NPDES permits control water pollution using two strategies. First, permits must include effluent limitations that are based on the capability of pollution-control technology. *Id*. §§ 1311, 1314, 1316-17, 1362(11). These are called "technology-based" limitations. Second, permits must also include any additional limits that are needed to implement applicable water quality standards. *Id*. § 1311(b)(1)(C); 40 C.F.R. § 122.44(d)(1)(vii)(A). These are called "water quality-based" limitations. For discharges of dredged or fill material into "waters of the United States," the Corps, or a state or tribe with a federally approved program, may issue CWA Section 404 permits. 33 U.S.C. § 1344(a), (d), (g).

States and authorized tribes adopt water quality standards for particular waterbodies or waterbody segments within their boundaries. 33 U.S.C. §§ 1313(a), (b), (c)(1), 1377(e); 40 C.F.R. § 131.8. They then identify, and prioritize, water-quality-limited segments, i.e., segments that do not meet water quality standards even after implementation of technology-based effluent limitations. 33 U.S.C. § 1313(d)(1)(A) & (B); 40 C.F.R. §§ 130.2(j) & 130.7(b)(1). States and tribes develop a Total Maximum Daily Load ("TMDL") for each impaired waterbody and pollutant causing the impairment. 33 U.S.C. § 1313(d). TMDLs function primarily as planning devices. *See Pronsolino v. Nastri*, 291 F.3d 1123, 1129 (9th Cir. 2002). TMDLs are implemented by adjusting pollutant discharge limits in individual permits and/or by nonpoint source controls.

### 2.    The Chesapeake Bay's Unique Status in the CWA

Since 1983, the states in the Chesapeake Bay watershed and the federal government have, through a series of interstate compacts known as the Chesapeake Bay Agreements and a structure known as the Chesapeake Bay Program partnership, joined together to study, plan, and implement pollutant reduction measures to restore the Bay. This partnership is enshrined in the

CWA, "animated by a shared objective" to restore and maintain the Nation's waters. *American Farm Bureau Federation v. EPA*, 792 F.3d 281, 299 (3d Cir. 2015); *see also* 33 U.S.C. § 1267(a)-(c). The CWA provides a means for EPA to award federal grants to the states and authorized tribes for technical assistance, implementation, and monitoring to carry out the section of the Act entitled "Chesapeake Bay," 33 U.S.C. § 1267(d)-(e), including the "Chesapeake Bay Agreement" defined as "formal, voluntary agreements executed to achieve the goal of restoring and protecting the Chesapeake Bay ecosystem and the living resources of the Chesapeake Bay ecosystem and signed by the Chesapeake Executive Council." 33 U.S.C. § 1267(a)(2).[1] The CWA also directs EPA, in coordination with states in the Chesapeake Bay watershed, to "ensure that management plans are developed and implementation is begun by signatories to the Chesapeake Bay Agreement to achieve and maintain" the goals of the Bay restoration program. *Id.* § 1267(g). In 2010, EPA adopted a TMDL for the Chesapeake Bay watershed (the "Bay TMDL"). 76 Fed. Reg. 549 (Jan. 5, 2011).

**B.    Prior Regulatory Definitions of "Waters of the United States" and Litigation**

The Corps first promulgated regulations defining "waters of the United States" in the 1970s. Those included only waters subject to the ebb and flow of the tide or used "for purposes of interstate or foreign commerce." 39 Fed. Reg. 12,115, 12,119 (Apr. 3, 1974). Thereafter, the Corps broadened its interpretation of the phrase. *See, e.g.*, 42 Fed. Reg. 37,122, 37,144 (July 19, 1977). In the 1980s, the Agencies adopted regulatory definitions substantially similar to the 1977

---

[1] The Act defines "Chesapeake Bay Ecosystem" as "the ecosystem of the Chesapeake Bay *and its watershed*." 33 U.S.C. § 1267(a)(3) (emphasis added). As the Agencies noted in the NWPR preamble, this and "[s]imilar broad pollution control programs were created for other major watersheds," and the CWA clarifies "that these provisions address all bodies of water in the watersheds . . . , regardless of the jurisdictional status of those waters." 85 Fed. Reg. 22,253.

definition; those regulations remained in effect until 2015. *See* 33 C.F.R. § 328.3(a) (1987) (Corps); 40 C.F.R. § 232.2(q) (1988) (EPA) (collectively, the "1986 Regulations").

Over time, the Agencies refined their application of the 1986 Regulations, as informed by three Supreme Court decisions. In *United States v. Riverside Bayview Homes, Inc.*, the Court upheld the Corps' assertion of jurisdiction over wetlands adjacent to navigable waters, in a case involving "a wetland that actually abuts on a navigable waterway." 474 U.S. 121, 135 (1985). But in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*"), the Court held "the text of the statute will not allow" the extension of CWA jurisdiction to "ponds that are *not* adjacent to open water." *Id.* at 168.

In *Rapanos*, the Supreme Court then assessed the Corps' assertion of jurisdiction over four specific wetlands that were at issue in an enforcement action and a permit proceeding. *Rapanos*, 547 U.S. at 719-20, 729-30. Pursuant to Justice Scalia's plurality opinion and a concurrence by Justice Kennedy, the Court found the Corps' jurisdictional analysis too expansive and remanded it for further consideration. *Id.* at 757 (Scalia, J., plurality); *id.* at 786-87 (Kennedy, J., concurring). The plurality stated that "the traditional term 'navigable waters' . . . carries *some* of its original substance" and "includes, at bare minimum, the ordinary presence of water." *Id.* at 734 (Scalia, J., plurality). But the plurality stated the term "waters of the United States" does "not necessarily exclude *seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months." *Id.* at 732 n.5. Further, the plurality would have excluded from jurisdiction "[w]etlands with only an intermittent, physically remote hydrologic connection to 'waters of the United States.'" *Id.* at 742.

In concurring in the judgment, Justice Kennedy opined that jurisdiction may extend to wetlands with a "'significant nexus' to waters that are or were navigable in fact or that could

reasonably be so made." *Id.* at 759 (Kennedy, J., concurring). But Justice Kennedy rejected the dissent's view that the CWA "would permit federal regulation whenever wetlands lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters." *Id.* at 778.

### 1.    The 2015 Rule

In 2015, the Agencies revised the regulatory definition of "waters of the United States." 80 Fed. Reg. 37,054 (June 29, 2015) ("2015 Rule"). Using Justice Kennedy's "significant nexus" discussion as its legal touchstone, *id.* at 37,061, the 2015 Rule had the "objective of enhancing regulatory clarity, predictability and consistency." *Id.* at 37,090. It purported to accomplish this in part by establishing "distance thresholds"—applied to certain waters nationwide—which rendered waters: (1) "per se jurisdictional"; (2) "subject to a case-specific significant nexus evaluation"; or (3) presumptively not jurisdictional (unless one of several special identified categories). *Id.* at 37,092-93.

Multiple parties sought judicial review of the 2015 Rule in courts across the country. A court of appeals and multiple district courts stayed or enjoined the 2015 Rule, concluding plaintiffs were likely to succeed. As a result, the 2015 Rule was only in effect for a limited time, and only in certain states. At no point in time was the 2015 Rule in effect nationwide. Before the rule's effective date, a district court preliminarily enjoined it in thirteen states. *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1051, 1060 (D.N.D. Aug. 27, 2015).[2] Approximately six weeks later, the Sixth Circuit stayed the rule nationwide. *In re EPA & DOD Final Rule*, 803 F.3d 804,

---

[2] The District of North Dakota's injunction applied in Alaska, Arizona, Arkansas, Colorado, Idaho, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, South Dakota, and Wyoming. *See id.* at 1051 & n.1; *North Dakota v. EPA*, No. 3:15-cv-59, Dkt. No. 79 at 4 (D.N.D. Sept. 4, 2015) (clarifying that the injunction's scope is limited to the parties).

808-09 (6th Cir. Oct. 9, 2015), *vacated by* 713 F. App'x 489 (6th Cir. Feb. 28, 2018). After the Supreme Court ruled that challenges to the 2015 Rule must proceed in the district courts, the Sixth Circuit lifted its stay of the rule. 713 F. App'x 489. However, because the Agencies acted administratively to extend the 2015 Rule's effective date to 2020, the rule did not go into immediate effect (in states not subject to a district court's injunction) when the Sixth Circuit's stay was lifted. *See* 83 Fed. Reg. 5200 (Feb. 6, 2018). Additionally, a district court preliminarily enjoined the rule in eleven more states. *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1370 (S.D. Ga. June 8, 2018).[3] After the Agencies' rule extending the 2015 Rule's effective date was enjoined nationwide, the 2015 Rule became effective except where subject to an injunction. *South Carolina Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959, 966, 969 (D.S.C. Aug. 16, 2018). A month later, the 2015 Rule was preliminarily enjoined in four additional states. *Texas v. EPA*, No. 3:15-cv-00162, 2018 WL 4518230 (S.D. Tex. Sept. 12, 2018) (enjoining the rule in Louisiana, Mississippi, and Texas); *North Dakota v. EPA*, No. 3:15-cv-59, Dkt. No. 250 (D.N.D. Sept. 18, 2018) (enjoining the rule in Iowa).[4] Additionally, another court preliminarily enjoined the rule in Oregon. *Oregon Cattlemen's Ass'n v. EPA*, No. 3:19-cv-564, Dkt. No. 58 (D. Or. July 26, 2019), *vacated as moot* Dkt. No. 81 (Mar. 2, 2020).[5]

---

[3] The Southern District of Georgia's injunction applied in Alabama, Florida, Georgia, Indiana, Kansas, Kentucky, North Carolina, South Carolina, Utah, West Virginia, and Wisconsin. *Id.*

[4] At the request of state parties, district courts later lifted the preliminary injunctions for two states and part of New Mexico. *See North Dakota v. EPA*, No. 3:15-cv-59, Dkt. No. 280 (D.N.D. May 14, 2019) (lifting injunction as to Colorado and New Mexico, but retaining injunction for coalition of New Mexico counties); *Georgia v. Wheeler*, No. 2:15-cv-79, Dkt. No. 253 (S.D. Ga. May 2, 2019) (withdrawing Wisconsin as a plaintiff).

[5] Four other states were denied preliminary injunctions. *See Ohio v. U.S. Army Corps of Engineers*, No. 2:15-cv-2467, 2019 WL 1368850 (S.D. Ohio Mar. 26, 2019) (Michigan, Ohio, and Tennessee), *appeal dismissed as moot*, *Ohio v. EPA*, 969 F.3d 306, 310 (6th Cir. 2020); *Oklahoma v. EPA*, No. 4:15-cv-381, Dkt. No. 110 (N.D. Okla. May 29, 2019).

Two courts ruled on summary judgment that the 2015 Rule was unlawful and remanded the rule to the Agencies. *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1372 (S.D. Ga. 2019); *Texas v. EPA*, 389 F. Supp. 3d 497, 504-06 (S.D. Tex. 2019). In so ruling, the Southern District of Georgia held that "the definition of waters of the United States in the [2015] WOTUS Rule extends beyond [the Agencies'] authority under the CWA." *Georgia*, 418 F. Supp. 3d at 1360. That court also held that the 2015 Rule's "distance limitations" were arbitrarily "selected for 'clarity' and convenience" yet lacked "scientific findings" justifying these key features. *Id.* at 1366. The Southern District of Texas held that the rule violated APA procedural requirements, including the failure to properly notice the distance limitations. *Texas*, 389 F. Supp. 3d at 504-06. Another court dismissed a challenge to the 2015 Rule on standing grounds, holding that plaintiffs had not identified "any project, proposed or existing, that is causing or will soon cause the harms he is concerned about." *Puget Soundkeeper Alliance v. Wheeler*, No. C15-1342-JCC, 2019 WL 6310562, at *7 n.8 (W.D. Wash. Nov. 25, 2019). Although several challenges to the 2015 Rule remain, those challenges are not currently proceeding because the rule has been repealed.[6]

### 2.     The Repeal Rule

In 2017, the President issued Executive Order 13778, which directed the Agencies to "review" the 2015 Rule and "consider interpreting the term 'navigable waters,' as defined in 33 U.S.C. 1362(7), in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos v. United States*." 82 Fed. Reg. 12,497, 12,497 (Mar. 3, 2017). Consistent with this directive, in

---

[6] *See, e.g.*, *Waterkeeper Alliance v. Wheeler*, No. 3:18-cv-3521, Dkt. No. 84 (N.D. Cal. Sept. 20, 2020) (denying plaintiffs' summary judgment motion "without prejudice to its renewal if and when the 2015 Rule were to become operative again"); *Southeast Stormwater Ass'n v. EPA*, No. 4:15-cv-579, Dkt. No. 104 (N.D. Fla. Aug. 14, 2020) (denying plaintiffs' summary judgment motion without prejudice and administratively closing the matter until the stay is lifted); *Washington Cattlemen's Ass'n v. EPA*, No. 2:19-cv-569, Dkt. No. 86 (W.D. Wash. July 31, 2020) (staying plaintiff's claims regarding the 2015 Rule and the Repeal Rule).

July 2017 (during a period when the 2015 Rule was stayed nationwide) the Agencies proposed to rescind the 2015 Rule. 82 Fed. Reg. 34,899 (July 27, 2017). The Agencies later clarified their proposal and sought additional comment through a supplemental notice of proposed rulemaking. 83 Fed. Reg. 32,227 (July 12, 2018). The Agencies reviewed approximately 770,000 comments. *See* 84 Fed. Reg. 56,626, 56,630 (Oct. 22, 2019) ("Repeal Rule").

After the rulemaking process, the Agencies repealed the 2015 Rule, and reinstated the 1986 Regulations' definition of "waters of the United States" and the regulatory regime that had existed prior to the 2015 Rule. The Agencies repealed the 2015 Rule for four primary reasons. First, the Agencies concluded that the 2015 Rule exceeded the scope of the Agencies' CWA authority. *Id.* at 56,627. Second, the 2015 Rule did not adequately consider and accord due weight to the express congressional policy in CWA Section 101(b) to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution" and "to plan the development and use . . . of land and water resources." *Id.* at 56,626 (quoting 33 U.S.C. § 1251(b)). Third, the 2015 Rule improperly approached the limits of constitutional validity without a clear statement from Congress in the CWA. *Id.* Fourth, the Agencies' distance limits in the 2015 Rule violated procedural requirements and were not sufficiently supported by the administrative record. *Id.*

The Repeal Rule became effective nationwide on December 23, 2019. *Id.* It has been challenged in various district courts. With the exception of a few cases (including this one), those challenges are not currently proceeding.[7] The NWPR replaced the Repeal Rule on June 22, 2020.

