**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CHESAPEAKE BAY FOUNDATION, INC., et al., | Civil Action Nos. 1:20-cv-01063-RDB; 1:20-cv-01064-RDB |
| Plaintiffs, | |
| v. | |
| ANDREW R. WHEELER, in his official capacity as Administrator of the United States Environmental Protection Agency, et al., | |
| Defendants, | |
| CHANTELL SACKETT; MICHAEL SACKETT | |
| Proposed Defendant-Intervenors. | |

## [PROPOSED] OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY PROPOSED DEFENDANT-INTERVENORS THE SACKETTS

Defendant-Intervenors Chantell and Michael Sackett (the Sacketts) oppose Plaintiffs' motion for summary judgment, Dkt # 35, to the extent that it challenges the definition of "adjacent wetlands" in the Navigable Waters Protection Rule (2020 Rule). Plaintiffs' claims rest on the propositions that the Federal Defendants (Agencies) engaged in discretionary decision making when they adopted the Navigable Waters Protection Rule and that they abused their discretion in so acting. This is incorrect, at least as to the 2020 Rule's revised definition of "adjacent wetlands." A plain reading of the text of the Clean Water Act, as authoritatively interpreted by the Supreme Court, precludes the Agencies from regulating wetlands that do not directly abut other regulable water bodies. The Agencies have no discretion to extend their regulations beyond that limit, and so their decision not to include most non-abutting wetlands was compelled by the statute and was

not a discretionary decision. Since as to "adjacent wetlands" it was not a discretionary decision, that provision of the Rule is not subject to remand, vacatur, or injunction based on the claims in the operable pleadings.

## STATEMENT OF THE CASE

### I.   Statutory Background.

The Clean Water Act, 33 U.S.C. § 1251, *et seq.*, regulates discharges of "pollutants" from "point sources" to "navigable waters." 33 U.S.C. §§ 1311(a), 1362(12). The Act defines "navigable waters" as "waters of the United States, including the territorial seas." *Id.* § 1362(7). The Act defines "territorial seas," but does not otherwise define "waters of the United States." *Id.* § 1362(8).

Under the Act, nonexempt discharges into "navigable waters" require a permit from either the Environmental Protection Agency (EPA) or the Army Corps of Engineers (Army), such as an Army "dredge and fill" permit under 33 U.S.C. § 1344. Dredge and fill permits substantially limit the use of property. *See* Daniel R. Mandelker, *Practicable Alternatives for Wetlands Development Under the Clean Water Act*, 48 Envtl. L. Rep. News & Analysis 10894 (Oct. 2018).

Those engaged in unpermitted, nonexempt discharges into "navigable waters" face citizen suits, administrative cease-and-desist and compliance orders, administrative penalties, civil actions for monetary civil penalties and injunctive relief, and criminal prosecution. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52–53 (1987). These severe burdens make it critically important that the regulated public knows what "navigable waters" means.

The Agencies have tried many times to define "navigable waters" over the years. In 1986, the Army adopted a regulatory definition that stretched the term "navigable waters" to include all interstate and some intrastate navigable waters, all their non-navigable tributaries, and all non-

navigable wetlands "adjacent" (broadly defined as "bordering, contiguous, or neighboring") to other regulated waters. *See* 33 C.F.R. § 328.3 (a)(7) & (c) (1987) (defining "adjacent wetlands").

## II.    The Supreme Court's *Rapanos* Decision.

The Supreme Court ruled that the 1986 Regulations were beyond the authority of the Clean Water Act in *Rapanos v. United States*, 547 U.S. 715 (2006). In *Rapanos*, a divided Court held that the tributary and adjacent wetlands provisions of the 1986 Regulations exceeded the scope of the statutory term "navigable waters." *Id.* at 715. A four-Justice plurality determined that the language, structure, and purpose of the Clean Water Act restrict federal authority over non-navigable tributaries to only those that are "relatively permanent, standing or continuously flowing bodies of water," commonly recognized as "streams, oceans, rivers and lakes." *Id.* at 739 (cleaned up). The plurality limited regulation of wetlands to those that physically abut relatively permanent and continuously flowing waters, with an immediate surface water connection making the wetland and water body "indistinguishable." *Id.* at 755.

Justice Kennedy joined the plurality in the judgment. But his concurrence proposed a broader interpretation of "navigable waters" than the plurality: the "significant nexus" test. *Id.* at 759 (Kennedy, J., concurring). Under this test, the government can regulate a wetland that does *not* abut relatively permanent waters if the wetland "significantly affect[s] the chemical, physical, and biological integrity" of a navigable-in-fact waterway. *Id.* at 779–80 (Kennedy, J., concurring). In Justice Kennedy's view, such wetlands can be regulated standing alone or combined with "similarly situated lands" within an undefined "region." *Id.* at 780 (Kennedy, J., concurring).

Both the *Rapanos* opinions that joined in the judgment agreed that the 1986 Regulations exceeded the authority of the Agencies "inasmuch as it allowed, as a matter of course, jurisdiction over wetlands adjacent to nonnavigable tributaries." *Precon Development Corp., Inc. v. U.S. Army*,

633 F.3d 278, 288 n.8 (4th Cir. 2011) (citing *Rapanos*, 547 U.S. at 739 (plurality) and *id.* at 781–82 (Kennedy, J., concurring in judgment)).

### III.    The Navigable Waters Protection Rule.

In 2015, after years of effort to address *Rapanos*, the Agencies adopted new regulations (the 2015 Rule) redefining "navigable waters." 33 C.F.R. § 328.3 (2016); 80 Fed. Reg. 37,054 (June 29, 2015). Several lawsuits challenged the 2015 Rule. On August 21, 2019, the U.S. District Court for the Southern District of Georgia ruled on summary judgment that the 2015 Rule violated the Clean Water Act. *Georgia v. Wheeler*, 418 F. Supp. 3d 1336 (S.D. Ga. 2019). A short time later, partially in response to the decision in *Georgia v. Wheeler*, the Agencies published the first regulation at issue in this case, which repealed the 2015 Regulations and re-adopted the 1986 Regulations. 84 Fed. Reg. 56,626 (Oct. 22, 2019) (the Repeal Rule, challenged in Section I of Plaintiffs' Summary Judgment Brief, Dkt # 35-1, at 9–27).