---

[7] *See, e.g.*, *Murray v. Wheeler*, No. 1:19-cv-1498, Dkt. No. 22 (N.D.N.Y. July 28, 2020) (briefing NWPR claims first); *Washington Cattlemen's Ass'n*, No. 2:19-cv-569, Dkt. No. 86 (staying 2015 Rule and Repeal Rule claims); *South Carolina Coastal Conservation League v. Wheeler*, No. 2:19-cv-3006, Dkt. No. 66 (D.S.C. Dec. 23, 2020) (holding case in abeyance); *Pierce v. EPA*, No. 0:19-cv-2193, Dkt. No. 41 (D. Minn. Dec. 28, 2020) (staying case). Briefing

C.       The Navigable Waters Protection Rule

On January 23, 2020, the Agencies signed a separate final rule—the NWPR—that takes a new approach to defining "waters of the United States." The NWPR went into effect on June 22, 2020. 85 Fed. Reg. 22,250. One district court denied a nationwide preliminary injunction. *California*, 467 F. Supp. 3d at 877. But in Colorado, a state-specific preliminary injunction currently applies. *See Colorado v. EPA*, 445 F. Supp. 3d 1295 (D. Colo. 2020), *on appeal*, No. 20-1238 (10th Cir.) (oral argument held Nov. 18, 2020).

The NWPR establishes four categories of jurisdictional waters: (1) the territorial seas and traditional navigable waters; (2) tributaries of such waters; (3) certain lakes, ponds, and impoundments of jurisdictional waters; and (4) wetlands adjacent to other jurisdictional waters (other than jurisdictional wetlands). 85 Fed. Reg. at 22,273. By creating these discrete categories of jurisdictional waters, the NWPR moves beyond the case-specific application of a "significant nexus" test. *Id*. The NWPR also specifies "exclusions for many water features that traditionally have not been regulated, and define[s] the operative terms used in the regulatory text." *Id*. at 22,270; *see also id*. at 22,340-41.

The NWPR relies on "a unifying legal theory for federal jurisdiction over those waters and wetlands that maintain a sufficient surface water connection to traditional navigable waters or the territorial seas." *Id*. at 22,252. It extends jurisdiction over "perennial" tributaries as well as "intermittent" tributaries that "flow[] continuously during certain times of the year and more than in direct response to precipitation." *Id*. at 22,275. The NWPR extends jurisdiction over "adjacent wetlands," meaning those wetlands that abut jurisdictional waters and those wetlands that are

---

has been scheduled on the Repeal Rule in only two other cases. *See Pasqua Yaqui Tribe v. EPA*, No. 4:20-cv-266, Dkt. No. 20 (D. Ariz. Oct. 28, 2020); *Navajo Nation v. Wheeler*, No. 2:20-cv-602, Dkt. No. 19 (D.N.M. Oct. 8, 2020).

non-abutting but are (1) "inundated by flooding" from a jurisdictional water during a typical year, (2) physically separated from a jurisdictional water only by certain natural features (e.g., a berm, bank, or dune), or (3) physically separated from a jurisdictional water by an artificial barrier that "allows for a direct hydrologic surface connection" during a typical year to a jurisdictional water. *Id.* at 22,251.

## STANDARD OF REVIEW

Courts "have an independent obligation to determine whether subject-matter jurisdiction exists." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Article III of the Constitution imposes an "irreducible constitutional minimum of standing" by limiting the jurisdiction of federal courts to "cases" and "controversies." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102 (1998). Ripeness likewise is "a justiciability doctrine" that is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 57 n.18 (1993)). Plaintiffs bear the burden of establishing jurisdiction. *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 181 (4th Cir. 2013). They must establish standing for both their NWPR and their Repeal Rule claims, as standing "is not dispensed in gross." *Davis v. Fed. Election Commission*, 554 U.S. 724, 734 (2008) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)). A "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)) (internal quotations omitted). Because Plaintiffs seek summary judgment, their affidavits must contain *specific* facts to establish jurisdiction. *Lujan*, 504 U.S. at 561.

Under the APA, "a reviewing court will overturn an agency action only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, . . . [or] without observance of procedure required by law.'" *North Carolina Growers' Ass'n v. United Farm Workers*, 702 F.3d 755, 763 (4th Cir. 2012) (quoting 5 U.S.C. § 706(2)). This standard of review "is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). The Court's role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The "ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id*. Where a court reviews a facial challenge to a regulation, plaintiffs bear the burden of establishing that "no set of circumstances exists under which the [rule] would be valid." *Reno v. Flores*, 507 U.S. 292, 301 (1993). That is, even if Plaintiffs "can point to a hypothetical case in which the rule might lead to an arbitrary result," that "does not render the rule 'arbitrary or capricious.'" *American Hospital Ass'n v. NLRB*, 499 U.S. 606, 619 (1991). This is because their case "is a challenge to the validity of the entire rule in all its applications."

## ARGUMENT

The Court should grant the Agencies' cross-motion for summary judgment and deny Plaintiffs' motion. The Court lacks jurisdiction to review Plaintiffs' challenge to the NWPR because Plaintiffs fail to demonstrate standing, and their claims are not ripe. Regardless, the NWPR constitutes a reasonable interpretation of the CWA's ambiguous phrase "waters of the United States" and should be upheld under *Chevron*, 467 U.S. at 837. Additionally, the NWPR is neither arbitrary nor capricious under the APA; it was well-reasoned and adequately explained. Lastly, although the Agencies contend that Plaintiffs will not prevail, if the Court determines that

jurisdiction exists and finds that the NWPR violates the law, the Agencies request separate briefing on an appropriately tailored remedy.

This Court need not—and indeed jurisdictionally cannot—reach Plaintiffs' challenge to the Repeal Rule because Plaintiffs' challenge is unripe and Plaintiffs lack standing to challenge the rule. If the Court invalidates the NWPR so that it may consider the merits of Plaintiffs' challenge, the Court should uphold the Repeal Rule. The Repeal Rule was lawfully promulgated, well-reasoned, and adequately explained. If the Court were to find that the Repeal Rule violates the law, the Agencies request separate briefing on an appropriately tailored remedy.

## I.      The Court Lacks Jurisdiction to Consider Plaintiffs' Claims.

### A.      The Court Lacks Jurisdiction to Review the NWPR.

#### 1.      Plaintiffs Lack Standing to Challenge the NWPR.

Plaintiffs claim standing (a) in their own right as organizations and (b) as representatives of their members. Pls.' Br. at 52-57. But Plaintiffs fail to prove "(1) [they] ha[ve] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant"— which is, here, changes to CWA jurisdiction as a result of the NWPR—and "(3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *Baehr v. The Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020). Where, as here, Plaintiffs are not the object of the challenged rule, "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562.

Plaintiffs do not have standing to challenge a "regulation in the abstract" without "any concrete application that threatens imminent harm" to their interests. "Such a holding would fly in the face of Article III's injury-in-fact requirement." *Summers v. Earth Island Institute*, 555

14

U.S. 488, 494 (2009). To establish standing, Plaintiffs must show a "concrete" and "certainly impending" injury *to them personally and directly* that would result from any differences attributable to the change in jurisdiction. *See Puget Soundkeeper*, 2019 WL 6310562 at *7, n.8 (finding organization lacked standing where no member had identified "any project, proposed or existing, that is causing or will soon cause the harms he is concerned about"). Plaintiffs must, for example, identify waters that personally affect them, that were once federally regulated and are no longer regulated under the NWPR. They then must demonstrate that pollutants are newly being discharged or will be discharged into these now unregulated waters.

Plaintiffs' eight declarations, Pls.' Br. Ex. C, Dkt. No. 35-4, fail this test. Plaintiffs simply point to waters and claim the regulatory treatment is now different.[8] But their mere concern about these waters, without identifying a specific and concrete harm to those waters, does not establish standing. This is especially true because a shift in CWA regulatory jurisdiction does not equate to a removal of environmental protections that automatically threatens or harms the environment. Pls.' Br. at 52-53. As described below, *infra* Argument II.B.6, states in the Chesapeake Bay watershed may establish restrictions under state law to achieve the Bay TMDL.

Even if Plaintiffs are correct that the NWPR may inflict environmental harm somewhere, Plaintiffs' abstract fears as to what *could* happen to Plaintiffs are the exact sort of hypothetical and speculative scenarios that do not show a concrete and cognizable injury. *Laidlaw*, 528 U.S. at 180-81. The relevant inquiry is not injury to the environment somewhere, but concrete injury

---

[8] *See, e.g.*, Dkt. No. 35-4, Baker Decl. ¶ 29 (alleging injury from "removing protections for ephemeral streams and non-adjacent wetlands."), Whitescarver Decl. ¶¶ 18-20 (describing generalized fears for ephemeral streams, wetlands, and the karst geography of Virginia), Emrich Decl. ¶ 7 (concern over removal of "protections"), Carter Decl. ¶¶ 9-12 (same), Ruhl Decl. ¶¶ 10, 12 (same), Watson Decl. ¶ 7 (same), Budden Decl. ¶ 9 (same), Hardesty Decl. ¶ 18 (alleging injury from "weakening protections" for unspecified "waters and wetlands integral to improving water quality on the Eastern Shore and in the Chesapeake Bay").

*to the plaintiff. Id.* And, the general fear of increased pollution is not an "imminent" injury. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper v. Amnesty International USA*, 568 U.S. 398, 409 (2013) (quoting *Lujan*, 504 U.S. at 565 n.2 (internal quotations omitted)).

Plaintiffs' contention—that the *fear* of a hypothetical environmental harm constitutes an actual and concrete, particularized injury—misunderstands the applicable case law. Pls.' Br. at 55. In *American Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, plaintiffs presented affidavits that described actual physical changes to the water, 326 F.3d 505, 518 (4th Cir. 2003). In *Central Delta Water Agency v. United States*, a federal agency was diverting water from a reservoir, which, if continued, would harm plaintiffs' crops by changing the salinity of the water. 306 F.3d 938, 943-45, 948 (9th Cir. 2002). Although the harm had not occurred, the releases had, which made plaintiffs' fear of harm sufficiently concrete. No such credible threat of harm exists here.

Plaintiffs' interest in these matters and related restoration and advocacy efforts do not demonstrate an injury in fact. Pls.' Br. at 52-53. A "mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' within the meaning of the APA." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). As Plaintiffs acknowledge, a mere "setback" to an organization's mission does not demonstrate injury to the organization. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Plaintiffs have not shown how the NWPR has undone any of the restoration efforts they have described—from tree plantings to fencing livestock to other best management practices. Baker Decl., ¶ 12, Hardesty Decl. ¶¶ 10-11. Plaintiffs vaguely speculate that these best management practices may be "less

16

appealing" to property owners in the future because there is no "legal mechanism requiring them to protect water quality on their farms or downstream." Baker Decl. ¶ 12. But Plaintiffs do not identify any best management practices that have not been adopted because of the NWPR. Further, their fear that landowners will no longer adopt such practices is unconvincing because the practices appear to have *always* been adopted on a voluntary basis.

Plaintiffs' education programs and advocacy efforts to achieve the Bay TMDL, Baker Decl. ¶¶ 18-22, also do not establish standing. An impact upon an organization's advocacy or educational initiatives does not constitute injury in fact. *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995); *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011). In any event, Plaintiffs do not identify a single effort that has been curtailed because of the NWPR.

Plaintiffs' claims as to representational standing also fail. Plaintiffs assert standing because their members live, work, and/or recreate in or along waters, and that those interests will be adversely affected by the NWPR. Baker Decl. ¶¶ 23-27. But simply stating that they generically use waters is not enough. *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 891 (1990). As with organizational standing, Plaintiffs must point to concrete or particularized injuries—caused specifically by the mere promulgation of the NWPR and attributable specifically to a regulatory change the NWPR makes—that are certainly impending. Despite Plaintiffs' more than 300,000 members, Plaintiffs have not pointed to a single individual that the NWPR has personally impacted. This omission is fatal to Plaintiffs' standing claims. For an organization only "has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right." *Laidlaw*, 528 U.S. at 181.

Plaintiffs allege merely hypothetical injuries to themselves or their members that might come to pass. They fail to show a particular injury to Plaintiffs or their members because specific waters or wetlands, previously under federal jurisdiction, that Plaintiffs or their members use, are or will imminently be polluted *due to the NWPR*. Thus, Plaintiffs lack standing.

### 2.     Plaintiffs' Challenges to the NWPR Are Not Ripe.

Ripeness is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies," and "to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 807-08. "Some statutes permit broad regulations to serve as the 'agency action,' and thus to be the object of judicial review directly, even before the concrete effects normally required for APA review are felt." *Nat'l Wildlife Federation*, 497 U.S. at 891. "Absent such a provision, however, a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Id.*

As with standing, Plaintiffs put forth no "concrete action applying the regulation" in a manner that will affect them. *Id.* Plaintiffs must wait for a "concrete action" that will impact these purportedly newly deregulated waters used by their members for their claims to be ripe for review. For instance, an entity with a current CWA Section 402 permit might request that a permit be terminated where waters are no longer jurisdictional. Or, in connection with an industrial activity, an entity could request a jurisdictional determination from the Corps declaring

18

that specific waters may now be filled without a CWA Section 404 permit. Such concrete activity—involving the discharge of specific pollutants into specific waterbodies—would "flesh[] out" Plaintiffs' claims to help this Court address the claims in this case. *Id.*

Although there are exceptions to the general ripeness doctrine, none apply here. One exception involves instances where "a substantive rule . . . as a practical matter requires the plaintiff to adjust his conduct immediately," *id.*, but no such allegations are made here. Plaintiffs are not regulated parties, so the NWPR does not require that they "adjust [their] conduct immediately." *Id.* Moreover, as the D.C. Circuit has held, even a claim involving purely legal issues is *still* not ripe for adjudication "if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *CTIA-The Wireless Ass'n v. FCC*, 530 F.3d 984, 987 (D.C. Cir. 2008) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). Here, of course, Plaintiffs' claims of injury are not purely legal. The potential for harm to restoration efforts, educational programs, or recreational interests that Plaintiffs claim, Pls.' Br. at 52-57, may not come to pass at all, or may raise different legal issues depending on the nature of the specific activity that is the alleged source of their potential future harm.