On April 21, 2020, the Agencies published the second regulation at issue in this case, the Navigable Waters Protection Rule. 85 Fed. Reg. 22,250 (Apr. 21, 2020) (the subject of Section II of Plaintiffs' Summary Judgment Brief, Dkt # 35-1 at 27–52). Among other things, the 2020 Rule defines "adjacent wetlands," 33 C.F.R. § 328.3(a)(4), as only those wetlands that abut or are flooded by other regulated waters, or that are physically separated from such waters only by natural barriers or by permeable artificial barriers. 33 C.F.R. § 328.3(c)(1).[1]

### ARGUMENT

The essence of Plaintiffs' claims is that the Agencies' selection of the narrow reading of "navigable waters" adopted by the *Rapanos* plurality over the broader reading endorsed by Justice

---

[1] Subsequent references to 33 C.F.R. § 328.3 and its subdivisions are, unless indicated otherwise, to the version published in the Federal Register on April 21, 2020, at 85 Fed. Reg. at 22,338–39, and the identical provisions at 40 C.F.R. § 120.2, published the same date at 85 Fed. Reg. at 22,340–41. 40 C.F.R. § 120.2(3)(i) corresponds to 33 C.F.R. § 328.3(c)(1).

Kennedy was a discretionary choice that required the Agencies to comply with the reasoned decision-making standards of the APA. Plaintiffs also argue that the proper interpretation of *Rapanos* is that Justice Kennedy's broader reading is controlling over the *Rapanos* plurality. Therefore, they argue, the narrower interpretation of the Act in the 2020 Rule violates the *Rapanos* concurrence and other principles.

The fundamental error in this approach is that under Supreme Court precedent for interpreting fractured decisions, the *Rapanos* plurality is controlling, and Justice Kennedy's broader reading (which is textually, constitutionally, and precedentially suspect) is not available to the Agencies or the courts as a valid interpretation of the Act. The controlling *Rapanos* plurality, at least as to non-abutting wetlands, compels the changes made to the 2020 Rule's definition of "adjacent wetlands." Thus, as to that portion of the Rule, no discretionary decision was made, and no relief is available to the Plaintiffs.

## I.    THE CLEAN WATER ACT ONLY REGULATES WETLANDS THAT DIRECTLY ABUT OTHER REGULABLE WATER BODIES.

Plaintiffs assert that the terms "navigable waters" and "waters of the United States, including the territorial seas" are to be interpreted as broadly as possible. *See* Dkt # 35-1 at 12–13. That is incorrect, as the text of the Act itself shows, as the Constitution requires, and as Supreme Court precedent dictates.

### A.    The Act's Text Limits "Navigable Waters" to Navigable-in-fact Waterways.

The Sacketts offer this brief textual analysis of the term "navigable waters" in the Act and refer the Court to the more extensive analysis submitted by their counsel during the public comment period on the 2020 Rule. *See* Roper Decl. Ex. A.

The proper interpretation of "navigable waters" begins with prior uses of the phrase in relevant statutes. *See Rapanos*, 547 U.S. at 723. For over a century, Congress regulated the

obstruction of navigation on rivers and lakes through statutes that applied to "navigable waters of the United States." *See id*. In the case of *The Daniel Ball*, the Supreme Court interpreted this term to refer to "[t]hose rivers . . . which are navigable in fact . . . [and] form . . . a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." 77 U.S. 557, 563 (1870); *see also Rapanos*, 547 U.S. at 723. In other words, "navigable waters of the United States" was limited to navigable-in-fact lakes, rivers, and streams.

In 1972, Congress adopted significant amendments to the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.*, since called the Clean Water Act. As noted above, the Act defines "navigable waters" to mean "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The terms "navigable waters" and "waters of the United States, including the territorial seas," are very close to the predecessor statutes' words "navigable waters of the United States." This evinces a congressional intent that the terms be interpreted in a closely related way. The only material variation is the Act's introduction of the term "the territorial seas." This indicates that the Act applies to navigable-in-fact waters as defined in *The Daniel Ball*, plus downstream waters to and including the territorial seas.

Nothing in the Act's definition or use of "navigable waters" extends to *non*-navigable waters upstream of or isolated from navigable-in-fact waters. Likewise, nothing in the legislative history of the Act shows that Congress "intended to exert anything more than its commerce power over navigation." *Solid Waste Agency of N. Cook Cty. v. Army Corps of Eng'rs*, 531 U.S. 159, 168 n.3 (2001) (*SWANCC*).[2] In contrast, when Congress has intended to extend its reach to waters that

_____

[2] Plaintiffs fail to acknowledge the significant constitutional limits that *SWANCC* imposes on the reading of the Clean Water Act and that decision's rejection of legislative history as a reason to read the Act broadly.

are not navigable, it has said so expressly. For instance, the Flood Control Act of 1936 claimed jurisdiction over "navigable waters or their tributaries, including watersheds thereof." Pub. L. No. 74-738, Sec. 1, 49 Stat. 1570 (June 22, 1936).

The Supreme Court has identified only one provision of the Act, 33 U.S.C. § 1344(g)(1) ("Section 404(g)(1)"), as the basis for interpreting "navigable waters" to include non-navigable wetlands abutting navigable rivers or lakes. *See United States v. Riverside Bayview Homes*, *Inc.*, 474 U.S. 121, 135–39 (1985). *But see SWANCC*, 531 U.S. at 171 (Section 404(g)(1) not dispositive of meaning of "navigable waters"); *id.* at 169 n.5 (Section 404(g)(1) falls short of congressional acquiescence in agency practice). The Supreme Court has never ruled on the precise meaning of the "other waters" provision of Section 404(g)(1), other than to hold in *Riverside Bayview*[3] that it reasonably includes wetlands immediately abutting and intermingling with navigable-in-fact creeks, 474 U.S. at 134, in *SWANCC* that it does not include isolated ponds, 531 U.S. at 171–72, and in *Rapanos* that the Act does not encompass all non-navigable tributaries or adjacent wetlands broadly defined, 547 U.S. at 734; *id.* at 787 (Kennedy, J., concurring in judgment).