### B.     The Court Lacks Jurisdiction to Review the Repeal Rule.

The Court lacks jurisdiction to review the Repeal Rule for the exact same reason that it lacks jurisdiction to review the NWPR. Plaintiffs have failed to allege an injury in fact, concrete, particularized, and actual or imminent. But fundamentally, the Court lacks jurisdiction because the NWPR has supplanted the Repeal Rule. Because the Repeal Rule *is not in effect* (except in Colorado, which does not affect the geographic reach of this case), no actual injury is traceable to the Repeal Rule. Nor can Plaintiffs meet the redressability prong as the Court cannot possibly vacate a rule that is not in effect in the relevant area. Plaintiffs' Repeal Rule claims present a purely academic question of legality, but the "judicial Power" conferred by Article III "'exists

only to redress or otherwise to protect against injury to the complaining party,' not to review the legality of governmental conduct in a vacuum." *Coalition for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1279 (D.C. Cir. 2012) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *see also, e.g.*, *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) ("[A] federal court has neither the power to render advisory opinions nor 'to decide questions that cannot affect the rights of litigants in the case before them.' " (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971))).

Plaintiffs' challenge to the Repeal Rule is likewise unripe because the rule itself has no practical effect on Plaintiffs. The NWPR defines "waters of the United States" (i.e., CWA jurisdiction), and the Agencies are not currently applying the Repeal Rule in any concrete fashion outside of Colorado. Plaintiffs' Repeal Rule claims can ripen only if a series of contingent future events take place. The NWPR must first be vacated, the Repeal Rule must then go into effect, and Plaintiffs must identify a concrete application of the Repeal Rule that injures them and can be redressed by vacating the Repeal Rule. Because none of these contingencies have occurred—and may never occur—the Court lacks jurisdiction to review the Repeal Rule.

## II.     The NWPR Should Be Upheld.

### A.     The NWPR Is Permissible Under the CWA.

The NWPR is a reasonable interpretation of an ambiguous statutory term. *See United States v. Deaton*, 332 F.3d 698, 709-10 (4th Cir. 2003) ("The statutory term 'waters of the United States' is sufficiently ambiguous to constitute an implied delegation of authority to the Corps; this authority permits the Corps to determine which waters are to be covered within the range suggested by *SWANCC*."). Where a challenged rule contains an agency interpretation of statutory language, the Court reviews that interpretation under *Chevron*'s familiar two-step framework. 467 U.S. at 837. At Step One, the Court determines "whether Congress has directly spoken to the precise question at issue." *Id*. at 842-43. "[I]f the statute is silent or ambiguous

with respect to the specific issue," the Court proceeds to Step Two to determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Because "waters of the United States" is ambiguous, the Court need only consider whether the Agencies' interpretation is reasonable. As explained further below, the NWPR's construction of "waters of the United States" reflects a reasonable and permissible interpretation of 33 U.S.C. § 1362(7) (defining "navigable waters" as "waters of the United States").

### 1. The NWPR Reasonably Construes "Waters of the United States," an Ambiguous Statutory Phrase.

*Chevron* "established a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Brand X*, 545 U.S. at 982 (internal quotations omitted); *see also Deaton*, 332 F.3d at 711 (concluding at *Chevron* Step 1 that "the CWA is ambiguous when it comes to jurisdictional coverage"). Because "waters of the United States" is ambiguous, the Agencies were empowered to reconsider their prior statutory interpretation— *even in the face of contrary judicial precedent. See Brand X*, 545 U.S. at 982-83.

The question at *Chevron* Step Two is "whether the agency's answer [to the interpretive question] is based on a permissible construction of the statute." *Mayo Foundation for Medical Education & Research v. United States*, 562 U.S. 44, 54 (2011). This need not be "the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009). Interpreting ambiguous language "involves difficult policy choices," so judicial deference is critical, as "agencies are better equipped to make [such choices] than courts." *Brand X*, 545 U.S. at 980; *see also Deaton*, 332 F.3d at 711.

The NWPR's "unifying legal theory"—consistent with the statutory text—asserts "federal jurisdiction over those waters and wetlands that maintain a sufficient surface water connection to traditional navigable waters." 85 Fed. Reg. at 22,252. Congress defined "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C § 1362(7). The Corps originally defined these terms to encompass only tidal waters and waters used "for purposes of interstate or foreign commerce." 39 Fed. Reg. 12,115, 12,119. After the Agencies broadened their statutory reading, the Supreme Court held that Congress permitted this language to extend to some "waters" that are not actually "'navigable' under the classical understanding of that term." 85 Fed. Reg. at 22,262 (citing *Riverside Bayview*, 474 U.S. at 133). But "the term 'navigable' indicates 'what Congress had in mind as its authority for enacting the CWA.'" *Id.* (citing *SWANCC*, 531 U.S. at 172). Congress also stated a goal "to preserve[ ] and protect" the power of states to regulate water resources and land within their borders. *See* 33 U.S.C. § 1251(b). The NWPR thus avoids federal regulation of non-navigable, non-adjacent waters and wetlands that lack a sufficient connection, which states or tribes may regulate as they see fit.

### 2. Neither the Act nor *Rapanos* Precludes the Agencies' Reasonable Interpretation of "Waters of the United States."

Contrary to Plaintiffs' arguments, neither *Rapanos* nor the CWA undermine the Agencies' reasonable construction of "waters of the United States."

#### a. *Rapanos* Does Not Foreclose the Agencies' Interpretation of "Waters of the United States."

Plaintiffs do not meaningfully dispute that *Chevron* deference is due. They nevertheless argue that the NWPR is unlawful because they assert it is modeled after the *Rapanos* plurality opinion. Pls.' Br. at 29. This argument is meritless for multiple reasons.

First, *Rapanos* addresses the *outer* limits of the CWA—what waters the Agencies *may* regulate. Its opinions do not dictate what waters the Agencies *must* regulate. *See California*, 467

F. Supp. 3d at 874-75. Neither Justice Kennedy nor the dissenting justices read the CWA to *require* extension of federal jurisdiction to all ephemeral streams, Pls.' Br. at 36, or wetlands that lack surface-water connections to jurisdictional waters, *id*. at 40. Instead, the *Rapanos* dissent viewed the relevant interpretive question in *Chevron* Step Two terms, and simply would have found the Corps' prior definition to be "reasonable." *Rapanos*, 547 U.S. at 805.

Second, and relatedly, neither *Rapanos* nor any other Supreme Court case considers and precludes the Agencies' interpretation set forth in the NWPR. *See United States v. Eurodif S.A.*, 555 U.S. 305, 315 (2009) ("[A] court's choice of one reasonable reading of an ambiguous statute does not preclude an implementing agency from later adopting a different reasonable interpretation."). Even if *Rapanos* is read to suggest that there is a better interpretation of the CWA than offered by the NWPR—and it should not be so read—nothing in either the dissent or Justice Kennedy's concurrence displaced the Agencies' discretion, under *Chevron*, to reasonably reinterpret the ambiguous term "waters of the United States." Under *Chevron* and *Brand X*, a "court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference *only if* the prior court decision holds that its construction follows from the *unambiguous* terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982 (emphasis added). Here, the Supreme Court has repeatedly recognized the term "waters of the United States" *is* ambiguous, including in *Rapanos*. 547 U.S. at 780 (Kennedy, J., concurring); *id*. at 752 (Scalia, J., plurality) (the CWA "is in *some* respects ambiguous"); *id*. at 796 (Stevens, J., dissenting) (noting "ambiguity inherent in the phrase 'waters of the United States' "); *see also SWANCC*, 531 U.S. at 170-71.

Third, the NWPR is guided in part by the *Rapanos* plurality but does not simply apply that opinion. Executive Order 13778 did not require the Agencies to rely exclusively upon the

plurality opinion. 85 Fed. Reg. at 22,273. And they did not. The NWPR instead synthesized "common principles of the *Rapanos* plurality and concurring opinions" to "balance between the clear directive from Congress to ensure that States maintain primary authority over land and water resources" and to preserve the appropriate level of federal authority. *Id*. There are concrete differences between the *Rapanos* plurality and the NWPR.[9] Indeed, the NWPR asserts jurisdiction beyond "those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right," as the plurality sought. *Rapanos*, 547 U.S. at 742. As explained below, *infra* Argument II.B, multiple factors, including relevant science, case law, policy considerations, and administrative practicalities all reasonably informed the NWPR.

Fourth, Plaintiffs contend that because five Justices rejected the plurality opinion, the Agencies cannot adopt its reasoning. Pls.' Br. at 29-30.[10] But as the Agencies explained, *eight* Justices actually *rejected* the significant nexus methodology, both because it was not grounded in the text of the CWA, and because it should not supplant agency rulemaking. NWPR RTC, Docket ID No. EPA-HQ-OW-2018-0149-11574, Topic 1 § 1.3.3.4-.5 at 60-68. So if *Rapanos* were interpreted by the superficial vote-counting approach suggested by Plaintiffs, the Agencies could not have adopted Justice Kennedy's significant nexus standard either (as the 2015 Rule intended). Yet, as Plaintiffs note, courts have applied Justice Kennedy's standard in assessing CWA jurisdiction. Pls.' Br. at 30 n.9.[11] And as Plaintiffs fail to mention, some courts have held

---

[9] The court in *Colorado*, 445 F. Supp. 3d at 1312, fundamentally misunderstood the NWPR and that it is not a rote application of the *Rapanos* plurality.

[10] Plaintiffs' reliance on *Vasquez v. Hillery*, 474 U.S. 254 (1986) is misplaced. *See* Pls.' Br. at 30. *Vasquez* addresses the process for determining which Supreme Court opinion is controlling when there are multiple non-majority opinions. That process is not necessary to ascertain that none of the *Rapanos* opinions address whether the CWA *unambiguously* prohibits the Agencies' interpretation in the NWPR, as required by *Brand X*.

[11] Plaintiffs overstate the holding in *Precon Development Corp. v. U.S. Army Corps of Engineers*, 633 F.3d 278, 288 (4th Cir. 2011) (cited in Pls.' Br. at 4, 30 n.9). The Court applied

that the plurality's test could be applied, or at least left open the possibility. *See, e.g., Deerfield Plantation Phase II-B Property Owners Ass'n, Inc. v. U.S. Army Corps of Engineers*, 501 F. App'x 268, 275 (4th Cir. 2012) (upholding Corps' determination that certain waters were not jurisdictional because neither *Rapanos* plurality's nor Justice Kennedy's test was met); *United States v. Donovan*, 661 F.3d 174, 176, 182, 184 (3d Cir. 2011); *United States v. Bailey*, 571 F.3d 791, 798-99 (8th Cir. 2009); *United States v. Johnson*, 467 F.3d 56, 64-66 (1st Cir. 2006). But those courts' consideration of CWA jurisdiction were all prior to the Agencies' new regulatory definition of "waters of the United States," so they cannot, in any event, trump the NWPR's reasonable interpretation of the statute. *Brand X*, 545 U.S. at 982.

> **b.    The CWA's Objective Does Not Foreclose the Agencies' Interpretation of "Waters of the United States."**

The NWPR appropriately balances Section 101(a) of the CWA, which states the Act's objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," with Section 101(b), which states Congress' policy to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." 33 U.S.C. § 1251(a)-(b). Plaintiffs assert that the Agencies overemphasize Section 101(b) to the detriment of Section 101(a). Pls.' Br. at 31. But Plaintiffs' preferred path for achieving the CWA's objective does not override the Agencies' delegated discretion to balance other statutory elements and policy considerations reflected in the statute itself. "It is [a court's] function to give the statute the effect its language suggests, however modest that may be; not to extend it to admirable purposes it might be used to achieve." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 270 (2010); *see also California*, 467 F. Supp. 3d at 874 (concluding that plaintiffs'

---

Justice Kennedy's significant nexus standard because the parties agreed that it governed in that case, where the Corps' assertion of jurisdiction was premised on that standard. *Id.* at 288.

"arguments that the narrowness of the [NWPR] serves poorly to carry out the objectives of the CWA . . . do not provide a sufficient basis for a court to substitute its judgment for the policy choices of the Agency"). The Agencies gave appropriate consideration to the objective of the Act. At the same time, the Agencies also balanced and implemented Congress' policy directive expressed in CWA Section 101(b). *See* 85 Fed. Reg. at 22,261-62, 22,273, 22,277, 22,287, 22,302, 22,308, 22,313. The Agencies must necessarily balance the statutory objective and policies. *Id.* at 22,253, 22,269-72, 22,287-88.

The CWA's objective to restore and maintain the integrity of the Nation's waters must be achieved through a *valid exercise* of federal authority. Plaintiffs fundamentally misunderstand the relationship between jurisdictional limits and an agency's obligation to fulfill the statutory objective. The statutory objective does not give the Agencies the authority to extend their jurisdiction beyond the limits imposed by the CWA or the Constitution. Congress limited the CWA's jurisdiction to "navigable waters," 33 U.S.C. § 1362(7), and the Agencies cannot exceed this authority. The "textual limitations upon a law's scope are no less a part of its 'purpose' than its substantive authorizations." *Rapanos*, 547 U.S. at 752 (plurality). And no legislation "pursues its purposes at all costs." *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 234 (2013). Indeed, Justice Kennedy acknowledged that "environmental concerns provide no reason to disregard limits in the statutory text." *Rapanos*, 547 U.S. at 778.

In *SWANCC*, the Court examined the CWA's statutory text and legislative history and found no "clear indication" of Congress' intent for the CWA to reach the waters at issue in that case. *SWANCC* 531 U.S. at 168 & n.3, 172, 174. Thus, *SWANCC* fully rejects Plaintiffs' argument here. Pls.' Br. at 27-28. While the CWA's objective is to restore and maintain the integrity of the Nation's waters, the Agencies may not interpret CWA jurisdiction to extend to

the broadest constitutionally permissible reach under the Commerce Clause. *SWANCC*, 531 U.S. at 166 (reversing holding that "the CWA reaches as many waters as the Commerce Clause allows"). One court has already rejected such challenges to the NWPR, holding that the CWA does not "compel[] the Agencies to extend federal regulation to the broadest permissible extent under the Commerce Clause, in the name of providing *all* of the benefits for water quality the science suggests might be achievable." *California*, 467 F. Supp. 3d at 875.