The analysis attached as Exhibit A to the Roper Declaration further shows that reading Section 404(g)(1) in conjunction with Section 10 of the Rivers and Harbors Act precludes a broad reading of the Act as allowing regulation of non-abutting wetlands. The analysis reinforces this conclusion by noting the uses of different terms for various sets of waters that the Act treats in different ways, the Act's protection of water rights established under state law, and the Supreme Court's reading of the Act in *Riverside Bayview*, *SWANCC*, and *Rapanos*.

---

[3] Plaintiffs are incorrect that *Riverside Bayview* held that the Act must be read broadly. *See* Dkt # 35-1 at 13, 20. The decision discussed the issue, but its holding is limited to affirming the Army's decision to regulate shoreline wetlands that directly abutted navigable-in-fact creeks where it was difficult to say where the creek ended and the wetland began. *Riverside Bayview*, 474 U.S. at 134.

All of this is to say that a rigorous textual analysis of the statute shows that the proper reading of "navigable waters" is a narrow one that includes navigable-in-fact waterways and their downstream waterways, but does not include non-abutting wetlands. This textual reading is close to that of the *Rapanos* plurality, which limited regulation of non-navigable tributaries to relatively permanent and continuously flowing water bodies which a person of ordinary experience would call a "stream." The plurality also limits regulation of "adjacent wetlands" to those affirmed in *Riverside Bayview* and emphasized that the necessary connection to meet this standard was intermingling, to the point where it is difficult to say where the creek ends and the wetland begins. *Rapanos*, 547 U.S. at 742; *id*. at 741 n.10.

### B.    The Constitution Requires a Narrow Reading of "Navigable Waters."

The interpretation of "navigable waters" is subject to constitutional constraints. Under the canon of constitutional avoidance, this Court should interpret the Act to avoid giving it a constitutionally suspect meaning. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) ("When 'a serious doubt' is raised about the constitutionality of an act of Congress, 'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" (quoting *Crowell v. Benson,* 285 U.S. 22, 62 (1932))).[4] Any interpretation that would extensively regulate a wide range of non-abutting wetlands raises issues under the Commerce Clause, the Tenth Amendment, and the Non-Delegation Doctrine.

### 1.    The Commerce Clause and Tenth Amendment Limit Agency Regulation of Non-abutting Wetlands.

---

[4] The canon of constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Id.* (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005)). As demonstrated elsewhere in this brief the term "navigable waters," as it is used in the Act is not ambiguous. *See supra* Section I.A; *infra* Part II. But even assuming it were, the canon of constitutional avoidance instructs that this Court should not adopt the Plaintiffs' broad reading of "navigable waters."

The Supreme Court held in *SWANCC* that the Act lacks a "clear statement" of congressional intent to exercise the Commerce Power to its outer limits. 531 U.S. at 172–74. Further, the legislative history of the Act only supports the Act's exercise of the Commerce Power over its traditional object: the transport of goods in interstate commerce through navigation. *Id.* at 168 & n.3. Any reading of "navigable waters" that authorizes regulation substantially beyond waters used to transport interstate commerce would violate the Clear Statement Rule. *See SWANCC*, 531 U.S. at 172 ("Where an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result.").

Similarly, a broad reading of "navigable waters" would violate the Tenth Amendment's reservation of powers to the states, including traditional authority over land use and water resource allocation, which are expressly recognized and protected in the Act. 33 U.S.C. § 1251(b); *see also* Gary E. Parish & J. Michael Morgan, *History, Practice and Emerging Problems of Wetlands Regulation: Reconsidering Section 404 of the Clean Water Act*, 17 Land & Water L. Rev. 43, 84 (1982) ("The existing [regulation] looks and has an effect similar to a program of federal land use control. There should be little doubt that Congress did *not* intend such a result.").

These constitutional concerns are exemplified by the Sacketts' property, which was claimed by EPA to be within the reach of the agencies' prior (i.e., before the 2020 Rule) regulatory definition of "adjacent wetlands." Sackett Decl. ¶¶ 7, Exs. A & B. But the Sacketts' vacant lot has no connection to any use of a water for the transport of goods in interstate commerce. *Id.* ¶¶ 3–4. EPA's regulation of building on the lot also directly conflicts with local land use administration. The Sacketts obtained all required local authorization to build; EPA's action directly countermands that decision, by deciding that no home would be allowed there. *Id.* ¶¶ 3–6. A federal veto of local land use permitting is exactly what *SWANCC* says the Act may not be interpreted to allow. *See*

*SWANCC*, 531 U.S. at 172. In contrast, the 2020 Rule more fully respects the Commerce Power and Tenth Amendment limits on federal control over land use by abandoning the Agencies' previously illegal assertion of regulatory authority over non-abutting wetlands. *Id.* ¶¶ 14–16.

### 2. The Non-Delegation Doctrine Also Limits Agency Regulation of Non-abutting Wetlands.

A broad interpretation of "navigable waters" also raises non-delegation concerns that this Court should avoid by interpreting the Act narrowly. Under the non-delegation doctrine Congress may not delegate legislative rulemaking authority to executive agencies without providing an "intelligible principle" to guide the agency. *See Panama Refining Co. v. Ryan*, 293 U.S. 288, 414–16 (1935); *A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495, 529-32 (1935). If Plaintiffs have correctly interpreted the Act as allowing the Agencies to regulate an ill-defined portfolio of non-abutting wetlands, then this is not a legal question any longer: it is a policy debate about where to draw the line of federal regulation. This debate has roiled the Agencies, the courts, the academy, the regulated public, and NGOs since the mid-1970s.