Plaintiffs also discount statutory language establishing the important role of states for implementing water quality regulation to achieve the CWA's objective. Pls.' Br. at 34-35. Congress recognized that states play a fundamental role in maintaining water quality and implementing the Act. *See, e.g.*, 33 U.S.C. § 1251(b) (establishing Congress' policy to "protect the primary responsibilities and rights of States"). *Rapanos*, 547 U.S. at 755-56 (Scalia, J., plurality) ("[C]lean water is not the *only* purpose of the statute. So is the preservation of primary state responsibility for ordinary land-use decisions."). Yet Plaintiffs dismiss the import of Section 101(b) as limited to the states' role in implementing the CWA and contend that "the Agencies make the wrong distinction between these programs by focusing on the 'waters' and not the 'pollutants.' " Pls.' Br. at 34; *see also id*. at 11, 31-34. Section 101(b) expressly calls for preserving and protecting the rights of States, including "to plan the development and use . . . of land." 33 U.S.C. § 1251(b). So the NWPR reasonably considers the CWA's statutorily-stated policy to preserve traditional state authority. The NWPR's "different balance between federal and state responsibilities does not mean [the Agencies] have disregarded the primary objective of the statute in an arbitrary or capricious manner." *See California*, 467 F. Supp. 3d at 876; *see also Kentuckians for Commonwealth Inc. v. Rivenburgh*, 317 F.3d 425, 440, 448 (4th Cir. 2003)

(rejecting arguments that CWA's objective should override Corps' definition of an ambiguous statutory term and finding Corps' interpretation a permissible construction of the statute).

Plaintiffs accuse the Agencies of "relying on states to be solely responsible for stream and wetland protection." Pls.' Br. at 31. But Plaintiffs overlook that many streams and wetlands remain subject to federal jurisdiction under the NWPR. And they ignore the import of the technical and financial assistance to states, local governments, interstate agencies, and tribes to address pollution in waters even if they are *not* federally regulated. *See, e.g.*, 33 U.S.C. § 1255(a)(1) (authorizing grants for reducing pollutant discharge "into *any waters*" (emphasis added)); *id.* § 1258(a) (authorizing agreements with states to "eliminate[e] or control . . . pollution, within all or *any part of the watersheds* of the Great Lakes" (emphasis added)); *id.* § 1329(i)(1) (authorizing grants for groundwater protection); *id.* § 1267 (establishing comprehensive framework for protection and management of "the ecosystem of the Chesapeake Bay *and its watershed*" (emphasis added)). The NWPR does not disturb these critical statutory provisions that help to implement the CWA's objective.

At best, Plaintiffs offer a different interpretation of how the policy directive of Section 101(b) might be read and balanced with the statutory objective of Section 101(a). Pls.' Br. at 33-35. But even if Plaintiffs' reading is plausible, it only demonstrates that statutory ambiguity exists. It cannot displace the NWPR's reasonable interpretation—which is entitled to deference. *See Brand X*, 545 U.S. at 980-92.

Further, although the Agencies assessed how states might regulate waters not covered by the NWPR, they did not base the NWPR's jurisdictional lines on that analysis. NWPR RTC Topic 1 § 1.2.3.1 at 26 ("The EA was intended to assist the agencies and members of the public to better understand the effects of the final rule, but did not form the basis for the agencies'

interpretation of the scope of their regulatory authority over 'waters of the United States.' "); *id*
§ 1.2.3.2 at 28 ("The ultimate response of states and tribes to this rule would not change the
agencies' interpretation of the scope of their legal authority."); *id*. Topic 11 § 11.3.2.3.c at 22
(same). Rather, the Agencies considered the scope of their authority and the import of Section
101(b) in determining that certain waters "are more appropriately regulated" by the states and
tribes than the federal government. 85 Fed. Reg. at 22,287, 22,308. Plaintiffs take such
statements out of context in arguing that the Agencies assumed that states *would* regulate such
waters. *See* Pls.' Br. at 30-33. The NWPR makes no such "unsupported assumption," Pls.' Br. at
32. Indeed, the NWPR recognizes that states may choose whether to regulate such waters. 85
Fed. Reg. at 22,318 (stating that certain waters not subject to federal regulation "are or could be
subject to State or tribal jurisdiction"); *id*. at 22,317 (stating the NWPR excludes "features and
land uses that are more appropriately regulated, *if at all*, under the sovereign authorities of States
and Tribes" (emphasis added)); *id*. at 22,333 (describing variability in NWPR's effects
depending on "whether or how States and Tribes choose to modify their existing regulatory
programs," and recognizing that states "may elect to. . . regulate waters that are no longer
jurisdictional" under the NWPR); *id*. at 22,334 (recognizing "States may or may not choose to
regulate" newly characterized non-jurisdictional waters); *see also id*. at 22,336; NWPR RTC
Topic 11 § 11.3.2.3.c at 22; *id*. § 11.3.3.2.a at 32 ("potential long-term effects will depend on
whether or how states and tribes choose to modify their existing regulatory programs.").

Additionally, Plaintiffs' claimed "disparity" across the states in regulations that apply to
non-federally regulated waters, *see* Pls.' Br. at 33, is not a result of the NWPR. Rather, states
have always had authority to regulate such waters as they see fit. Whether states choose more
protective regulations than others, or choose not to regulate non-federal waters at all, is a

decision left solely to the states' discretion. As the Supreme Court has recognized, the CWA lacks a clear statement that Congress intended to extend federal jurisdiction to *all* waters that may serve the Act's objective. Although the NWPR better distinguishes which waters are subject to federal regulation as opposed to those that are within the sole discretion of states and tribes to regulate—the NWPR does not alter the authority of the states and tribes to manage their land and water resources as they see fit. Likewise, Plaintiffs' argument that downstream states would have "no recourse" to address upstate pollution in non-jurisdictional waters is incorrect. *See* Pls.' Br. at 33. First, if pollutants discharged into a non-jurisdictional water reach a jurisdictional water, CWA Section 402 permitting requirements may still apply. 85 Fed. Reg. at 22,333. Second, as the Agencies recognized, disputes over pollution in non-jurisdictional waters that cross state lines could be mediated by EPA or resolved in court through application of federal common law. NWPR RTC Topic 1 § 1.2.3.1 at 26; *id.* Topic 11 § 11.3.2.5 at 26.

### B. The NWPR Is Neither Arbitrary Nor Capricious Under the APA.

Not only is the NWPR authorized by the statute, its interpretation of "waters of the United States" was reasoned, well-supported, and should be upheld. The NWPR's extensive preamble and response to comments documents thoroughly explained why the Agencies believe the NWPR "to be better" than prior regulations. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The summary of key elements spanned almost 60 pages in the Federal Register. 85 Fed. Reg. at 22,273-329. The Agencies further analyzed district court opinions as to the 2015 Rule, including a district court's decision granting summary judgment against the 2015 Rule and remanding it to the Agencies. *E.g.*, *id.* at 22,272. The Agencies analyzed relevant Supreme Court cases. *E.g.*, *id.* at 22,268. And these analyses are further supplemented by almost 600 pages of responses to comments. *See generally* NWPR RTC (Topics 1-13). The Agencies complied with

their obligations under the APA. The NWPR's exclusion of (i) ephemeral streams; and (ii) non-adjacent wetlands was well-explained and rational.

Much of Plaintiffs' challenge to the NWPR stems from their policy dissatisfaction with the rule and their preference for the 2015 Rule. There is no question that the NWPR represents a departure from both the regulatory regime reinstated by the Repeal Rule and the 2015 Rule. But to change a policy, an agency must merely provide "a satisfactory explanation for its action." *Fox Television*, 556 U.S. at 513. It does *not* require reasons any "more substantial than those required to adopt a policy in the first instance." *Id.* at 514. And an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better." *Id.* at 515. The NWPR should be upheld.

### 1.    Science Alone Cannot Determine the Agencies' Jurisdiction.

Plaintiffs' pervasive argument that the NWPR fails to adequately consider science fails. Pls.' Br. at 36-51. Even though the Agencies reviewed the relevant science, including their prior scientific findings, the Agencies recognize that fundamentally the definition of "waters of the United States" must be grounded in a legal analysis of the limits on CWA jurisdiction reflected in the statutory text and Supreme Court precedent. 85 Fed. Reg. at 22,308 ("[S]cience cannot dictate where to draw the line between Federal and State or tribal waters, as those are legal distinctions that have been established within the overall framework and construct of the CWA."). In developing the NWPR, the Agencies were entitled to weigh the relevant considerations differently from how they had in the past. And, on one critical point for refuting Plaintiffs' argument, the Agencies reached the exact same conclusion that they reached when finalizing the 2015 Rule: science alone cannot define jurisdictional boundaries of "waters of the

United States." *See, e.g.*, 80 Fed. Reg. at 37,055; *see also id.* at 37,060 ("[S]cience does not provide bright line boundaries with respect to where 'water ends' for purposes of the CWA. Therefore, the agencies' interpretation of the CWA is informed by the [Connectivity] Report and the review and comments of [EPA's Science Advisory Board], but not dictated by them.").

The 2015 Rule based its interpretation "not only on legal precedent and the best available peer-reviewed science, but also on the agencies' technical expertise and extensive experience in implementing the CWA over the past four decades." *Id.* at 37,055. EPA's Science Advisory Board ("SAB") similarly stressed in 2015: " 'significant nexus' is a legal term, not a scientific one." *Id.* at 37,065. So "science does not provide a precise point along the continuum at which waters provide only speculative or insubstantial functions to downstream waters." *Id.* at 37,090. The conclusions reached in the NWPR differed from conclusions reached in 2015. But in both rules the Agencies correctly explained that the contours of CWA jurisdiction require a balancing of various factors, including legal and scientific considerations. *E.g.*, 85 Fed. Reg. at 22,288.

More importantly, the Agencies did not conclude that any particular waters are ecologically unimportant or unworthy of protection. To the contrary, Plaintiffs confuse the scope of CWA *jurisdiction* over discharges with the scope of CWA *protection*. To this end, the Agencies considered that the CWA's longstanding NPDES permitting program will continue to address some point source discharges of pollutants into non-jurisdictional waters that flow into waters of the United States. *See* 85 Fed. Reg. at 22,319 (stating that a "CWA section 402 permittee currently discharging to a jurisdictional water that becomes non-jurisdictional under this final rule would likely remain subject to the requirements of the Act"); RPA, Docket ID No. EPA-HQ-OW-2018-0149-11573, at 79. The Agencies explained this "longstanding approach," which holds that discharges into a water that "is non-jurisdictional but conveys pollutants to

downstream jurisdictional waters" may still be regulated because that water "may be a point source that subjects a discharger . . . to section 402 permitting requirements." 85 Fed. Reg. at 22,297; *see also County of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1476 (2020) (the CWA "requires a permit when there is a direct discharge from a point source into navigable waters or when there is the *functional equivalent of a direct discharge*").

Contrary to Plaintiffs' assertion, Pls.' Br. at 33-34, the Agencies accurately describe the relationship between regulatory and non-regulatory provisions of the CWA. The CWA's non-regulatory measures will continue to address pollution of the Nation's waters generally. *Id.* at 22,253 (discussing non-regulatory program provisions). States, tribes, and local entities can also exercise programs under their own laws that further enhance the quality of waters within their borders. *See* RPA Appendices A & B; NWPR EA, Docket ID No. EPA-HQ-OW-2018-0149-11572, at 37. And many states do so. *See* RPA Appendix A. Some state programs may well require permits for certain discharges to state waters regardless of the NWPR. *See* 85 Fed. Reg. at 22,318 (stating that certain waters and features not subject to regulation under the CWA are or could be subject to state or tribal jurisdiction); *see also* RPA at 47. These programs collectively pursue the objective of maintaining the integrity of the Nation's waters, which the Agencies endorse as the sole objective of the CWA. Based on their analyses, the Agencies reasonably concluded that the NWPR may not significantly affect certain CWA programs.

The Agencies' balancing of relevant considerations is not arbitrary or capricious. Science does not and cannot offer a precise answer to the question of what constitutes a "water of the United States." *See id.* at 22,262-71 (discussing *SWANCC* and *Rapanos*). But in any event, the Agencies considered the relevant science, as evidenced by the record.

### 2. The NWPR's Consideration of Science Is Well-Reasoned and Supported by the Administrative Record.

The Agencies considered relevant scientific principles to inform aspects of the NWPR. The Agencies explained why the Connectivity Report and other science did not preclude—but actually supported—aspects of the NWPR. *E.g.*, 85 Fed. Reg. at 22,288-95. The preamble summarized why the Agencies can recognize a "gradient of connectivity." *Id.* at 22,288 (quoting SAB Commentary). The Agencies relied on scientific principles, including hydrologic connectivity, to develop the flow classifications (i.e., perennial, intermittent, ephemeral) used in the NWPR, the incorporation of inundation by flooding as a surface water connection establishing jurisdiction for certain waters and wetlands, and the use of the "typical year" concept that relies upon a large body of precipitation and other climatic data to inform what may be in a normal range for a particular geographic region. *Id.* The NWPR's treatment of these issues is well-supported by the administrative record.

First, the NWPR's flow classifications are informed by science and well-reasoned. Citing a conceptual model within the SAB Commentary, the Agencies recognized that, of perennial, intermittent, and ephemeral streams, ephemeral streams have the lowest probability of impacting downstream water quality. *See id.* The Agencies accepted and analyzed the "connectivity gradient," and potential relationships among perennial, intermittent, and ephemeral streams and downstream waters within a tributary system. *Id.* And the Agencies' record also includes many sections specifically discussing, for example, the "Prior Findings in the Connectivity Report," "Consideration of Forgone Environmental Benefits," the intersection of "Scientific Rationale and Legal Authority," "The Connectivity Report," and "Other Comments on Science." NWPR RTC Topic 1 §§ 1.5.5.3 at 114-15, 1.5.5.7 at 121-22, 1.7 at 136-38; *id.* Topic 13 §§ 13.1.7.1 at 12-14, 13.1.7.2 at 14-17. The Agencies based the definition of "tributary" (which includes certain

perennial and intermittent waters) "upon a reasonable inference of ecological interconnection" between those waters and paragraph (1)(i) waters. 85 Fed. Reg. at 22,288 (citing *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring)). Thus, Plaintiffs' assertion that the Agencies did not account for this interconnection is inaccurate. Pls.' Br. at 37.