The difficulty in determining where to set the outer limit of regulation along the continuum from "navigable-in-fact only" to "all waters, no matter how remote or insignificant," is that the Act is utterly silent on that rather important question. Not one word in the Act offers any direction or principle to determine how small or remote or slightly connected a non-navigable non-abutting wetland may be and still be regulated. Likewise, the Act provides no guidance on the policy question of how many or what type of non-abutting wetlands should be regulated under the Act. It does not identify any facts that the agencies should investigate or determine in order to address that policy question, nor does it provide any direction on how those facts should be determined or weighted. *See Gundy v. United States*, 139 S. Ct. 2116, 2135-42 (2019) (Gorsuch, J., dissenting);

*id.* at 2130-31 (Alito, J., concurring); *Paul v. United States*, 140 S. Ct. 342 (2019) (statement of Kavanaugh, J., respecting denial of certiorari).

As a result, to the extent that "navigable waters" is interpreted to include an extensive catalog of different categories of non-navigable waters (including some but not all non-abutting wetlands and ephemeral drainages), the Act provides no "intelligible principle" for determining which non-navigable waters are included. Because this would violate the non-delegation doctrine, the Court should decline to adopt a broad reading of the term.

## II.   UNDER THE CONTROLLING PLURALITY OPINION IN *RAPANOS*, THE 2020 RULE'S DEFINITION OF "ADJACENT WETLANDS" IS REQUIRED.

*Rapanos* is the best Supreme Court authority on whether wetlands that do not abut navigable-in-fact rivers and lakes are federally protected "navigable waters" under the Clean Water Act. Since *Rapanos* has no majority opinion, this Court must determine which opinion controls. The correct answer is the plurality opinion.

### A.   In *Rapanos*, A Divided Court Limited the Clean Water Act's Application to Wetlands.

The issue in *Rapanos* was how to interpret whether "navigable waters" include wetlands that do not physically abut navigable-in-fact waterways. 547 U.S. at 728; *see also id*. at 759 (Kennedy, J., concurring). The Supreme Court's judgment vacated and remanded the case because the lower courts and the Agencies had not properly interpreted that term. *Id*. at 757. However, the five Justices supporting the judgment adopted different but concentric interpretations.

The four-Justice plurality determined that the language, structure, and purpose of the Act limit federal authority over non-navigable tributaries to "relatively permanent, standing or continuously flowing bodies of water" commonly recognized as "streams[,] . . . oceans, rivers, [and] lakes" connected to traditional navigable waters. *Id*. at 739. The plurality then limited

regulation of wetlands under the Act to only those wetlands that physically abut such waters, where wetland and water are "indistinguishable." *Id*. at 755.

The plurality sharply critiqued "the breadth of the [Army] Corps' determinations in the field" and especially its continued reliance on an expansive interpretation of "adjacent" waters. *Id*. at 727. It emphasized that in defining "navigable waters" as "*waters* of the United States," the Clean Water Act did not include all "*water* of the United States" but instead could only refer to "continuously present, fixed bodies of water." *Id*. at 732-33. The plurality further explained that the definition of "waters of the United States" must be rooted in the traditional understanding of "navigable waters." *Id*. at 734. As for wetlands, the plurality reiterated that the Act regulates "only those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters and wetlands.'" *Id*. at 742.

Justice Kennedy concurred in the judgment but interpreted the Act more broadly than the plurality. He shared the plurality's concern that an overly broad interpretation of the Act would read "navigable" out of the text, and he disagreed that the Act covers "wetlands [that] lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters." *Id*. at 778 (Kennedy, J., concurring). Instead, he proposed that to be regulated under the Act, non-navigable waters must have a "significant nexus with navigable waters." *Id*. at 779. Under this "significant nexus" test, wetlands are regulable if "either alone or in combination with similarly situated lands in the region, [they] significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id*. at 780. He emphasized that this connection must not be "speculative or insubstantial." *Id*.

**B.      The Supreme Court Has Adopted the *Rapanos* Plurality as the Controlling Opinion, as Shown Most Recently in *County of Maui*.**

In April 2020, the Supreme Court clearly showed that it reads the *Rapanos* plurality as the controlling opinion. In *County of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020), the Court addressed the question of whether, under the Clean Water Act, the movement of a pollutant from an injection well (a point source) through groundwater (not a point source) to the ocean (a navigable water) is a regulated "discharge." *Id.* at 1468. Although that question does not directly bear on this case, the Court's application of *Rapanos* is determinative here.

In deciding *County of Maui*, the Court issued four separate opinions: a six-Justice majority opinion authored by Justice Breyer, *id.* at 1468–78, a concurrence by Justice Kavanaugh, *id.* at 1478–79 (Kavanaugh, J., concurring), and two separate dissents, one by Justice Thomas (joined by Justice Gorsuch), *id.* at 1479–82 (Thomas, J., dissenting), and one by Justice Alito, *id.* at 1482–92 (Alito, J., dissenting). All four opinions cite the *Rapanos* plurality, and all four opinions apply its discussion of point sources under the Act in evaluating whether pollutants moving through groundwater to the ocean constitute a regulable discharge. *See id.* at 1475 (citing *Rapanos*, 547 U.S. at 743) (stating that nothing in the Clean Water Act requires that a pollutant move "directly" or "immediately" from its origin to navigable waters); *id.* at 1478 (Kavanaugh, J., concurring) (concluding that the majority reading of "discharge" "adheres to the interpretation set forth in Justice Scalia's plurality opinion in *Rapanos*"); *id.* at 1482 (Thomas, J., dissenting) (concluding that the *Rapanos* plurality opinion does not decide the precise issue presented in *County of Maui*); *id.* at 1487 n.5 (Alito, J., dissenting) (concluding that the *Rapanos* plurality opinion supports "daisy chaining" point sources). Every Justice joined at least one of these opinions elaborating on the *Rapanos* plurality, with Justice Kavanaugh both joining the majority and writing separately on the role of the *Rapanos* plurality in the *County of Maui* decision.