Second, the NWPR's "typical year" concept is reasonable and provides flexibility. Plaintiffs wrongly contend that the definition of "typical year" is vague and will "sow more confusion in the regulated community" simply because the term provides some necessary flexibility when choosing a relevant time period to evaluate (e.g., seasonally, annually). *Id.* The Agencies explained in detail the methodology generally used to determine whether waters are assessed during normal precipitation conditions. 85 Fed. Reg. at 22,274-75. A 30-year rolling average was adopted to ensure consistent application. *Id.* The Agencies described how they use professional judgment and a weight-of-the-evidence approach in considering precipitation data along with other data sources. *Id.* at 22,275. The Agencies explained that the purpose of analyzing a "typical year" is to "evaluate the flow regime of a stream and the connectedness of a wetland within the context of what is typical . . . to avoid making erroneous jurisdictional determinations at times that may be too wet or too dry to be considered 'normal.' " *Id.* at 22,271.

The flexibility inherent in the "typical year" analysis exists for good reason and does not make the term overly vague. The phrase "waters of the United States" applies nationwide and is equally applicable to waters as diverse as South Carolina swamps, Rocky Mountain snowpack-fed streams, and the mighty Mississippi. *Id.* at 22,292; *see also id.* at 22,274; *id.* at 22,294-95 (recognizing "the need to consider seasonality and the timing of tributary flows"). Providing flexibility in the precise method of measuring a "typical year" allows for consideration and use of "the best available data and information" for a given waterbody. 85 Fed. Reg. at 22,275.

Even if flexibility were not important, Plaintiffs' criticism of the "typical year" analysis as vague is without merit. The Agencies were not required "to promulgate regulations that, either by default rule or by specification, address every conceivable question." *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 96 (1995); *Alliance for Natural Health U.S. v. Sebelius*, 775 F. Supp. 2d 114, 134 (D.D.C. 2011) ("[I]t is not the Court's role to dictate what level of specificity is appropriate. When Congress has not specified the level of specificity . . . the agency is entitled to broad deference in picking the suitable level." (internal quotations omitted)).

### 3. The Agencies Explained Their Reasons for Excluding Ephemeral Features.

Contrary to Plaintiffs' argument, the CWA's objective does not "require the inclusion of ephemeral streams in the definition of 'waters of the United States.'" Pls.' Br. at 36; *see supra* Argument II.A.2.b (discussing that jurisdiction does not extend to all waters that would assist in meeting the CWA's objective). The Agencies reasonably explained that ephemeral waters, those which flow or pool "only in direct response to precipitation," are not "navigable waters." 40 C.F.R. § 120.2(3)(iii); 85 Fed. Reg. at 22,251; *see also* 85 Fed. Reg. at 22,275. In reaching this conclusion, the Agencies explained that "a mere hydrologic connection cannot provide the basis for CWA jurisdiction" because "the bodies of water must be 'geographical features' (i.e., rivers and streams) that are 'relatively permanent' (i.e., perennial or intermittent) and that contribute surface water flow to a traditional navigable water . . . in a typical year." 85 Fed. Reg. at 22,289. Because ephemeral features "only flow during or in immediate response to rainfall," *id.* at 22,274, they are not "relatively permanent bodies of water," *id.* at 22,271; *see also id.* at 22,289. The Agencies "determined that requiring surface water flow in a typical year from relatively permanent bodies of water to traditional navigable waters and wetlands adjacent to

such waters as a core requirement of [jurisdiction] is the most faithful way of interpreting the Federal government's CWA authority over a water." *Id.* at 22,271.

In reaching their definition of "tributary" and excluding ephemeral features, the Agencies also considered the "connectivity gradient," including the "decreased 'probability that changes . . . will be transmitted to downstream waters' at flow regimes less than perennial and intermittent." *Id.* at 22,288 (quoting SAB Commentary). Therefore, the Agencies reasonably concluded that ephemeral streams *are* scientifically different from intermittent or perennial streams. *E.g.*, *id.* at 22,275-76 (describing differences in source of water and duration of flow). And because ephemeral features are defined by their impermanence, they "are more appropriately regulated by States and Tribes under their sovereign authorities." *Id.* at 22,287. Such "[a] clear regulatory line between jurisdictional and excluded waters has the additional benefit of being less complicated than prior regulatory regimes that required a case-specific significant nexus analysis." *Id.* at 22,288; *see also Reno v. Flores*, 507 U.S. at 311 (affirming consideration of "administrative efficiency as the reason for selecting one means of achieving a purpose over another"). This clear boundary "is consistent with the role of the Federal government under the Constitution and the CWA" because states "traditionally exercise 'primary power over land and water use.' " 85 Fed. Reg. at 22,287 (quoting *SWANCC*, 531 U.S. at 174).

Plaintiffs' citations to the record to argue the significance of ephemeral streams do not undermine the Agencies' decisionmaking process. Plaintiffs reference a study on intermittent and ephemeral streams in the arid Southwest region to argue that ephemeral streams may "perform the same critical hydrological functions as perennial streams." Pls.' Br. at 36-37. But that study does not adequately distinguish between intermittent and ephemeral streams. Nor does it offer guidance for determining *legal* jurisdiction prescribed by congressional statute. "Virtually all

water, polluted or not, eventually makes its way to navigable water." *County of Maui*, 140 S. Ct. at 1470. Even the 2015 Rule, which Plaintiffs prefer, did not extend jurisdiction to all ephemeral features. In any event, for the purposes of *legal* jurisdiction, the Agencies considered the spectrum of connectivity and reasonably determined that jurisdiction to regulate ephemeral features is more appropriately left to states and tribes. 85 Fed. Reg. at 22,288.

The Agencies' decision to exclude ephemeral features from the definition of "waters of the United States" had "a 'reasonable foundation' " in the record. *Reno v. Flores*, 507 U.S. at 309. The Agencies explained their reasoning for drawing the boundaries they did. The Court owes this determination deference.

### 4.   The NWPR's Treatment of Adjacent Wetlands Is Reasonable.

The Agencies explained their reasoning for assigning CWA jurisdiction to "adjacent wetlands." NWPR RTC Topic 8 § 8.3 at 5. These wetlands are included in the definition of "waters of the United States" because they are "inseparably bound up with the 'waters' of the United States." 85 Fed. Reg. at 22,308 (quoting *Riverside Bayview*, 474 U.S. at 134). This definition covers waters beyond the "continuous surface connection" of the *Rapanos* plurality. *See* 40 C.F.R. § 120.2(3)(i)(C) (including wetlands that are physically separated from a non-wetland jurisdictional water "only by a natural berm, bank, dune, or similar natural feature"). The Agencies also explained their reasons for excluding non-adjacent wetlands. 85 Fed. Reg. at 22,308. Classifying all wetlands as jurisdictional would be inconsistent with the CWA and Supreme Court case law. *Id.* So would including isolated wetlands that lack a hydrological surface connection to other jurisdictional waters, or that connect hydrologically only infrequently. *Id.* The category of "adjacent wetlands" under the NWPR, by contrast, provides regulators and the regulated community with a "clear and implementable approach" to

determining CWA jurisdiction. NWPR RTC Topic 8 § 8.1 at 2; 85 Fed. Reg. at 22,307-08; *see also Reno v. Flores*, 507 U.S. at 311-13.

Plaintiffs wrongly argue that the NWPR's provisions as to wetlands ignore scientific evidence and factors contemplated by the CWA and the Supreme Court. Pls.' Br. at 38-40. Both law and policy support the Agencies' principled distinction between natural and artificial barriers separating wetlands from jurisdictional waters. Natural barriers are evidence of an interactive relationship between jurisdictional water and wetlands, while artificial barriers are not. 85 Fed. Reg. at 22,312-14, 22,307, 22,311; *see also id.* at 22,280 (such natural features indicate "a sufficient hydrologic surface connection between the jurisdictional water and the wetland," making the wetlands "part of" adjacent jurisdictional waters).

The Agencies also explained the inclusion of abutting wetlands, which touch a jurisdictional water at least at one point or side, *id.* at 22,315, as categorically jurisdictional while requiring a regular surface water connection for certain non-abutting wetlands. *See, e.g., id.* at 22,279 (noting inclusion of abutting wetlands and "other wetlands that are inseparably bound up with jurisdictional waters," and reliance "on certain regular hydrologic surface connections to establish jurisdiction" of non-abutting wetlands); *id.* at 22,279-80 (discussing *Rapanos* plurality and *Riverside Bayview*). The term "abut" "clearly identif[ies] those waters that are inseparably bound up with other jurisdictional waters." *Id.* at 22,307. The Agencies reasoned that wetlands that abut jurisdictional waters are "in such close proximity to jurisdictional waters that they are considered categorically jurisdictional under the CWA." *Id.* at 22,309. And, contrary to Plaintiffs' assertion that the Agencies did not consider the characteristics of wetlands, the Agencies explained that a surface water connection is not required for abutting wetlands "as not

39

all abutting wetlands display surface water as the wetland hydrology factor but rather may have saturated soils, a high water table, or other indicators of hydrology." *Id.*

Just as with the definition of "tributary," the definition of "adjacent wetlands" rests upon a legal determination, informed by science. Plaintiffs' mere disagreement with the Agencies' use of the relevant scientific literature, such as the Connectivity Report, and dissatisfaction with the outcome of the NWPR, do not render the rule arbitrary and capricious.

Deference is particularly important in situations like this, where no one clear answer exists and where many reasonable definitions could be adopted. The "scope of CWA jurisdiction over wetlands has confounded courts, members of the regulated community, regulators, and the public for decades." *Id.* at 22,308. The Supreme Court has acknowledged the difficult task facing the Agencies, which "must necessarily choose some point at which water ends and land begins . . . this is often no easy task." *Riverside Bayview*, 474 U.S. at 132. "Where on this continuum to find the limit of 'waters' is far from obvious" for any entity. *Id.* The Agencies reasonably decided to "strike a better balance" between federal, state, and tribal jurisdiction, consistent with the Agencies' best interpretation of the text, structure, and purpose of the CWA and relevant Supreme Court guidance. The Court owes deference to the Agencies' determination.

Setting jurisdictional boundaries as to wetlands does not conclusively determine "which of the nation's waters warrant environmental protection and which do not." NWPR RTC Topic 8 § 8.3.3 at 12. The Agencies cannot exceed their authority under the CWA even to achieve "specific scientific, policy, or other outcomes." *Id. See also Rapanos*, 547 U.S. at 741-42 (Scalia, J., plurality) (reasoning that ecological considerations do not provide an independent basis for including physically isolated wetlands in the definition of "waters of the United States").

Accordingly, the Agencies reasonably defined "adjacent wetlands," and the Court should defer to Agencies' carefully-considered NWPR.

###### 5.     The Agencies Adequately Considered the Effects of the NWPR on Water Quality.

Plaintiffs wrongly characterize the import of the CWA's objective and the Agencies' consideration of the NWPR on water quality. Pls.' Br. at 48-51. Plaintiffs' real objection is that the Agencies did not reach a specific conclusion about the NWPR's effects on water quality due to data limitations, as the Agencies did consider the effects on water quality within those limitations. But the data limitations that prevented such precise conclusions have long been known and consistently cited by the Agencies. In 2015, former EPA Administrator McCarthy testified to Congress that national datasets, including the National Wetlands Inventory and the National Hydrography Dataset, are "not used to determine jurisdiction and not intended to be used for jurisdiction," "are not relevant to the jurisdiction of the 'waters of the U.S.,' " and "are not consistent with how we look at the jurisdiction of the [CWA]." 85 Fed. Reg. at 22,330 n.61. In 2014, when developing the 2015 Rule, an EPA blog post entitled "Mapping the Truth" stated, "[w]hile these [USGS and FWS] maps are useful tools for water resource managers, they cannot be used to determine CWA jurisdiction—now or ever." *Id*. at 22,329-30 n.61. As a result, the Agencies did not use these datasets to precisely quantify the nationwide impacts of the 2015 Rule. And the Agencies could not generate the predictions using these datasets about the potential nationwide effects of the NWPR on water quality that Plaintiffs argue was necessary.

Plaintiffs also misconstrue the significance of the Agencies' statement that they did not rely upon the EA or the RPA as part of their rulemaking. Pls.' Br. at 50 (citing 85 Fed. Reg. at 22,332, 22,335). The Agencies stated that "the final rule is not based on the *information* in the agencies' economic analysis or resource and programmatic assessment." 85 Fed. Reg. at 22,332

(emphasis added). Thus, to the extent the EA quantifies the economic costs and benefits of the NWPR in dollars, that information is not a basis for the Agencies' decision. But, both the EA and RPA provide helpful explanations about how the CWA works, including the specifics of the permit programs under CWA Sections 402 and 404. The Agencies are not precluded from citing these documents to help explain how the CWA works or to predict how states may regulate newly non-jurisdictional waters. These documents are part of the rulemaking record and nothing requires the Agencies or this Court to pretend these documents do not exist, as Plaintiffs ask.[12]

As previously noted, Plaintiffs also confuse the scope of CWA jurisdiction with the breadth of the Act's regulatory protection. For example, Plaintiffs repeatedly downplay the states' continued role in protecting water quality, which the NWPR does not disturb. States must establish water quality standards for "waters of the United States" within their borders, and these standards must consider the downstream effects on other jurisdictions. *See supra* p. 4; 40 C.F.R. § 131.10(b). The NWPR does not alter the substantive requirements of water quality standards that states must have in place for "waters of the United States." These account for *all* pollution reaching waters of the United States, including from non-jurisdictional ephemeral streams, non-adjacent wetlands, and even nonpoint sources. So, even if under the NWPR certain discharges are no longer within CWA permitting jurisdiction (though potentially covered by state laws), pollution that reaches jurisdictional waters and causes an exceedance of water quality standards in jurisdictional waters may continue to be addressed. Should that occur, states will need to

---

[12] The Court should decline Plaintiffs' request to judicially notice an attachment to their brief which post-dates the NWPR's finalization. *See* Pls.' Br. at 51 & n.13, Pls.' Ex. B. This document could not have been timely considered by the Agencies and is not properly part of the record. However, the Agencies explained that they *did* consider the SAB's draft commentary, and that its relevant comments "were also raised by public commenters throughout the rulemaking process, and as a result, have been addressed" in the NWPR. 85 Fed. Reg. at 22,261; *see generally* Docket ID No. EPA-HQ-OW-2018-0149-11589.

adjust their TMDLs to ensure that the underlying water quality standards are met. The Agencies'
technical assessment (ignored by Plaintiffs) explained this. RPA at 63.