While the four opinions disagreed about how the *Rapanos* plurality opinion applied to the specific issue in *County of Maui* (namely, the definition of "discharge"), they all agreed that it was the only *Rapanos* opinion that mattered. None of the *County of Maui* opinions cited or relied on either the *Rapanos* concurrence or the dissent. Thus, when deciding the scope of the Act in *County of Maui*, every member of the Supreme Court looked only to the *Rapanos* plurality opinion.

This is consistent with and grows organically from the Supreme Court's prior citations to *Rapanos*. Before *County of Maui*, *Rapanos* was cited in opinions in nine Supreme Court cases. In *all* of those opinions, the author cited the *Rapanos* plurality opinion. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 706 (2006) (Scalia, J., dissenting); *Exxon Shipping v. Baker*, 554 U.S. 471, 508 n.21 (2008); *Kucana v. Holder*, 558 U.S 233, 253 (2010); *PPL Montana, LLC v. Montana*, 565 U.S. 576, 592 (2012); *Sackett v. EPA*, 566 U.S. 120, 123 (2012); *id.* at 133 (Alito, J., concurring); *Abramski v. United States*, 573 U.S. 139, 198 (2014) (Scalia, J., dissenting); *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 268 (2015); *Army Corps v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1811-12, 1815 (2016); *National Ass'n of Mfrs. v. Department of Defense*, 138 S. Ct. 617, 625, 633 (2018). By contrast, the Court has only cited Justice Kennedy's *Rapanos* concurrence once, in an opinion by Justice Kennedy—and even then the citation immediately followed a citation to the plurality opinion. *See PPL Montana*, 565 U.S at 592 (citing *Rapanos*, 547 U.S. at 730-31 and *id.* at 761 (Kennedy, J., concurring in judgment)). The Sacketts' research reveals no Supreme Court citation to the *Rapanos* dissent.

This pattern of adopting and relying on the *Rapanos* plurality opinion can be seen most clearly in the Supreme Court's post-*Rapanos* cases that address questions arising under the Clean Water Act. *See Sackett*, 566 U.S. at 123; *id.* at 133 (Alito, J., concurring); *Hawkes Co.*, 136 S. Ct. at 1811-12, 1815; *National Ass'n of Mfrs.*, 138 S. Ct. at 625, 633. And as noted above, this pattern

culminated in *County of Maui*, in which all four opinions debated how the *Rapanos* plurality opinion applies to the definition of "discharge." Notably, *none* of the Supreme Court's post-*Rapanos* Clean Water Act cases cite either Justice Kennedy's concurrence or the dissent.

Based on the Supreme Court's consistent and clear adoption of the *Rapanos* plurality and its interpretation of the Act's text as clearly excluding non-abutting wetlands, the Rule's exclusion of wetlands that do not abut regulated waters was not merely an exercise of agency discretion, but is required by the unambiguous text of the Clean Water Act. *Rapanos*, 547 U.S. at 741 (excluding non-navigable wetlands from Clean Water Act authority unless they abut regulated tributaries so closely that the end of one and the beginning of the other cannot be clearly discerned).

### C.     *County of Maui* **Supersedes Fourth Circuit Decisions Discussing** *Rapanos***.**

There is no precedential Fourth Circuit decision on the question of which of the *Rapanos* opinions controls, so this Court is free to adopt the *Rapanos* plurality as the holding of the case based on the Sacketts' arguments above.

The Fourth Circuit has applied Justice Kennedy's concurrence in three cases, based on the agreement of the parties. In *Precon Development Corp., Inc. v. U.S. Army*, 633 F.3d 278, 288 (4th Cir. 2011), the Fourth Circuit applied Justice Kennedy's concurrence, but only because all parties agreed that it was the applicable test. When *Precon* returned to the Fourth Circuit following remand, that Court again applied the Kennedy concurrence in an unpublished opinion, based on the law of the case doctrine. *Precon v. U.S. Army*, 603 Fed. App'x 149, 150 & n.3 (4th Cir. 2015). Similarly, in *Deerfield Plantation Phase II-B Property Owners Ass'n, Inc., v. U.S. Army*, 501 Fed. App'x 268 (4th Cir. 2012), the parties agreed that if either test was satisfied, the features in question would be regulable. *Id*. at 273. None of these cases decide which *Rapanos* opinion is controlling, and two of the three are unpublished in any event.

The only Fourth Circuit decision to state that Justice Kennedy's concurrence is controlling was subsequently vacated by the Supreme Court, following its above-discussed decision in *County of Maui*. *See Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637, 649 n.10 (4th Cir. 2018), *vacated and remanded*, 140 S. Ct. 2736 (2020). Moreover, *Upstate Forever* relied exclusively and without other analysis on a Ninth Circuit decision, *U.S. v. Robertson*, 875 F.3d 1281 (9th Cir. 2017), for the proposition that Justice Kennedy's concurrence controls. But the Supreme Court also vacated *Robertson*. 139 S. Ct. 1543 (2019). With both *Upstate Forever* and *Robertson* vacated by the Supreme Court, there are no Fourth Circuit precedential decisions on the question of which *Rapanos* opinion controls.

## D.   Under *Marks v. United States*, the Plurality Opinion Is the Holding of *Rapanos*.

Even absent the Supreme Court's clear and progressively more robust adoption of the *Rapanos* plurality opinion, this Court can identify the plurality opinion as the holding of *Rapanos* by applying the test laid out in *Marks v. United States*, 430 U.S. 188 (1977).

### 1.   The Controlling Opinion Is the One That Is a "Logical Subset" of the Other.

In *Marks*, the Supreme Court stated that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" 430 U.S. at 193 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). Applying that standard to *Rapanos* requires that the plurality opinion be taken as the holding.