Because the discharge of certain pollutants from a point source conveyed downstream to
a jurisdictional waterbody may remain covered by the CWA—even if initially discharged into a
non-jurisdictional water—the record disproves the suggestion that the NWPR materially alters
all aspects of the CWA's existing permit scheme, water quality standards, and other protections.

### 6. The NWPR Preserves State Flexibility to Manage Water Quality in the Chesapeake Bay.

The Chesapeake Bay watershed enjoys a unique and significant status in the CWA. *See*
33 U.S.C. § 1267. The NWPR in no way alters that status nor disbands any of the partnerships
created specifically to protect the Bay, nor does it change the Bay TMDL. The Chesapeake Bay
watershed states (Delaware, Maryland, New York, Pennsylvania, Virginia, West Virginia, and
the District of Columbia) are responsible for implementing their own Chesapeake Bay TMDL
watershed implementation plans. The NWPR does not disturb this nor does it change the legal
framework whereby EPA provides technical assistance and grants to states to preserve the
Chesapeake Bay watershed "*regardless of the jurisdictional status of those waters.*" 85 Fed. Reg.
at 22,253 (emphasis added); 33 U.S.C. § 1267; NWPR RTC Topic 11 § 11.3.2.5 at 25-26 (EPA
may enter agreements with states and receives annual appropriations to support restoration
efforts).

As a preliminary matter, even if Plaintiffs are correct that the NWPR threatens the
achievability of the Bay TMDL, Pls.' Br. 40-45, as explained above, *supra* Argument II.A, the
Agencies cannot exceed the legal limits of jurisdiction prescribed by the CWA, regardless of
how laudable their intentions. And, a change in jurisdiction does not automatically translate to
environmental harm. *Supra* Argument II.B.1. The Agencies did not "view the definition of

'waters of the United States' as conclusively determining which of the nation's waters warrant environmental protection," but instead sought to draw "the boundary between those waters subject to federal requirements under the CWA and those waters that states and tribes are free to manage under their independent authorities." NWPR RTC Topic 11 § 11.7 at 74.

Fundamentally, Plaintiffs fail to explain how the NWPR threatens the achievability of the Bay TMDL. Plaintiffs' claim, that removing waters from CWA jurisdiction removes the waters "from the scope of the Bay TMDL," is flatly incorrect. Pls.' Br. at 42. The NWPR makes no substantive change to the Bay TMDL that EPA established in 2010. The potential removal of certain unspecified waters in the Chesapeake Bay Watershed from federal jurisdiction would simply confer sole jurisdiction over those waters to the appropriate state. Presumably, that state could then—pursuant to its own watershed implementation plan—address, under appropriate state legal authorities, nutrient and sediment loads to those waters to meet the Bay TMDL's reduction targets.

Moreover, Plaintiffs appear to misunderstand the relationship between CWA permits and the Bay TMDL. CWA permits do not by themselves define and achieve the Bay TMDL. Indeed, as the Third Circuit noted, "it is impossible to meet [TMDL] standards by point-source reductions alone." *American Farm Bureau Federation*, 792 F.3d at 299. Setting aside that Plaintiffs do not identify any individual CWA permits that will no longer be required for point sources with Bay TMDL allocations, the removal of certain waters from CWA jurisdiction means that states will have sole jurisdiction over those waters and can institute their own point source pollution limitations or reallocate the pollution load between point sources and nonpoint sources.

This unwanted (by Plaintiffs) transfer of responsibility is at the crux of Plaintiffs'
claims—that states will have to adjust to their own management plans to achieve the Bay TMDL.
Comment of Virginia Dep't of Environmental Quality, Attach. A, Docket ID No. EPA-HQ-OW-
2018-0149-5186 at 7-8 (describing how TMDLs are tied to Virginia's permits); Comments of
District of Columbia Dep't of Energy and Env., Docket ID No. EPA-HQ-OW-2018-0149-4744
at 8 (describing need to create independent fill program). The Agencies responded to these
comments during the rulemaking process, recognizing that "a change in the scope of CWA
jurisdiction could affect existing and future . . . TMDL restoration plans." NWPR RTC Topic 11
§ 11.4.2 at 44. But the Agencies reasonably concluded that states could "take a flexible approach
to reviewing and updating these TMDLs based on their resources, state priorities, and
availability of new data and information." *Id.* Ultimately states are responsible for implementing
their own watershed implementation plans to protect the Bay. *American Farm Bureau
Federation v. EPA*, 984 F. Supp. 2d 289, 332 (M.D. Pa. 2013) (stating that "implementation [of
the Bay TMDL] is left correctly to the states" and "the states are still free to choose
both *if* and *how* they will implement the [Bay] TMDL allocations"), *aff'd*, 792 F.3d 281 (3d Cir.
2015).

As the CWA makes clear, states bear primary responsibility and enjoy significant
flexibility in fashioning and adjusting water quality standards. 33 U.S.C. § 1313. Delaware,
Maryland, Virginia, West Virginia, Pennsylvania, and New York all have defined waters of the
state, adopted EPA-approved water quality standards, and established programs that protect
them. RPA Appendix A at 16-17, 37-38, 56-58, 66-67, 80-82, and 84-85. The Agencies also
responded to comments concerning cross-boundary pollution, concluding that states may resolve
these issues through a variety of options, including (i) Section 402 affected state notification

45

processes; and (ii) Section 319(g) provisions allowing EPA to convene an interstate management conference to address cross-boundary nonpoint source pollution into navigable waters. NWPR RTC Topic 11 § 11.3.2.5 at 25-26. Other remedies for pollution disputes among states could derive from federal common law under the Supreme Court's original jurisdiction; remedies for disputes between a state and a public or private party could derive from state or federal common law. 85 Fed. Reg. 22,286. The NWPR preserves the ability for states in the Chesapeake watershed to adapt and make decisions to restore and maintain the Bay's water quality.

## III.   The Repeal Rule Was Lawful.

As explained above, the Court does not have jurisdiction to consider the Repeal Rule. *See supra* Argument I.B. The Repeal Rule has been replaced by the NWPR. The Repeal Rule thus has no present real-world effect (except in Colorado, which is not at issue here). Unless the NWPR is itself completely vacated *and* the Repeal Rule becomes effective, Plaintiffs' challenge to the Repeal Rule simply cannot proceed. However, in the unlikely event that the Repeal Rule becomes operative while this litigation is pending, and the Court reaches the merits of Plaintiffs' Repeal Rule challenge, the Court should uphold the Repeal Rule.

Agencies may revise or repeal regulations based on changes in statutory interpretation or policy judgments. *Fox Television*, 556 U.S. at 513-15; *supra* Argument II.B. In so doing, an agency must merely provide a satisfactory explanation for its action. *Fox Television*, 556 U.S. at 513. This does not require reasons any "more substantial than those required to adopt a policy in the first instance." *Id.* at 514; *see also id.* at 514-15 (rejecting lower courts' interpretations that a heighted standard of review applies to repeals, such as a requirement that an agency explain why the new rule effectuates the statute as well or better than the old rule). Numerous courts held that the 2015 Rule was unlawful or that plaintiffs were likely to succeed in invalidating the 2015 Rule based on various substantive and procedural flaws. *See supra* Background B.1. The Repeal Rule

complied with APA requirements when reasonably removing those flawed regulations from the books in light of such concerns.

### A.    The Repeal Rule Was Reasonable and Well-Supported.

The Agencies thoroughly explained their reasons for the Repeal Rule. Contrary to Plaintiffs' arguments, the Agencies did not "ignore" the science that had supported the 2015 Rule. Nor were the Agencies required to further evaluate that information to repeal the 2015 Rule. *See* Pls.' Br. at 13-14, 18-19. Indeed, at the time of the Repeal Rule's issuance various courts had enjoined the 2015 Rule in more than half the country. So the Agencies reasonably reexamined their consideration of the CWA and its case law, as well as the policy considerations. They then concluded that the 2015 Rule exceeded the scope of their legal authority. The Agencies also concluded that the 2015 Rule's distance limitations were not adequately supported in the record, and were not developed in accordance with APA procedural requirements. The Agencies acknowledged that the pre-2015 Rule regulatory framework was not perfect. But they reasonably explained why it was preferable while the Agencies developed a new regulatory definition of "waters of the United States."

### 1.    The Agencies Reasonably Concluded that the 2015 Rule Extended Jurisdiction Beyond Recognized Limits of the CWA.

The Agencies based the Repeal Rule on four primary grounds. Three were based on the substance of the CWA, Supreme Court case law, and congressional intent. The fourth involved procedural errors concerning the 2015 Rule's distance limitations.

*First*, the Agencies reasonably concluded that the 2015 Rule failed to comply with the legal test that the Agencies' themselves claimed to base the 2015 Rule upon. The rule thereby exceeded the CWA's legal limits on the scope of federal authority, as intended by Congress and reflected in Supreme Court cases. 84 Fed. Reg. at 56,639, 56,640-53. The 2015 Rule identified

Justice Kennedy's significant nexus standard as its touchstone. But the 2015 Rule misconstrued and misapplied that standard. *Id*. at 56,639. Thus, although the Repeal Rule did not opine that Justice Kennedy's opinion is or should be controlling, contrary to Plaintiffs' claims, evaluation of the 2015 Rule under that standard does not present a contradiction. *See id*. at 56,639 n.27; Pls.' Br. at 19 n.5. The Agencies reasonably repealed the 2015 Rule because that rule exceeded the scope of authority on which it was premised. 84 Fed. Reg. at 56,639. Nor is there conflict with the Agencies' reconsideration of *Rapanos* in the Repeal Rule and their later decision to promulgate the NWPR by developing new principles without reliance on the "significant nexus" test. The question asked at repeal was simple: did the 2015 Rule actually comply with the test that the Agencies set for themselves? The Repeal Rule concluded that the 2015 Rule had not.

After several adverse court decisions about the 2015 Rule, the Agencies reconsidered their interpretation of relevant Supreme Court opinions. They then acknowledged that Justice Kennedy's significant nexus standard was a limiting test that constrains overly broad applications of the CWA. 84 Fed. Reg. at 56,640, 56,643, 56,645. Yet, as the Agencies explained, key provisions of the 2015 Rule "were at odds with Justice Kennedy's understanding of the phrase 'significant nexus.' " *Id*. at 56,640. The 2015 Rule expanded the meaning of the terms "tributary," "adjacent," and "significant nexus," including by broadly interpreting the phrase "similarly situated lands in the region." *Id*. at 56,640, 56,643; *see id*. at 56,644-45 (discussing the phrase "similarly situated lands in the region"); *id*. at 56,646-47 (discussing broad "tributary" category); *id*. at 56,647-49 (describing expansive "adjacent" category). The categories of case-specific waters also construed jurisdiction too expansively. *Id*. at 56,649-50.

The Agencies' "reinterpretation of a Supreme Court Justice's opinion referencing 'similarly situated lands in the region' " was a particularly problematic misconstruction of the

significant nexus test. *Id*. at 56,645. The Agencies originally interpreted Justice Kennedy's test as only permitting aggregation of "wetlands adjacent to the same tributary reach" for determining significant nexus. *Id*.; *see also id*. (explaining that the 2008 *Rapanos* Guidance "more closely aligned with what Justice Kennedy intended for that test"). The 2015 Rule, however, "broadened the scope of aggregation for determining jurisdiction in a 'significant nexus' analysis." *Id*. This resulted in, for example, "the categorical assertion of *per se* jurisdiction over an expansive 'tributary' network," including categorical jurisdiction over ephemeral "tributaries," and thereby "expanded federal jurisdiction to cover waters outside the scope of the Act, and thus exceeded the agencies' statutory authority." *Id*. at 56,645-46.

The Agencies further explained how the 2015 Rule's reinterpretation of Justice Kennedy's standard led to problematic applications of the CWA, contrary to Justice Kennedy's position that "the significant-nexus test itself prevents problematic applications of the statute." 547 U.S. at 783 (Kennedy, J., concurring); 84 Fed. Reg. at 56,643, 56,651. Similar to the Corps' overbroad assertion of jurisdiction at issue in *SWANCC*, the 2015 Rule permitted jurisdiction over certain non-navigable, isolated, intrastate waters. 84 Fed. Reg. at 56,640-41, 56,651. Indeed, the very waters at issue in *SWANCC*—which the Supreme Court held were *not* jurisdictional based on the text of the statute—would "almost certainly" have been considered jurisdictional under the 2015 Rule. *Id*. at 56,641, 56,642. In the Repeal Rule, the Agencies reasoned that Justice Kennedy, who joined the *SWANCC* majority decision, did not intend the significant nexus standard to be applied in such a manner. *Id*. at 56,642 (quoting 2008 *Rapanos* Guidance at 9 n.32). The 2015 Rule thus exceeded the Agencies' authority by asserting jurisdiction over waters that the Supreme Court itself had previously concluded the text of the CWA would not allow. *Id*.; *see also id*. at 56,643.

The Agencies also cited the 2015 Rule's misapplication of the scientific findings on which the rule relied. *Id.* at 56,652. The 2015 Rule specifically claimed that science could *not* define where to draw the line of federal CWA jurisdiction. *Id.* (citing 80 Fed. Reg. at 37,060). The rule nevertheless relied heavily on the Connectivity Report to support its reinterpretation of the significant nexus standard. In particular, the Agencies relied on the Connectivity Report to support the 2015 Rule's watershed-scale aggregation approach to applying Justice Kennedy's standard. *Id.* at 56,652-53. The 2015 Rule cited "one of the main conclusions" of the Connectivity Report "that the incremental contributions of individual streams and wetlands are cumulative across entire watersheds, and their effects on downstream waters should be evaluated within the context of other streams and wetlands in that watershed." *Id.* at 56,644 (quoting 80 Fed. Reg. at 37,066). The Agencies then relied on this conclusion of the Connectivity Report to support their reinterpretation of the scope of Justice Kennedy's legal test *itself*—and the scope of aggregation it allows—for determining what constitutes "significant nexus." *Id.* at 56,644-45.