As discussed above, the Fourth Circuit has not decided in a precedential opinion which of the *Rapanos* opinions, if any, is the holding of the case. However, the Fourth Circuit has addressed

how it applies *Marks*; specifically, it has adopted the approach taken by the D.C. Circuit in *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc). *See A.T. Massey Coal Co., Inc. v. Massanari*, 305 F.3d 226, 236 (4th Cir. 2002) (quoting *Ass'n of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1254 (D.C. Cir. 1998) (quoting *King v. Palmer*, 950 F.2d at 781)). Under the Fourth-Circuit-adopted *King* approach to *Marks*, there is no holding unless "the narrowest opinion represents a 'common denominator of the Court's reasoning' and 'embod[ies] a position implicitly approved by at least five Justices who support the judgment.'" *Massey Coal*, 305 F.3d at 236 (quoting *Apfel*, 156 F.3d at 1254 (quoting *King v. Palmer*, 950 F.2d at 781)). Under the *King* approach, and contrary to Plaintiffs' arguments, *see* Dkt 35-1 at 40, a court is not "free to combine a dissent with a concurrence to form a *Marks* majority." *King*, 950 F.2d at 783.

The relevant question is which opinion supporting the judgment—the *Rapanos* plurality or the concurrence—"is the logical subset of [the] other." *Massey Coal*, 305 F.3d at 236. The answer to that question dictates the outcome of this matter. And in answering that question, this Court should start with what the judgment actually did in *Rapanos*. After determining that the lower courts had not applied a proper definition of "navigable waters," the Court remanded *Rapanos* to the Sixth Circuit for further proceedings. 547 U.S at 757. The Supreme Court did not decide the merits of the case; the only question it really addressed was "what does 'navigable waters' or 'waters of the United States' mean in the Clean Water Act?"[5] The holding of *Rapanos*, therefore, is the opinion that is the logical subset of the other as to the meaning of "navigable waters."

---

[5] Both the plurality and Justice Kennedy's concurrence show this. *See* 547 U.S. at 729 ("In these consolidated cases, we consider whether four Michigan wetlands . . . constitute 'waters of the United States' within the meaning of the Act."); *id.* at 759 (Kennedy, J., concurring) ("These consolidated cases require the Court to decide whether the term 'navigable waters' in the Clean Water Act extends to wetlands that do not contain and are not adjacent to waters that are navigable in fact.").

This approach accords with *Marks*, in which the Supreme Court applied its prior fractured decision in *Memoirs v. Massachusetts*, 383 U.S. 413 (1966). *See Marks*, 430 U.S. at 193–94 (discussing *Memoirs*). *Memoirs* was a split decision, with three Justices stating that the First Amendment protected pornographic material unless it met three tests. 383 U.S. at 418. Two other Justices would read the First Amendment more broadly to protect all obscene material without limit. *Id.* at 421, 424 (Black and Douglas, JJ., concurring). The Supreme Court said in *Marks* that the narrower reading of the applicable constitutional provision—i.e., the opinion that was a logical subset of the other—was the controlling opinion. *Marks*, 430 U.S. at 193. Similarly, a "logical subset" approach to applying *Marks* to *Rapanos* must look at how broadly or narrowly the two opinions supporting the judgment interpret the applicable statutory provision.

### 2. The *Rapanos* Plurality Opinion is a "Logical Subset" of the Concurrence as to the Definition of "Navigable Waters."

In *Rapanos*, a majority of the Supreme Court decided that the term "navigable waters" in the Clean Water Act was narrower than agency regulations defining the term. 547 U.S. at 724, 734 ("The plain language of the statute simply does not authorize this 'Land Is Waters' approach to federal jurisdiction."); *id*. at 759 (Kennedy, J., concurring) (concluding that the lower court did not apply the proper standard to determine whether the Clean Water Act applies to wetlands not abutting navigable waters). The Justices supporting the judgment adopted concentric rationales. Four Justices joined in an opinion that interprets "navigable waters" narrowly, while Justice Kennedy interpreted the term "navigable waters" more broadly, but in a way that included all the waters that the plurality would allow regulation of.

The key point of departure between them was the plurality's narrow reading of the term "significant nexus" (as describing only the type of physical intermingling that prevented a clear distinction between the waters and the wetlands) and Justice Kennedy's broad reading of it (as

categorically encompassing not only wetlands that are physically intermingled, in accord with the plurality, but also encompassing other wetlands on a case-by-case basis—an approach with which the plurality disagreed). *Compare Rapanos*, 547 U.S. at 754–55 (disagreeing with Justice Kennedy's broad reading of "significant nexus"), *with id.* at 774 (Kennedy, J., concurring) (opining that Supreme Court precedent does not limit jurisdictional wetlands to physically abutting jurisdictional tributaries). As shown in more detail below, when it comes to the regulation of wetlands, the plurality opinion's position is a "logical subset" of Justice Kennedy's.

The plurality concluded that the application of the term "navigable waters" to a wetland requires a two-part inquiry:

> [E]stablishing that wetlands . . . are covered by the Act requires two findings: first, that the adjacent channel contains a "wate[r] of the United States," (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the "water" ends and the "wetland" begins.

*Rapanos*, 547 U.S. at 742. And for the plurality, the term "body of water" is limited to lakes, streams, and rivers. *Id.* at 732–33.

Justice Kennedy's concurrence agreed with several important aspects of the plurality opinion. For example, he agreed that the term being interpreted was "navigable waters," 547 U.S. at 760 (Kennedy, J., concurring), and that the issue was whether wetlands that do not directly abut such waters are nonetheless regulable, *id.* at 759 (Kennedy, J., concurring). And both the plurality and Justice Kennedy agreed that wetlands that abut traditionally navigable waters are the outer scope of the term "adjacent." *Id.* at 740–41 & n.10; *id.* at 759 (Kennedy, J., concurring) (addressing "whether the term 'navigable waters' in the Clean Water Act extends to wetlands that do not contain and are not adjacent to waters that are navigable in fact"). Justice Kennedy also expressed important points of commonality with the plurality's reasoning. "The plurality's opinion begins

19

from a correct premise," which is that the Act regulates "at least some waters that are not navigable in the traditional sense." *Id.* at 767 (Kennedy, J., concurring).

But Justice Kennedy criticized the plurality, *id.* at 768 (Kennedy, J., concurring), for identifying two limitations to the Act: first, that the water adjacent to the wetland must be "a relatively permanent body of water connected to traditional interstate navigable waters"; and second, that the wetland must have "a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." 547 U.S. at 742.