**Second**, the Agencies concluded that the 2015 Rule did not adequately consider and accord due weight to the express congressional policy in CWA Section 101(b). *Id.* at 56,639; *id* at 56,654. The Agencies considered that the CWA balances the traditional regulatory power of the states with the need for federal regulations and oversight to protect "waters of the United States." *Id.* at 56,639, 56,653. The Agencies explained that the 2015 Rule had expanded federal jurisdiction in a manner that encroached on traditional state land-use regulation and state authority to regulate state waters. *Id.* at 56,639.

Contrary to Plaintiffs' argument, Pls.' Br. at 20, the Agencies did not arbitrarily ignore the 2015 Rule's attempts to balance the CWA's objective with its policy. Rather, the Agencies specifically cited the prior discussion and found the 2015 Rule deficient in this respect. 84 Fed.

Reg. at 56,654 (acknowledging the 2015 Rule's discussion of Section 101(b), but finding the 2015 Rule "did not appropriately recognize" the policy of Section 101(b)); Repeal Rule RTC, Document ID No. EPA-HQ-OW-2017-0203-15694, § 4.5 at 42-43 (same). And, because the 2015 Rule asserted jurisdiction over certain waters more appropriately left solely in the jurisdiction of states and tribes, the Repeal Rule concluded the Agencies insufficiently considered the policy in Section 101(b). 84 Fed. Reg. at 56,654.

While claiming that the 2015 Rule properly balanced Section 101(b), Pls.' Br. at 20, Plaintiffs inconsistently argue that the Repeal Rule's interpretation of Section 101(b) and any balance with Section 101(a) does not comport with the CWA at all. Pls.' Br. at 10-12. But the CWA does not unambiguously prohibit the Agencies' interpretation. As the Repeal Rule described, the CWA contemplates both state and federal responsibilities to meet the CWA's objective. 84 Fed. Reg. at 56,632-34, 56,654. Yet the 2015 Rule did not fully recognize the partnership between states and the federal government in meeting that "shared objective" in Section 101(a). *Id.* at 56,655 (quoting *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992)). Thus, the 2015 Rule did not give due weight to Section 101(b). *Id.* Even if Plaintiffs presented an alternative plausible reading of the statute, the Agencies' reasonable interpretation is entitled to deference. *Brand X*, 545 U.S. at 982. The Agencies thus reasonably concluded that the pre-2015 Rule regulatory regime, though imperfect, nevertheless was a better balance of Sections 101(a) and (b). Repeal Rule RTC § 4.7.2 at 53-54; *see* 84 Fed. Reg. at 56,653.

***Third***, invoking principles of constitutional avoidance, the Agencies found that the 2015 Rule approached the limits of the Agencies' constitutional and statutory authority without a clear indication that Congress intended to invoke the outer limits of its power. 84 Fed. Reg. at 56,639. Like the Corps' overbroad application of its regulations in *SWANCC*, the 2015 Rule raised

significant questions of Commerce Clause authority and encroached on traditional state regulation. *Id.* at 56,639, 56,655 (quoting *SWANCC*, 531 U.S. at 172-73, 173). In *SWANCC*, the Court rejected arguments that the use of non-navigable, isolated, intrastate ponds by migratory birds fell within Congress' power to regulate. The Court explained that such claims raised "significant constitutional questions" and "would result in a significant impingement of the States' traditional and primary power over land and water use." *Id.* at 56,655 (quoting *SWANCC*, 531 U.S. at 173, 174). Yet the 2015 Rule was so expansive in its putative application, it stretched federal jurisdiction to such constitutionally questionable waters, including the constitutionally questionable waters in *SWANCC*. *Id.* at 56,541-42.

Because the 2015 Rule misapplied the significant nexus standard, shifted the balance of state and federal regulatory authority, and raised constitutional questions without a clear statement, the Agencies reasonably concluded that repeal of that rule was warranted.

### 2.    The 2015 Rule's Distance Limitations Were Flawed.

Independent of those legal and policy concerns, the Agencies reasonably repealed the 2015 Rule because key features of its promulgation violated the APA. First, the Agencies conceded violations of the APA's public notice and comment requirements. The distance limitations used to define "neighboring" in its "adjacent" waters category, and one of its case-specific categories, were not included in the proposal for public comment. *Id.* at 56,656-57. Second, the Agencies acknowledged that some of these distance limitations were not sufficiently supported by the 2015 Rule's administrative record. *Id.* at 56,639-40, 56,656-59.

Notably, the 2015 Rule had already been held unlawful in both these respects by district courts on summary judgment, and so remanded back to the Agencies. *See id.* at 56,657. In addressing the 2015 Rule's errors concerning the distance limitations, the Repeal Rule also

responded to those remands. *Id.* at 56,657, 56,659, 56,661; *see also id.* at 56,640. Because the distance limitations were central to the rule, the Agencies reasonably concluded that these procedural errors and lack of record support warranted repealing the 2015 Rule. *Id.* at 56,659.

### 3.   The Agencies Reasonably Returned to the Preexisting Regulatory Regime While Developing a New Definition.

The Agencies also reasonably explained why repeal of the 2015 Rule was preferable to other potential options. *Id.* at 56,659-62. The deficiencies of the 2015 Rule "pervaded" its entire structure and scope, and "resulted in a definition of 'waters of the United States' that covered waters outside the limits on federal CWA jurisdiction intended by Congress and reflected in Supreme Court cases, in addition to raising significant constitutional questions." *Id.* at 56,659.

Contrary to Plaintiffs' argument, *see* Pls.' Br. at 7, the Agencies *did* "evaluate the effects" of reinstating the preexisting regime. The Agencies considered that the preexisting regime "adhere[s] more closely than the 2015 Rule to the jurisdictional limits reflected in the statute and case law." 84 Fed. Reg. at 56,661. The Agencies believed the preexisting regime was consistent with Justice Kennedy's intent that the significant nexus standard would not be applied in a way that resulted in assertion of jurisdiction over waters deemed non-jurisdictional in *SWANCC*. *Id.* And the preexisting regime resulted in a better balance of CWA Sections 101(a) and (b). *Id.* The Agencies concluded that reinstating the preexisting regime was the "most effective and efficient way to remedy the fundamental and systemic flaws of the 2015 Rule," while achieving the objective of the CWA and providing for regulatory certainty during the Agencies' rulemaking process to revise the definition of "waters of the United States." *Id.* at 56,661. The Agencies concluded that reinstating the familiar preexisting regime would provide "greater regulatory certainty and national consistency." *Id.* at 56,660. Sufficient regulatory certainty would not be provided by relying solely on non-regulatory actions, nor by repealing the 2015 Rule without

restoring the preexisting regime. *Id.* at 56,662. Thus, the Agencies believed that reinstating that regime while they developed a new rule was better than other potential alternatives to repeal. *See* 84 Fed. Reg. at 56,661-62, 56,664; *Fox Television*, 556 U.S. at 515.

Plaintiffs cannot credibly dispute that the pre-2015 Rule regulatory regime was longstanding and familiar. *See* Pls.' Br. at 22. As the Agencies explained, the text of the regulations had remained largely unchanged since the 1980s. 84 Fed. Reg. at 56,660. And the Agencies' revised application of the regulations, informed by Supreme Court decisions, agency guidance, and their technical expertise, had been applied for more than a decade. *Id.* Thus, both regulators and regulated entities had amassed significant experience and expertise operating under that regulatory regime. *Id.* at 56,660. While the Agencies recognized that the preexisting regime posed some implementation challenges, primarily because certain waters required a case-specific significant nexus evaluation, *id.*, the Agencies reasonable intended reinstatement of that regulatory regime to be an interim step, prior to finalizing a new definition of "waters of the United States." *Id.* at 56,661, 56,662. And, regardless, the 2015 Rule relied on case-specific significant nexus evaluations as well. Therefore, retention of the 2015 Rule would not have meaningfully addressed this criticism of the pre-2015 Rule regime.

Plaintiffs fault the Agencies for not providing a substantive analysis to show that the 2015 Rule created more regulatory uncertainty than the pre-2015 Rule regulatory regime. Pls.' Br. at 22. But the Agencies did not need such a quantitative analysis. Many commenters and their voluminous submissions to the record indicated "substantial disagreement and confusion as to the scope of the 2015 Rule and the extent of federal CWA jurisdiction more broadly." 83 Fed. Reg. at 32,239; *see also* 84 Fed. Reg. at 56,660. This provided more than adequate basis for reinstating the preexisting regime while the Agencies developed a new rule (the NWPR). *See* 84

Fed. Reg. at 56,661-62, 56,664. The 2015 Rule generated a changing patchwork of application through its litigation. *See supra* Background B.1. As the Agencies recognized at the time of the Repeal Rule, the 2015 Rule had been enjoined in more than half the states, where the preexisting regime was in effect. 84 Fed. Reg. at 56,660, 56,664. And restoring the preexisting regime would also remedy the 2015 Rule's infirmities identified by two courts that remanded the 2015 Rule. *Id.* at 56,661. Returning to the preexisting regime would thus create national consistency. *Id.* While the Agencies recognized the possibility that future legal challenges to the Repeal Rule might result in application of different regulatory definitions in different areas of the country, the Agencies' decision to return to a singular regulatory definition nationwide was reasonable.

Plaintiffs' attempted comparison to *North Carolina Growers' Ass'n*, 702 F.3d at 770, is inapposite. Pls.' Br. at 22. Even though regulatory certainty was not a primary basis for the Repeal Rule, *see supra* Argument III.A.1-2, here, the Agencies took and considered comments on the issue. *See* Repeal Rule RTC § 2 at 12-21 (addressing comments on regulatory certainty).

### 4. The Repeal Rule Did Not Need to Substantively Reevaluate the 2015 Rule's Record Concerning Science or Water Quality.

Given that the 2015 Rule exceeded the Agencies' authority and suffered from multiple APA violations in promulgation, the Agencies did not also need to specifically address or refute the rule's scientific findings to repeal it. Regardless, the Repeal Rule did not "ignore," "dismiss[]," or "abandon[]" the Connectivity Report. *See* Pls.' Br. at 13-14, 18. Contrary to Plaintiffs' allegations, the Agencies *did* explain their "reversal from the [2015 Rule] and its

scientific and factual record." *See id.* at 7, 18-19. The Agencies explained in detail that the 2015 Rule interpreted the scope of regulatory jurisdiction too broadly. *See supra* Argument III.A.1.[13]

The Repeal Rule fully acknowledged that the 2015 Rule's scientific record was extensive, and it did not dispute that record or the 2015 Rule's scientific findings. Repeal Rule RTC § 6.0 at 79-80; *see id.* at 80 (stating that the Connectivity Report "continues to inform agency actions, including certain aspects of the agencies' proposed revised definition"); *id.* § 6.3 at 83 (recognizing that the report summarizes current scientific understanding). But the technical findings of the Connectivity Report are beside the point. The Agencies repealed the 2015 Rule because of its legal deficiencies, including with respect to APA procedural requirements. 84 Fed. Reg. at 56,652 (stating that the 2015 Rule misapplied the report's findings, but not disputing the report itself). While the Agencies' determinations of CWA jurisdiction are informed by science, statutory interpretation of jurisdiction must conform to the contours of the Agencies' legal authority. 84 Fed. Reg. at 56,652; Repeal Rule RTC §§ 6.0, 6.2.2, 6.3 at 80, 82-83. Moreover, the Agencies explained that their separate, parallel rulemaking to promulgate a new definition of "waters of the United States" (the NWPR) was being informed by the Connectivity Report. Repeal Rule RTC § 6.0, at 79-80; *see also supra* Argument II.B.2. Pending the conclusion of that work, the Agencies reasonably preferred nationwide return to the familiar, preexisting regulatory regime to trying to somehow fix the 2015 Rule or allowing its uncertainty to continue.

Plaintiffs' arguments that the Agencies should have evaluated potential effects on water quality and the costs and benefits of reinstating the preexisting regime fares no better. Pls.' Br. at 21-22. In fact, the Agencies *did* evaluate costs and benefits in their Economic Analysis

---

[13] While the Repeal Rule acknowledged that certain statements in the *Rapanos* plurality opinion were instructive, contrary to Plaintiffs' suggestion, the Repeal Rule did not base its finding that the 2015 Rule exceeded CWA authority on the *Rapanos* plurality opinion. *See* Pls.' Br. at 12.

accompanying the Repeal Rule. *See generally* Repeal Rule EA, Docket ID No. EPA-HQ-OW-
2017-0203-15695.[14]   Regardless, the Agencies repealed the 2015 Rule because of legal
infirmities.  They did not base their decision on projected impacts on water quality.  This was
entirely reasonable. As the Agencies noted, the Repeal Rule did not alter the CWA's goals,
including the goal to attain "water quality which provides for the protection and propagation of
fish, shellfish, and wildlife and provides for recreation in and on the water." Repeal Rule RTC
§ 6.4.2 at 86 (quoting 33 U.S.C. § 1251(a)(2)). The Agencies also noted that the Repeal Rule did
not diminish state and tribal authorities to protect their aquatic resources, including waters that
are beyond the reach of the CWA's jurisdiction.  *Id.* §§ 6.4.2, 8.0.2 at 86, 109.

Plaintiff's attempt to analogize *Air Alliance Houston v. EPA*, 906 F.3d 1049 (D.C. Cir.
2018). Pls.' Br. at 21-22. This is inapt. Unlike the agency's rationale found lacking in that case,
the Repeal Rule fully articulated reasons for repeal. After several adverse court decisions, the
Agencies reasonably reconsidered their statutory authority, Justice Kennedy's significant nexus
standard, and the process for promulgating the 2015 Rule. *Cf. Air Alliance Houston*, 906 F.3d at
1067-68 (holding rule failed to provide "reasoned explanation" when delaying another rule's
effective dates because it failed to explain departure from agency's reasoning in originally
setting those dates (citing *Fox Television*, 556 U.S. at 515-16)).