As to relative permanence ("the plurality's first requirement"), Justice Kennedy viewed the plurality's reading of the Court's prior decision in *Riverside Bayview*, as too narrow. *Rapanos*, 547 U.S. at 771 (Kennedy, J., concurring). Justice Kennedy concluded that the Army could reasonably construe the term "waters" more broadly to include not only the "permanent streams" accepted by the plurality, but also "impermanent streams." *Id.* at 770 (Kennedy, J., concurring).

Turning to "[t]he plurality's second limitation," Justice Kennedy disagreed that *Riverside Bayview* limits the scope of wetlands included within the term "navigable waters" to just those which abut navigable waters so closely that they cannot be distinguished, or even that there must be a continuous surface connection. *Id.* at 772–73 (Kennedy, J., concurring). Justice Kennedy likewise disagreed with the plurality's reading of *SWANCC*, as requiring a surface connection between wetlands and navigable waters. *Id.* at 774 (Kennedy, J., concurring). Ultimately, in contrast to the plurality, Justice Kennedy concluded that the Army's broader definition of non-abutting but still "adjacent" wetlands would be reasonable if limited to those wetlands with a significant nexus. *Id.* at 775 (Kennedy, J., concurring).

In short, Justice Kennedy's concurrence agreed that those waters that the plurality generally considers "navigable" are clearly covered by the Act. But Justice Kennedy's view was that the

plurality read the statute, *Riverside Bayview*, and "significant nexus" as used in *SWANCC*, too narrowly. In his view, the Clean Water Act reaches beyond the plurality's limitations. As to wetlands, Justice Kennedy agreed with the plurality that those wetlands which abut covered tributaries so closely that they cannot easily be distinguished are categorically covered by the Act, because they have a "significant nexus" to the covered waters. *Id*. at 780 (Kennedy, J., concurring). Whereas the plurality would limit covered wetlands to this category, for Justice Kennedy they are a subset of the broader group of "adjacent" waters (as broadly defined by the Agencies) to which he would find the Act applicable on a case-by-case basis. Thus, the relatively permanent tributaries and directly abutting wetlands covered by the plurality's rule are a logical subset of Justice Kennedy's broader reading of "navigable waters." So, following the logical subset approach to applying *Marks*, as required in this Circuit, the *Rapanos* plurality's reading of "navigable waters" is a logical subset of Justice Kennedy's and is therefore the holding of the case.

## III. PLAINTIFFS' APA-BASED CLAIMS ARE UNAVAILING BECAUSE PROCEDURAL DEFICIENCIES CANNOT REVERSE A NON-DISCRETIONARY AGENCY DECISION.

Plaintiffs mistakenly argue that because the Agencies did not provide a "reasoned explanation" for excluding non-abutting wetlands from the Rule, and did not sufficiently consider water quality impacts in doing so, the rule is arbitrary and capricious under the APA. *See* Dkt # 35-1 at 56–61. As to the definition of "adjacent wetlands," Plaintiffs' objections are unavailing.

As discussed above, the Agencies' exclusion of non-abutting wetlands was compelled by the plain language of the Clean Water Act, Supreme Court precedent, and the U.S. Constitution. Under the controlling plurality opinion in *Rapanos*, the language of the Act limits the regulation of wetlands to those that directly abut other regulated water bodies. *Rapanos*, 547 U.S. at 755. And the Agencies' decision to exclude non-abutting wetlands was required under the U.S. Constitution,

since including non-abutting wetlands would violate various constitutional provisions and doctrines. *See supra* Section I.B. Any alleged procedural deficiencies in the rulemaking process therefore could not have affected the Agencies' non-discretionary exclusion of non-abutting wetlands from Federal authority, and Plaintiffs' arguments that the Rule was promulgated in violation of the procedural requirements of the APA must fail.

Procedural or factual infirmities in agency decision-making will not affect the lawfulness of non-discretionary agency action. *See* Kevin M. Stack, *The Constitutional Foundations of Chenery*, 2007 Yale L.J. 952, 965–66 ("As Judge Friendly put it, '[W]hen agency action is statutorily compelled, it does not matter that the agency which reached the decision required by law did so on a debatable or even a wrong ground, for remand in such a case would be but a useless formality.'") (quoting Henry J. Friendly, *Chenery Revisited: Reflections on the Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199, 210). This general principle applies within the broader context of administrative law, as illustrated by three applications.

First, the *Chenery* doctrine, which provides that an agency may not defend an administrative decision on different grounds than those on which the decision was originally based, is inapplicable where the decision was compelled by law. *See Koyo Seiko Co. v. United States*, 95 F.3d 1094, 1099–1102 (Fed. Cir. 1996) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). Thus, in *Koyo Seiko*, the Federal Circuit declined to apply *Chenery* and affirmed a Commerce Department antidumping proceeding on grounds other than those in the agency's record, concluding that the decision was compelled by statute. *Id*. The court held that there can be no application of the *Chenery* doctrine where the "the sole issue is one of statutory construction," the "plain language of the statute compels the conclusion," and the conclusion does not "implicate the exercise of agency discretion." *Id*. at 1101; *see also Ark. AFL-CIO v. Fed. Commc'ns Comm'n*,

11 F.3d 1430, 1440 (8th Cir. 1993) (court may find additional bases "for a correct legal result" beyond those offered by the agency; "the Supreme Court clearly limited *Chenery* to situations in which the agency failed to make a necessary determination of fact or of policy." (citing *Chenery*, 318 U.S. at 88)). Likewise, the 2020 Rule's definition of adjacent wetlands is compelled by the Act. As such, the adjacent wetlands provision of the Rule must be upheld under the text of the Clean Water Act, irrespective of the reasoning set forth by the Agencies.