As Plaintiffs did with the NWPR, here too they appear to argue that generalized CWA
objectives override statutory and constitutional limits on the Agencies' authority. *See* Pls.' Br. at
9, 12. As explained above, this is not the case. *See supra* Argument II.A.2.b. The Supreme Court
has already held that the term "waters of the United States" cannot reasonably be interpreted to

---

[14] The Economic Analysis found that the 2015 Rule's economic analysis likely overstated the
rule's costs and benefits and may have underestimated the 2015 Rule's impacts in some states.
Repeal Rule EA at 47-50; Repeal Rule RTC § 6.4.2 at 86.

cover *all* waters, no matter how remote or insubstantial, so long as the CWA's objective is achieved. *See SWANCC*, 531 U.S. at 166 (reversing holding that "the CWA reaches as many waters as the Commerce Clause allows"); *id.* at 168 (concluding that the CWA does not allow jurisdiction to extend to the ponds at issue). Yet, in the Repeal Rule, the Agencies acknowledged the 2015 Rule impermissibly interpreted federal jurisdiction to potentially cover many such remote or insubstantial waters. 84 Fed. Reg. at 56,654; Repeal Rule RTC § 4.5 at 43. Akin to when a court grants a motion to dismiss, even assuming the scope of the 2015 Rule might better serve the CWA's objective or goals, the 2015 Rule was *legally* problematic. No science required the Agencies to retain such a rule.

### B. The Repeal Rule Complied with APA Procedural Requirements.

#### 1. The Repeal Rule Complied with Notice and Comment Procedures and Was Not Predetermined.

As the Supreme Court recently reaffirmed, the APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2385 (2020) (quoting *Fox Television*, 556 U.S. at 513). In *Little Sisters*, the Court rejected the purported open-mindedness test because it has no basis in the APA. *Id.* Likewise, Plaintiffs' appeal to such a test here must be rejected. *See* Pls.' Br. at 23-25, 27 (alleging that the Agencies had a closed mind).[15]

The Repeal Rule complied with the APA, including procedural requirements. It was not unlawfully predetermined. The Agencies provided notice of their proposal to repeal the 2015 Rule and reinstate the preexisting regulatory regime, and solicited and considered comments on

---

[15] Reliance on *McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317 (D.C. Cir. 1988), is entirely misplaced. There, an agency's inflexible use of a model rendered it a rule, which had not been properly subjected to APA proceedings. 838 F.2d at 1318-19. And given *Little Sisters*, *McLouth*'s reasoning of agency's open-mindedness is no longer good law. *See id.* at 1321-23.

the proposal, including with a supplemental notice. *See, e.g.*, 82 Fed. Reg. 34,899-903; 83 Fed. Reg. 32,227-28, 32,231, 32,240-42, 32,247-49. With the proposal and the supplemental notice, interested persons had a total of 90 days to provide comments.[16] Indeed, the Agencies received approximately 770,000 comments. The Agencies responded to comments in the preamble to the final Repeal Rule, as well as in a separate 173-page Response to Comments document. *See generally* Repeal Rule RTC (summarizing comments and responses). That is all that the APA requires. *Little Sisters*, 140 S. Ct. 2367 at 2385-86.

Neither Executive Order No. 13778, nor the statements of the President and former EPA Administrator cited by Plaintiffs, show that the Agencies did not meaningfully consider comments.[17] Plaintiffs incorrectly suggest that the Executive Order mandated a particular outcome. It did not. The Order directed the Agencies to review the 2015 Rule and "publish for notice and comment a *proposed* rule rescinding or revising the rule, *as appropriate and consistent with law*." *Id.* (emphasis added). This left to the Agencies the discretion to determine whether and what final action would be "appropriate."

Plaintiffs' argument that the Agencies unduly restricted public comment is wrong. Pls.' Br. at 7, 24-25. Wishing to negate any argument that commenters had been confused about the proposed repeal, the Agencies clarified and provided more detail regarding their proposed repeal

---

[16] Plaintiffs' suggestion that the comment period was inadequate, Pls.' Br. at 25 & n.7, should be rejected. The APA does not specify a timeframe for public comment, nor does Executive Order No. 12866 impose such a requirement. *See Little Sisters*, 140 S. Ct. at 2385.

[17] "An administrative official is presumed to be objective and capable of judging a particular controversy fairly on the basis of its own circumstances." *United Steelworkers of America v. Marshall*, 647 F.2d 1189, 1208 (D.C. Cir. 1980) (internal quotations omitted). The presumption is not overcome by an official's public position, expression of strong views, or holding of an underlying philosophy. *Id.* Thus, the statements cited by Plaintiffs do not show that the outcome of the Repeal Rule was predetermined. Nor does a court's invalidation of a separate rule that extended the 2015 Rule's applicability date show that the Agencies' decision to repeal the 2015 Rule was predetermined. *See* Pls.' Br. at 24.

in a supplemental notice. 83 Fed. Reg. at 32,227. And, as Plaintiffs acknowledge, the

supplemental notice requested comment on issues Plaintiffs allege the initial proposal did not.

*See* Pls.' Br. at 25. Thus, the Court should reject Plaintiffs' argument that the supplemental

notice failed to cure any alleged defect in the scope of comments requested by the initial notice.

Moreover, the open-mindedness test on which Plaintiffs rely has been squarely rejected by the

Supreme Court. *Little Sisters*, 140 S. Ct. at 2385.

Plaintiffs argue that because the Agencies undertook two separate rulemakings to

redefine "waters of the United States," the Agencies impermissibly narrowed the issues

addressed in the Repeal Rule. Pls.' Br. at 26. Plaintiffs are incorrect. In both the Repeal Rule and

NWPR rulemakings, the Agencies complied with the procedural requirements imposed by the

APA; no more is required. *Little Sisters*, 140 S. Ct. at 2385-86; *Vermont Yankee Nuclear Power*

*Corp. v. NRDC*, 435 U.S. 519, 523-24 (1978). When repealing the 2015 Rule, the Agencies did

not ignore criticisms of the pre-2015 Rule regulatory regime. As previously explained, they

acknowledged that the preexisting regime was imperfect, and that it presented implementation

challenges—primarily because of its reliance on the significant nexus standard in certain cases.

84 Fed. Reg. at 56,660. The Agencies nevertheless explained why they believed that reinstating

the preexisting regime was the best alternative pending the Agencies' consideration of public

comments on a proposed new definition that would move away from such a regime. *Id.* at

56,661-62. An agency "need not demonstrate to a court's satisfaction that the reasons for the new

policy are *better* than the reasons for the old one; it suffices that the new policy is permissible

under the statutes, that there are good reasons for it, and that the agency *believes* it to be better."

*Fox Television*, 556 U.S. at 515. The Agencies reasonably described the reasons for their

conclusions. *See supra* Argument III.A.3.

60

## 2. The Economic Analysis Accompanying the Repeal Rule Was Not a Basis for the Rule.

As explained above, the Agencies did not need to rely on an evaluation of the costs and benefits of repealing a rule that they found exceeded their authority. Although the Agencies prepared an Economic Analysis to accompany the Repeal Rule pursuant to Executive Order 12866, the Agencies did not rely on the findings of that analysis to repeal the 2015 Rule. 84 Fed. Reg. at 56,662. Plaintiffs argue that the final version of the Economic Analysis differed so substantially from the proposed version that the public did not have a meaningful opportunity to comment on it. Pls.' Br. at 25. But Plaintiffs ignore that the changes made to the Economic Analysis were responsive to public comments. *See* 84 Fed. Reg. at 56,662-63. In any event, Plaintiffs' procedural argument is ineffective because the Economic Analysis was not a basis for the Repeal Rule. *Id.* at 56,662, 56,665; *see Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039-40 (D.C. Cir. 2012) (stating that an agency's economic analysis can be tested under the APA *if* the "agency decides to rely on a cost-benefit analysis as part of its rulemaking"). Thus, even if the Agencies inaccurately or incompletely analyzed the impacts, it would not render the Repeal Rule unreasonable.

## 3. The Repeal Rule's Conclusions Concerning the Distance Limitations Were Sufficiently Noticed and Supported.

Plaintiffs argue that the Repeal Rule's conclusions concerning the 2015 Rule's distance limitations were not sufficiently noticed for comment. Pls.' Br. at 20-21. But as explained above, the Agencies requested comments on several potential grounds for repealing the 2015 Rule, as well as comments on reasons for repeal generally. *See, e.g.*, 83 Fed. Reg. at 32,227, 32,231. The supplemental notice specifically highlighted that the 2015 Rule's distance limitations were not subject to public comment before appearing in the final 2015 Rule, as well as courts' concerns

with the distance limitations. *See id.* at 32,229 (describing distance limitations as "numeric measures" and "quantitative measures"); *id.* at 32,241, 32,243. The Agencies then specifically requested public comment concerning the 2015 Rule's distance limitations, *id.* at 32,241, as well as on "other issues that may be relevant to the agencies' consideration of whether to repeal the 2015 Rule, *such as whether potential procedural deficiencies limited effective public participation in the development of the 2015 Rule*," *id.* at 32,249 (emphasis added). Thus, unlike the notice errors Plaintiffs cite in *McLouth*, the Repeal Rule supplemental notice fully "alerted a reader to the stakes." 838 F.2d at 1322-23.

Plaintiffs mistakenly argue that acknowledgement of two court opinions issued after the comment period closed—court decisions confirming the noted unlawful flaws with the distance limitations—somehow constitutes post hoc rationalization. It does not.[18] In the supplemental notice to repeal the 2015 Rule, the Agencies cited alleged flaws in the distance limitations. *E.g.*, 83 Fed. Reg. at 32,229, 32,238. The Agencies also considered and responded to the public comments on those issues. 84 Fed. Reg. at 56,656-57; Repeal Rule RTC § 4.4 at 39-40. Reliance on the further court decisions was thus not "post hoc" rationalization. Those decisions were entirely consistent with and reasonably further supported the Agencies' pre-notice rationalizations for repeal.

---

[18] Plaintiffs seem to fundamentally misunderstand the nature of courts' consideration of post hoc rationalizations. *See Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (recognizing that the post hoc rationalization rule "is not a time barrier which freezes an agency's exercise of its judgment," but a rule that courts will not uphold agency action on rationales that are not provided by the agency); *see also Olivares v. Transportation Security Administration*, 819 F.3d 454, 463-64 (D.C. Cir. 2016) (finding materials disclosed *after agency action was challenged* provided sufficient explanation for agency's decision).

**IV.     To the Extent the Court Finds Fault with Either Rule, It Should Defer Ruling on Remedy.**

Should the Court find an APA violation, rather than set aside the entire NWPR or Repeal Rule, the Agencies respectfully request further briefing to the Court on any issues of remedy that may arise. Remedy issues are complex. The implications for setting aside a nationwide rule with public benefits like the NWPR are significant. And the APA does not require blanket disruption of the NWPR for the entire country, no matter what the APA infraction. *See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (deciding whether to vacate based on seriousness of agency action's deficiencies and vacatur's disruptiveness). Rather, the Court must impose a "less drastic remedy," for example "partial" vacatur of individual provisions, if "sufficient to redress respondents' injury." *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010); *see also Kentuckians for Commonwealth Inc.*, 317 F.3d at 436 (reaffirming that relief "should be no more burdensome to the defendant than necessary . . . carefully addressed to the circumstances of the case" (citations omitted)).

Plaintiffs raise a variety of challenges to the NWPR. Pls.' Br. at 27-51. Depending on the Court's findings, an appropriate remedy must be tailored to any violation. A court's "role is to vindicate the individual rights of the people appearing before it"; so a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1931, 1933-34 (2018). Congress does not expand the Article III powers of the courts through statutory provisions. *See, e.g.*, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016). So Article III's jurisdictional limits apply to the APA's general instruction that unlawful agency action "shall" be "set aside." 5 U.S.C. § 706(2). Section 706 does not supplant the Article III requirement that, "[f]or all relief sought, there must be a litigant with standing." *Town of Chester, New York v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). Thus, if a less drastic remedy "was sufficient

to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted." *Monsanto*, 561 U.S. at 165-66.

Section 706(2) also does not mandate a "depart[ure] from established principles" of equitable discretion. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). As a court acts in equity to decide only the case or controversy before it, *see id.*, an appropriate remedy must take into account the jurisdiction of and parties before other district courts, debating similar issues about the NWPR, throughout the country. "Government litigation frequently involves legal questions of substantial public importance," so "[a]llowing only one final adjudication would deprive this [Supreme] Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari." *United States v. Mendoza*, 464 U.S. 154, 160 (1984).

In particular, the Court must decline Plaintiffs' request to precipitously reinstate the 2015 Rule for any putative violation of the APA. That rule was held unlawful by two different courts after summary judgment and remanded to the Agencies. *See supra* Background B.1. Multiple other courts enjoined or stayed the 2015 Rule based on the likelihood that plaintiffs' challenges would succeed. *See id.* And reinstating the 2015 Rule would implicate the rights and claims of multiple existing and future litigants around the country. Thus, if the Court finds the NWPR or the Repeal Rule unlawful, further briefing on an appropriate remedy should be taken.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied and Defendants' cross-motion for summary judgment should be granted.

Dated: January 15, 2021.

Respectfully submitted,

JONATHAN D. BRIGHTBILL
*Acting Assistant Attorney General*


/s/ *Sonya J. Shea*
SONYA J. SHEA, Bar No. 807648
*Trial Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Telephone: (303) 844-7231
Facsimile: (303) 844-1350
Of Counsel:                                sonya.shea@usdoj.gov

DAVID FOTOUHI                 SARAH IZFAR, Bar No. 19587
Acting General Counsel              *Trial Attorney*
Environmental Protection Agency     Environment and Natural Resources Division
                                    U.S. Department of Justice
CRAIG R. SCHMAUDER              P.O. Box 7611
Deputy General Counsel              Washington, D.C. 20044
Department of Army                  Telephone: (202) 305-0490
                                    Facsimile: (202) 514-8865
DAVID COOPER                   sarah.izfar@usdoj.gov
Chief Counsel
U.S. Army Corps of Engineers        *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 15, 2021, I electronically transmitted the foregoing to the Clerk of Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to registered counsel for all parties.

/s/ Sonya J. Shea