Second, in reviewing ALJ decisions, several courts have held that remand "is unnecessary . . . '[w]here application of the correct legal standard could lead to only one conclusion.'" *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (affirming an agency decision in a social security appeal despite factual errors in the ALJ's conclusions (quoting *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998))); *Kang v. Attorney General*, 611 F.3d 157, 167-68 (3d Cir. 2010) (refusing to remand to the Board of Immigration Appeals where "application of the correct legal principles" would not alter the legal conclusions reached by the court). Likewise, remanding the adjacent wetlands provisions of the 2020 Rule to the Agencies for the further proceedings that Plaintiffs claim are required by the APA would lead to an identical result: the exclusion of non-abutting wetlands, as required by the Act and the Constitution.

Third, although "[a]n administrative remand may be appropriate when an agency procedurally errs by failing to articulate a reasoned basis for its decision[,] . . . [w]hen an agency legally errs by acting outside its statutory authority, a remand would be futile and improper." *Union Pacific R.R. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885, 901 (8th Cir. 2013). In *Union Pacific*, the Eighth Circuit refused to remand a Customs decision because the agency had plainly exceeded its statutory authority, and a court "simply will not remand '[w]here application of the correct legal standard could lead to only one conclusion.'" *Id.* (quoting *Zabala*, 595 F.3d at 409).

Although *Union Pacific* involved reversing rather than upholding an agency decision, it stands for the same fundamental principle: remand to the agency to correct procedural infirmities is inappropriate where the matter is resolved by a legally compelled conclusion.

The general principle established in these cases recognizes that it is inappropriate to set aside or remand a non-discretionary action, such as a legally compelled regulatory interpretation of a statute, to the administrative process.[6] Therefore, Plaintiffs' APA claims fail as to the 2020 Rule's non-discretionary definition of adjacent wetlands.

## IV. THE SACKETTS HAVE STANDING TO DEFEND THE RULE

The Sacketts have standing to defend the adjacent wetlands provision of the Rule. An intervenor may demonstrate standing via the standard constitutional inquiry—by proving "injury-in-fact," causation, and redressability. *See Doe v. Public Citizen*, 749 F.3d 246, 262 (4th Cir. 2014) (quoting *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 12 (2004)).

As noted by the D.C. Circuit (where circuit authority requires standing for defendant-intervenors), a defendant-intervenor demonstrates "a sufficient injury in fact where . . . [the defendant-intervenor] benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit." *Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 317 (D.C. Cir. 2015). That is precisely the case with the Sacketts. Starting in 2008, EPA has claimed regulatory authority over the Sacketts' residentially zoned vacant lot on the grounds that it contains features regulated as "adjacent wetlands" under

---

[6] Arguments under *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1911 (2020) are inapplicable to the 2020 Rule's nondiscretionary exclusion of non-abutting wetlands from the definition of "navigable waters." *See* Dkt # 35-1 at 59. Unlike the agency decision at issue in *Regents*, the exclusion of non-abutting wetlands from federal authority did not involve any subsequent "policy choices" or the exercise of "discretionary authority." *See Regents of Univ. of Cal.*, 140 S. Ct. at 1910–11. Instead, the 2020 Rule simply follows the Clean Water Act's unambiguous command to exclude non-abutting wetlands from federal authority.

the 1986 Regulations. *See* Sackett Decl. ¶¶ 7–13, Exs. A & B. As a result, the Sacketts have been unable to build a home on their lot for the last thirteen years. Sackett Decl. ¶¶ 11–13. But under the 2020 Rule's revised definition of "adjacent wetlands," the Sacketts' property is excluded from agency authority under the Act. *See* 33 C.F.R. § 328.3(c)(1); Sackett Decl. ¶¶ 3–4; 14–15, Exs. A & B (establishing that the Sacketts' lot has no surface water connection to any other surface water and is separated from the closest surface water by an impermeable artificial barrier). The 2020 Rule therefore affords the Sacketts significant regulatory relief and benefit. *See* Sackett Decl. ¶ 16.

But the Plaintiffs' challenge to the 2020 Rule, if successful, would remove that relief and reinitiate the Sacketts' injuries anew. *See* Complaint, *Chesapeake Bay Found., Inc. v. Wheeler*, 1:20-cv-01064 (D. Md. Apr. 27, 2020), Dkt # 1 at 37 (seeking vacatur of the 2020 Rule). Should the 2020 Rule be vacated, one outcome would be the immediate revival of the regulations in effect in 2008 and the return of the Sacketts' property to EPA's asserted regulatory dominion. And since EPA's jurisdictional determination regarding the Sacketts' property remains in effect, this injury is certain and immediate. Sackett Decl. ¶ 13. The revival of the prior rules would therefore have an immediate negative effect on the Sacketts' ability to use and enjoy their private property and would remove the benefit to the Sacketts of the 2020 Rule. *See* Sackett Decl. ¶ 17–19.

These injuries are directly traceable to the Plaintiffs' lawsuit and would be redressed through a judgment in favor of Defendants, which would permit the regulatory relief afforded the Sacketts by the 2020 Rule to remain in effect. *See Crossroads Grassroots Policy Strategies*, 788 F.3d at 316 (under similar circumstances, if a defendant-intervenor "can prove injury, then it can establish causation and redressability").

## CONCLUSION

Plaintiffs' motion for summary judgment must be denied.

DATED:  January 15, 2021.

Respectfully Submitted,

/s/ Glenn E. Roper
GLENN E. ROPER
D. Md. No. 21382
Pacific Legal Foundation
1745 Shea Center Dr., Suite 400
Highlands Ranch, CO 80129
Telephone:  (916) 419-7111
Email:  geroper@pacificlegal.org

ANTHONY L. FRANÇOIS*
Cal. Bar No. 184100
CHARLES T. YATES*
Cal. Bar No. 327704
Pacific Legal Foundation
930 G Street
Sacramento, CA 95814
Telephone:  (916) 419-7111
Email:  afrancois@pacificlegal.org
Email:  cyates@pacificlegal.org

*Attorneys for Proposed Defendant-Intervenors
Chantell and Michael Sackett*

* *pro hac vice* motions pending

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 15, 2021, I filed and thereby caused the foregoing document to be served via the CM/ECF system in the United States District Court for the District of Maryland on all parties registered for CM/ECF in the above-captioned matter.

/s/ Glenn E. Roper
GLENN E. ROPER